Harley I. Lewin
McCarter & English, LLP
245 Park Avenue, 27th Floor
New York, NY  10167
Tel: (212) 609-6800
Fax: (212) 609-6921
hlewin@mccarter.com

Lee Carl Bromberg
McCarter & English, LLP
265 Franklin Street
Boston, MA  02110
Tel:  617-449-6500
Fax:  617-443-6161
lbromberg@mccarter.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CHRISTIAN LOUBOUTIN S.A.; CHRISTIAN LOUBOUTIN, L.L.C.; and CHRISTIAN LOUBOUTIN, <br><br> Plaintiffs, <br><br> v. <br><br> YVES SAINT LAURENT AMERICA, INC.; YVES SAINT LAURENT AMERICA HOLDING, INC.; YVES SAINT LAURENT S.A.S.; YVES SAINT LAURENT (an unincorporated association); JOHN AND JANE DOES A-Z (UNIDENTIFIED); and XYZ COMPANIES 1-10 (UNIDENTIFIED), <br><br> Defendants. | **CIVIL ACTION NO.:** <br><br> **COMPLAINT AND JURY DEMAND** |

## COMPLAINT

Plaintiffs, Christian Louboutin S.A., Christian Louboutin, L.L.C. and Christian Louboutin ("Plaintiffs"), as and for their Complaint state as follows:

### JURISDICTION AND VENUE

1.      This is an action for injunctive relief and damages for trademark infringement, unfair competition and false designation of origin, and trademark dilution arising under the Trademark Act of 1946, 15 U.S.C. §§ 1051, *et seq*., as amended by the Trademark Dilution Revision Act, Pub. L. No. 109-312 (Oct. 6, 2006) and the Prioritizing Resources and Organization for Intellectual Property Act of 2008, Pub. L. No. 110-403 (Oct. 13, 2008) (collectively, the "Lanham Act"), and for trademark infringement, trademark dilution, unfair competition, and deceptive acts and practices under the laws of the State of New York and common law.

2.      This Court has original jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, and 1338(a)-(b) and 15 U.S.C. §§ 1116 and 1121.  This Court has jurisdiction pursuant to the principles of supplemental jurisdiction and 28 U.S.C. § 1367 over Plaintiffs' claims for trademark infringement, trademark dilution, unfair competition, and deceptive acts and practices under the laws of the State of New York and common law.

3.      This Court has personal jurisdiction over Defendants Yves Saint Laurent America, Inc. and Yves Saint Laurent America Holding, Inc. in that such Defendants have a principal place of business in New York, New York.

4.      This Court has personal jurisdiction over all of the Defendants in that they distribute, promote and sell the footwear that is the subject of this Complaint in retail stores located in this District and via a website that is accessible and sells directly to consumers in this District.

5.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 in that Defendants Yves Saint Laurent America, Inc. and Yves Saint Laurent America Holding, Inc.'s principal place of business is in this District, Defendants are subject to personal jurisdiction in this District, and the events or omissions giving rise to Plaintiffs' claims occurred and continue to occur in this District and elsewhere throughout the United States and the world.

## THE PARTIES

6.      Plaintiff Christian Louboutin S.A. ("CLSA") is a corporation, organized and existing under the laws of France, having its principal place of business at 19 rue de Jean-Jacques Rousseau, Paris, France 75001.

7.      Plaintiff Christian Louboutin, L.L.C. ("CLLLC") is a New York corporation with a principal place of business at 306 West 38th Street, New York, New York 10018.  CLLLC has the exclusive right to distribute and sell Louboutin Footwear, as defined below, in Christian Louboutin retail premises (stand alone shops and shop-in-shop), in the United States.

8.      Plaintiff Christian Louboutin is an individual and a citizen of the country of France with an address at 1 rue Volney, Paris, France 75002.  Mr. Louboutin is the originator of women's footwear sold under his name and bearing the world famous Red Sole Mark, described in detail below.

9.      Upon information and belief, Defendant Yves Saint Laurent America, Inc. is a New York corporation with a principal place of business at 3 East 57th Street, New York, New York 10022.  Upon information and belief, Yves Saint Laurent America, Inc. is responsible for wholesale product distribution and franchising in the United States.  Upon information and belief, Yves Saint Laurent America, Inc. manages the *YVES SAINT LAURENT* online retail website at <www.ysl.com>, together with Defendant Yves Saint Laurent S.A.S., and the *YVES SAINT LAURENT* boutique store located at  3 East 57th Street, New York, New York 10022.

3

10.     Upon information and belief, Defendant Yves Saint Laurent America Holding, Inc. is a New York corporation with a principal place of business at 3 East 57th Street, New York, New York 10022, the same address as the *YVES SAINT LAURENT* boutique store.

11.     Upon information and belief, Yves Saint Laurent S.A.S. is a French company with a principal place of business at 7, Avenue George V, Paris, France 75008, and has a place of business in this District at 3 East 57th Street, New York, New York 10022.  Upon information and belief, Yves Saint Laurent S.A.S. is an affiliate of Defendants Yves Saint Laurent America Inc. and Yves St. Laurent Holding, Inc. and regularly does business in this District.

12.     Upon information and belief, the unincorporated entity that Defendants use as a trade name, Yves Saint Laurent, is the registrant of record for the domain name <www.ysl.com>.  Defendants conduct e-commerce via an "online boutique" located at said web address.  The e-commerce so conducted is shown as "for U.S. only."   Upon information and belief, the unincorporated association doing business as Yves Saint Laurent is a division of Yves Saint Laurent S.A.S., is located at 7, Avenue George V, Paris, France 75008, and has a place of business in this District at 3 East 57th Street, New York, New York 10022.

13.     Upon information and belief, Defendants identified as various John Does and Jane Does are individuals who acted for, in concert with or through the named Defendants, and are subject to the jurisdiction of this Court.  The identities of the various John Doe and Jane Doe defendants are not presently known, and the Complaint herein will be amended to include the name or names of these individuals when such information becomes available.

14.     Upon information and belief, Defendants identified as various XYZ Companies, have, through their agents, servants and employees, acted for, in concert with, through, over or under the named Defendants, and are subject to the jurisdiction of this Court.  The identities of

the various XYZ Companies are not presently known, and the Complaint herein will be amended to include the name or names of these companies when such information becomes available. Defendants are collectively referred to hereinafter as "Defendants" or "YSL."

## BACKGROUND

### PLAINTIFFS' FOOTWEAR AND THE RED SOLE TRADEMARK

**A.     The Growth of Plaintiffs' Red Sole Mark**

15.    In 1991, Plaintiff Christian Louboutin, an experienced high fashion luxury shoe designer, opened the first *CHRISTIAN LOUBOUTIN* footwear boutique in Paris, France.

16.    Mr. Louboutin is the first designer to develop the idea of having red soles on women's shoes.  His first conception of this idea occurred when he painted red nail polish on the black soles of a pair of women's shoes.  Subsequently, in 1992, Mr. Louboutin introduced the world's first lacquered red footwear outsole, which is shown in the drawing below (the "Red Sole Mark").  Since that time, the Red Sole Mark has appeared on the outsole of all *CHRISTIAN LOUBOUTIN* women's high fashion luxury shoes sold in the United States, and throughout the world, for the past nineteen years ("Louboutin Footwear").  Upon information and belief Plaintiffs' use of the Red Sole Mark on women's designer luxury footwear has been substantially exclusive in the United States for the almost two decades commencing in 1992 to date.



17.    In 1992, Plaintiffs began selling *CHRISTIAN LOUBOUTIN* brand shoes in high end department stores in the United States.  In 1993, Plaintiffs opened the first free standing *CHRISTIAN LOUBOUTIN* store in New York City.  Since 1993, Plaintiffs have opened six additional *CHRISTIAN LOUBOUTIN* stores across the United States.  These stores continue

today to sell Louboutin Footwear (as well as other footwear of Louboutin) bearing the distinctive red lacquered outsole.

18.     The Red Sole Mark is the signature of *CHRISTIAN LOUBOUTIN* brand footwear. Louboutin Footwear is instantly recognizable as a result of Plaintiffs' trademark red outsole. The location of the bright color on the outsole of a women's pump is said to provide an alluring "flash of red" when a woman walks down the street, or on the red carpet of a special event. Examples of Louboutin Footwear appear below:



19.     Sales of Louboutin Footwear grew slowly at first in the United States but accelerated dramatically from the early 2000s.  While the breakthrough of Louboutin Footwear in the United States is attributable to many factors, the popularity of the footwear started to grow significantly when celebrity stylists began to dress their clients in Louboutin Footwear.  These celebrities were photographed by news publications and paparazzi while wearing Louboutin Footwear at high profile events, on evenings out, and as they did their daily errands.

20.     As a result of this celebrity coverage, editors from numerous women's and fashion magazines began featuring photographs and articles about Louboutin Footwear, with the distinctive Red Sole Mark, in their publications.  For example, the March 2005 cover of *Vanity Fair* featured the five stars of the then-popular show *Desperate Housewives* all wearing Louboutin Footwear.  This *Vanity Fair* cover enhanced recognition of the *CHRISTIAN LOUBOUTIN* brand.

21.     The increased media coverage of Louboutin Footwear led to Plaintiffs receiving requests from movie and television producers, directors, fashion designers, stylists and stars to use the footwear in their projects.  For example, the lead characters regularly wore Louboutin Footwear in episodes of *Sex & the City*, which aired from June 1998 to June 2004, as well as in both *Sex and the City* movies.  Below are examples of such use by the fictional character Carrie Bradshaw in *Sex and the City 2*, which was released in 2009:



The character of Carrie Bradshaw is of course played by famous actress and high fashion leader Sarah Jessica Parker in both movies and in the television series.

22.     As consumers began to see Louboutin Footwear featured in celebrity tabloids, editorial publications and movies and on television shows, sales of the footwear increased dramatically. Consumers would regularly come into stores with pages torn from magazines demanding 'the shoes with the red soles" or relating the shoes to the celebrities seen wearing them in the magazines.

23.     The demand by stylists, celebrities, editors, producers and consumers for Louboutin Footwear has increased year after year.

24.     Louboutin Footwear, with the alluring flash of red on the sole, is now the footwear of choice among glamorous celebrities and many famous, internationally known actresses, television personalities, pop music stars, socialites and high fashion leaders, including Oprah Winfrey, Madonna, Angelina Jolie, Halle Berry, Beyoncé, Jennifer Lopez, Sarah Jessica Parker, Blake Lively, Gwyneth Paltrow, Nicole Richie, Diane von Furstenberg, Princess Caroline of Monaco, the late Elizabeth Taylor and many others.

25.     Louboutin Footwear has recently been featured in major motion pictures, including, *inter alia*, *Burlesque*, *Sex and the City 2*, *Valentine's Day* and *The Proposal*, and in such popular, nationally televised shows as the *Today Show*, *Real Housewives of Beverly Hills*, *Fairly Legal*, *Covert Affairs*, *Harry's Law* and *Gossip Girl*.

26.     Major recording artists, television personalities and famous actresses, regularly wear Louboutin Footwear at extremely high profile events.  Most recently, renowned actresses Scarlett Johansson and Halle Berry wore Louboutin Footwear to the 2011 Academy Awards, and major recording artists, television personalities and famous actresses, namely, Jennifer Hudson, Jennifer Lopez, Lea Michele, Heidi Klum, and Kim Kardashian wore Christian Louboutin Footwear to the 2011 Grammy Awards.  Sarah Jessica Parker was featured on the cover of *The New York Times Magazine* and on the cover of *Elle* magazine.  Photographs of these celebrities wearing Louboutin Footwear to these red carpet events were prominently featured in Internet discussion groups, known as blogs, and in national publications like *US Weekly*.

27.     The Red Sole Mark is so well-known that it was celebrated in star pop music performer Jennifer Lopez's 2009 single "Louboutins," wherein she pays homage to Louboutin

Footwear and the Red Sole Mark.   In the song, Ms. Lopez sings:   "I'm throwing on my Louboutins; watch these red bottoms; and the back of my jeans; watch me go, bye baby; don't know what you got until it's gone."   Ms. Lopez performed the single "Louboutins" repeatedly on national television in the United States, including, *inter alia*, "So You Think You Can Dance."

28.     Fashion designers Diane von Furstenberg, Marchesa, Phillip Lim, J. Mendel, Rodarte, Roland Mouret and Peter Som, amongst others, have regularly featured Louboutin Footwear on their fashion show runway models when exhibiting their latest creations for buyers in New York, London and Paris, amongst other cities.

29.     The renown of the *CHRISTIAN LOUBOUTIN* brand and the Red Sole Mark is so widespread that in 2009, Plaintiffs and Mattel embarked on a yearlong exclusive collaboration celebrating the fiftieth anniversary of BARBIE®, which included Mr. Louboutin custom-designing Plaintiffs' peep-toe pumps in BARBIE®-pink that were worn at Mercedes-Benz Fashion Week at BARBIE's® first-ever runway show and offered for sale in limited release, three BARBIE® collector dolls wearing Louboutin Footwear and a 2010 diary.

30.     Each article and product placement results in attention from tens of thousands, and often millions of individuals for the Louboutin Footwear and especially its Red Sole Mark.

31.     By reason of the remarkable unsolicited media coverage of Louboutin Footwear, product placements, celebrity appreciation and Plaintiffs' marketing strategy, the Red Sole trademark is known to relevant consumers throughout the United States and the world as associated with Plaintiffs' unique footwear.   The Red Sole has become synonymous with Christian Louboutin and high fashion.

**B.**   **Plaintiffs' Marketing Efforts Increase the Goodwill and Brand Recognition in the Red Sole Mark.**

32.     Since 1992, Plaintiffs have undertaken very successful efforts to build goodwill and brand recognition in the Red Sole Mark.  Plaintiffs invest extensive and ongoing efforts to strategically market, advertise and promote the Louboutin Footwear in the United States and throughout the world using word of mouth, unsolicited advertising and editorial as their main vehicles to promote their product.

33.     Plaintiffs have made the conscious effort to keep Louboutin Footwear as a recognized luxury item and thus away from what is commonly known as mainstream marketing. The manufacture, design, promotion, distribution, lending and sale of Louboutin Footwear are all done by Plaintiffs with this fundamental strategy in mind.

34.     Plaintiffs have strictly limited the locations (known in the industry as "doors") where genuine Louboutin Footwear may be purchased.  Louboutin Footwear is only sold in Plaintiffs' own free standing eponymous boutiques, high end department stores, a few very select small individual retailers, and on the Internet via Plaintiffs' website, and the e-commerce sites of Barneys New York, Neiman Marcus, Saks Fifth Avenue, Bergdorf Goodman, and Net-A-Porter.com (which is considered by many to be the Internet equivalent of Neiman Marcus or the like).  In particular, in the United States, consumers can purchase genuine Louboutin Footwear in only seven stand-alone *CHRISTIAN LOUBOUTIN* boutiques located in major cities, at the high end department stores Barneys New York, Neiman Marcus, Bergdorf Goodman, Saks Fifth Avenue and Nordstrom, at a very small number of unique luxury boutiques and via the Internet sites stated above.

35.     To maintain demand, Plaintiffs often will not fill an entire order that a vendor would like to receive, preferring instead to keep product in short supply and suffering "sold out"

status from time to time.  Consumers thus watch carefully for all deliveries and often are on
waiting lists for new product.

36.     Plaintiffs carefully screen all requests from editors of magazines, celebrity
stylists, writers, photographers and others who make public use of Plaintiffs' footwear to assure
that such use will enhance the reputation of the *CHRISTIAN LOUBOUTIN* brand and the Red
Sole Mark.  For example, for publications, Plaintiffs screen the readership, photographers,
content and advertisers to confirm that the Louboutin Footwear is in the right publication and
that the products advertised therein are similar in style and luxury.

37.     Plaintiffs do not give away footwear in return for photography placements or
celebrity use, nor do Plaintiffs purchase advertising space in return for use of their products in
photograph spreads by the very same magazines or newspapers.  Virtually all products provided
for editorial photography or for celebrity events are returned to Plaintiffs upon completion of the
event.  This strategy is very different than those employed by competing brands.  If celebrities
want their own Louboutin Footwear, they purchase them.  If a magazine wants to use Louboutin
Footwear in an editorial, they must request and then return the footwear, if provided at all.  Such
strategy has had great results, with both celebrity and editorial use of Louboutin Footwear
growing each year through the date hereof.

38.     Although Plaintiffs give a small amount of money as co-operative marketing
money to certain of their upscale department store retailers, Plaintiffs themselves do not buy
advertising space.  Plaintiffs rely almost entirely on filling the numerous requests to loan
footwear for product placements, women's magazine fashion editorials, and celebrity events as
the strategy to publicize and market Louboutin Footwear.  Plaintiffs maintain special press
relations offices in New York, London, Paris, Hong Kong, etc. for the sole and exclusive purpose

of fulfilling trade requests for Louboutin Footwear to be used by editors, celebrities and the like throughout the world.  The press office in New York is the busiest of all Plaintiffs' press offices because it not only services the United States and the Americas, but because New York is the location where many non-United States based magazines, production companies, and movie companies regularly come to photograph their editorials, movies, videos and the like resulting in an enormous volume of requests for Louboutin Footwear and attendant worldwide publicity.

39.     Once one of Plaintiffs' press offices receives a request for a pair or more of the Louboutin Footwear, Plaintiffs differentiate themselves from others by using extraordinary service to handle all such requests.  Where most similarly situated brands' press offices maintain limited colors and sizes of select product, Plaintiffs' press offices are known throughout the United States, especially in New York, and the rest of the world for keeping wide ranges of styles, sizes and colors of almost all relevant shoe models on hand so that any request can be filled in a day or perhaps two at the most.  As a result, the various press offices of Plaintiffs regularly handle a huge volume of requests and have become the "go to" offices for most editors needing footwear for photo shoots and similar events.  By reason of such service and technique, Plaintiffs' Louboutin Footwear enjoys an extremely high incidence of credit in virtually all major women's and fashion magazines read by their relevant consumers.

40.     Plaintiffs' marketing strategy includes personal appearances by Mr. Louboutin. Mr. Louboutin regularly appears in high-end United States department stores to promote Louboutin Footwear.  He is well-known worldwide for autographing the red soles on his shoes with special, very-personalized messages.  Mr. Louboutin is regularly covered by prestigious magazines in the United States and throughout the world.  His story of the Red Sole Mark, where it came from and how it has become the signature of his footwear has been told and retold on

numerous occasions in the United States and throughout the world.  Most recently, the March 28, 2011 issue of *The New Yorker Magazine*, at pages 83-91, features a biographical sketch of Mr. Louboutin and discusses his "instantly recognizable" Red Sole Mark.

41.     Plaintiffs promote Louboutin Footwear on social networking websites like Twitter and Facebook.  Plaintiffs' Facebook site has more than half a million fans who routinely provide comments.  Fans, many of whom are in the United States, have created independent groups on Facebook that discuss Louboutin Footwear.  Independent United States-based fashion blogs such as PassionLouboutin at <passionlouboutin.blogspot.com>, StyleBistro at <www.stylebistro.com>, The Shoe Goddess at <www.theshoegoddess.com>, and The Purse Blog at <www.purseblog.com> regularly feature and discuss Plaintiffs' footwear as well, of course, as the prominent red soles.  Many of the participants in these on-line discussions are located in the United States.

42.     Plaintiffs are well known for the extremely high quality of the Louboutin Footwear.  They maintain rigorous quality control over the manufacture and servicing of their footwear worldwide and pride themselves on their commitment to customer service.

43.     Plaintiffs have received numerous accolades and awards recognizing the uniqueness and beauty of the Louboutin Footwear.  For example, in 1996 and 2008, Mr. Louboutin received Fashion Footwear Association of New York awards from the International Fashion Group, in 2005-2006, Mr. Louboutin and the Red Sole Mark were featured in an exhibit at the world renowned Bata Shoe Museum in Toronto, Canada, in 2008, Mr. Louboutin was the Star Honoree for the Fashion Group International and was the subject, along with the Red Sole Mark, of a retrospective mounted by the Museum at New York's Fashion Institute of Technology, and in 2010, Mr. Louboutin was named the *Footwear News* Person of the Year.  In

2007, 2008, 2009, 2010 and 2011, Plaintiffs were honored by the Luxury Institute as a top brand on the Institute's annual Luxury Brand Index in the category of Most Prestigious Women's Shoes.

44.     As a result of the high quality of Louboutin Footwear, Plaintiffs' marketing strategy, and the distinctive red sole, Plaintiffs' shoes are coveted not only by those who can readily afford them, but by those who are price conscious.  The Red Sole Mark, that "flash of red" walking down the street, has come to signify taste, style, and that the wearer has "arrived."

**C.     The United States Trademark Registration for the Red Sole Mark**

45.     In 2007, Plaintiff Christian Louboutin applied to register his red sole trademark with the U.S. Patent and Trademark Office.  On January 1, 2008, the U.S. Patent and Trademark Office awarded a federal trademark registration to Mr. Louboutin on the Principal Register on the ground that the Red Sole Mark had acquired distinctiveness based on its many years of continuous use in commerce, the considerable media attention featuring the Red Sole Mark, consumer association of the Red Sole Mark with Louboutin Footwear, and the considerable sales of Louboutin Footwear bearing the Red Sole Mark.

46.     The Certificate of Registration for the Red Sole Mark identifies the mark as "a lacquered red sole."  The goods listed in this registration are "women's high fashion designer footwear."  A copy of the Certificate of Registration is attached hereto as Exhibit 1.

47.     The federal registration for the Red Sole Mark is valid, subsisting, unrevoked, and uncancelled, and, at all times relevant, in full force and effect.

**D.     Plaintiffs' Protection of their Red Sole Mark**

48.     As the popularity of Louboutin Footwear has grown, so have the number of incidents of unauthorized copying.  Plaintiffs have implemented a unique worldwide program to

14

deal with both counterfeits and infringements of their trademarks, especially the Red Sole Mark, as well as the designs of their products generally.

49.    Plaintiffs go to enormous lengths to police the marketplace and enforce the Red Sole Mark in order to protect the public from deception and confusion, as well as to protect the core of the company, the employees, the customers, and all who manufacture, distribute, promote and sell genuine Louboutin Footwear.    Plaintiffs routinely protect the Red Sole Mark by confronting the particular problem with what Plaintiffs believe is an appropriate remedy, including cease and desist letters, litigation, seizures and raids, Internet-based remedies such as eBay's VERO complaint program and ICANN's Uniform Domain Name Dispute Resolution proceedings.    Plaintiffs openly publicize and discuss their efforts on <http://stopfake.christianlouboutin.com/>, their website that is designed to educate the public about counterfeit products.

**DEFENDANTS' CONDUCT**

50.    In January 2011, Plaintiffs first learned that a competitor, YSL, had just begun selling women's shoes with red outsoles that are virtually identical to Plaintiffs' Red Sole Mark. YSL shoe models Tribute, Tribtoo, Palais, and Woodstock all appear now to carry the copy of Plaintiffs' Red Sole Mark (the "Infringing Footwear").    Examples of the Infringing Footwear are shown below:



51.     By manufacturing, distributing, promoting, offering to sell and selling shoes with outsoles that are identical and/or highly similar to the Red Sole Mark, Defendants are, upon information and belief, seeking to take unfair advantage of the enormous goodwill and brand recognition in the Red Sole Mark that Plaintiffs have developed over the past two decades. Defendants' use of a red sole on their Infringing Footwear threatens to mislead the public, and has impaired Plaintiffs' ability to control their reputation, and the quality and careful distribution of Louboutin Footwear bearing the Red Sole Mark.

52.     In January 2011, Plaintiffs learned that Defendants' Infringing Footwear was being offered for sale in the United States at the same high end department stores that carry Louboutin Footwear, namely, Saks Fifth Avenue, Barneys New York, Bergdorf Goodman, Nordstrom and Neiman Marcus.   The Infringing Footwear was also available for sale on the websites run by these same retail businesses.

53.     Upon information and belief, Defendants were at all times relevant selling and continue to sell the Infringing Footwear on their website at <www.ysl.com>, and in their boutique stores, including the one located at 3 East 57th Street, New York, New York 10022. Defendants' website is available throughout the world, including the United States and in this District.

54.     Since becoming aware of the Infringing Footwear, Plaintiffs have repeatedly sought to have Defendants remove the Infringing Footwear from the marketplace. Plaintiffs contacted the then President of Defendants and sought her cooperation.  By letter of January 17, 2011, Defendants advised Plaintiffs they were going to continue to sell the Infringing Footwear.

55.     On or about February 3, 2011, Defendants, through their parent company, PPR Group, admitted by letter of said date directed to Plaintiffs that they were aware of the Red Sole Mark and agreed that the Red Sole Mark was famous, distinctive and closely associated with Plaintiffs, but refused notwithstanding to stop selling the Infringing Footwear.   (Upon information and belief, since this date, PPR Group has reorganized its operations and moved YSL into a "Luxury Group" together with other similar high end brands, such as Gucci, which are also controlled by PPR Group.)  Upon information and belief, Defendants from January 2011 through the date hereof, continue to offer to sell and sell the Infringing Footwear both at retail and via Internet websites available to consumers in this District, and throughout the world,.

56.     Upon information and belief, Defendants, as a result of the foregoing acts, intentionally, willfully and knowingly adopted red outsoles that are virtually identical to the Red Sole Mark in, *inter alia*, an effort to trade on Plaintiffs' goodwill and the cachet associated with Louboutin Footwear bearing the Red Sole Mark.

57.     Plaintiffs have not at all times relevant authorized Defendants to manufacture, distribute, promote, offer for sale, or sell products bearing the Red Sole Mark or marks that resemble the Red Sole Mark.

58.     Defendants' use of red footwear outsoles that are virtually identical to Plaintiffs' Red Sole Mark is likely to cause and is causing confusion, mistake and deception among the relevant purchasing public as to the origin of the Infringing Footwear, and is likely to deceive the

public into believing that the Infringing Footwear originates from, is associated with, or is otherwise authorized by Louboutin, all to the damage and detriment of Plaintiffs, Plaintiffs' reputation and goodwill and to the unjust enrichment of Defendants.

59.     Defendants' use of such outsoles on or in connection with the manufacture, promotion, distribution, offer for sale, and sale of the Infringing Footwear is causing immediate and continuing irreparable harm to Plaintiffs and will continue to do so unless restrained by this Court.

## COUNT ONE

## FEDERAL TRADEMARK INFRINGEMENT AND COUNTERFEITING
## (15 U.S.C. § 1114(a))

60.     Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs of this Complaint as if fully set forth herein.

61.     Plaintiffs' federally registered Red Sole Mark, and the goodwill of the business associated with it in the United States and throughout the world, are of great and incalculable value.

62.     The Red Sole Mark is highly distinctive and arbitrary and has become universally associated in the public mind with footwear of the highest quality that finds its source in Plaintiffs.

63.     Without Plaintiffs' authorization or consent, and having knowledge of Plaintiffs' prior rights in the Red Sole Mark, Defendants manufactured, distributed, promoted, offered for sale and sold in commerce the Infringing Footwear in direct competition with Plaintiffs' footwear with the authentic Red Sole Mark.

64.     Defendants' infringing acts as alleged herein are likely to cause confusion, mistake, and deception to consumers as to the affiliation, connection, or association of

Defendants with Plaintiffs, and as to the origin, sponsorship, or approval of Defendants' Infringing Footwear by Plaintiffs, all to the damage and detriment of Plaintiffs and of Plaintiffs' reputation, goodwill and sales.

65.    Plaintiffs have no adequate remedy at law.   If Defendants' activities are not enjoined, Plaintiffs will suffer immediate and continuing irreparable harm and injury to their reputation and to the goodwill associated with the Red Sole Mark.

**COUNT TWO**

**<u>FALSE DESIGNATION OF ORIGIN AND UNFAIR COMPETITION</u>**
**<u>(15 U.S.C. § 1125(a))</u>**

66.    Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs of this Complaint as if fully set forth herein.

67.    The Infringing Footwear sold and offered for sale by Defendants is of the same nature and type as the women's footwear sold and offered for sale by Plaintiffs.

68.    By misappropriating and using footwear outsoles on the Infringing Footwear that are identical and/or highly similar to Plaintiffs' distinctive Red Sole Mark, Defendants have misrepresented and falsely described to the public the origin and source of the Infringing Footwear and have created a likelihood of confusion among the public and the ultimate purchasers as to both the source and sponsorship of the Infringing Footwear.

69.    Defendants' unlawful and unauthorized manufacture, distribution, promotion, offer for sale, and sale of the Infringing Footwear creates express and implied misrepresentations that the Infringing Footwear was manufactured, authorized, approved of and/or sponsored by Plaintiffs, all to Defendants' profit and Plaintiffs' great damage and injury.

70.    By engaging in the aforesaid acts, Defendants are unfairly competing with Plaintiffs.

19

71.     Plaintiffs have no adequate remedy at law.  If Defendants' activities are not enjoined, Plaintiffs will suffer immediate and continuing irreparable harm and injury to their business and to their reputation, and to the goodwill associated with the Red Sole Mark.

## COUNT THREE

### FEDERAL TRADEMARK DILUTION
### (15 U.S.C. § 1125(c))

72.     Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs of this Complaint as if fully set forth herein.

73.     Plaintiffs' Red Sole Mark is distinctive and is a "famous mark" within the meaning of § 43(c) of the Lanham Act, 15 U.S.C. § 1125(c).  The Red Sole Mark was a famous mark prior to Defendants' conduct as alleged herein.

74.     Defendants' manufacture, distribution, promotion, offer for sale and sale in commerce of the Infringing Footwear dilutes the distinctiveness and renown of the Red Sole Mark.

75.     Upon information and belief, Defendants' conduct is being done with the knowing and willful intent to trade on Plaintiffs' reputation and the goodwill in the Red Sole Mark, and to dilute and blur the distinctiveness and renown of the Red Sole Mark.

76.     Upon information and belief, Defendants were aware that their use of copies and/or colorable imitations of the Red Sole Mark on the Infringing Footwear is being done without the authorization of Louboutin.

77.     Plaintiffs have no adequate remedy at law.  If Defendants' activities are not enjoined, Plaintiffs will suffer immediate and continuing irreparable harm and injury to their business, to their reputation, and to the goodwill and distinctiveness in the Red Sole Mark.

## COUNT FOUR

## <u>TRADEMARK INFRINGEMENT UNDER NEW YORK COMMON LAW</u>

78.     Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs of this Complaint as if fully set forth herein.

79.     With knowledge of Plaintiffs' prior rights in the federally registered Red Sole Mark, Defendants have, without authorization from Plaintiffs, traded on and continue to trade on, the goodwill associated with Plaintiffs' Red Sole Mark, and have misled consumers into assuming that there is an association between the Infringing Footwear and Plaintiffs, by using copies and/or colorable imitations of the Red Sole Mark to manufacture, distribute, promote, and sell the Infringing Footwear.

80.     Defendants' acts as alleged herein are likely to cause confusion, mistake, and deception to consumers as to the affiliation, connection, or association of Defendants with Plaintiffs, and as to the origin, sponsorship, or approval of Defendants' goods by Plaintiffs.

81.     By Defendants' unauthorized acts, they are directly infringing Plaintiffs' rights in the federally registered Red Sole Mark in violation of New York common law, to the damage of Plaintiffs and the unjust enrichment of Defendants.

82.     Upon information and belief, Defendants' conduct is intentional and willful because Defendants have infringed and continue to infringe Plaintiffs' federal trademark registration for the Red Sole Mark (i) with knowledge that Plaintiffs own and have the exclusive nationwide right to use the Red Sole Mark, (ii) with the intention of causing a likelihood of confusion and mistake and to deceive, and (iii) with the intention of eliminating competition from Plaintiffs.

83.     Plaintiffs have suffered and will continue to suffer irreparable injury for which Plaintiffs have no adequate remedy at law.  Plaintiffs are therefore entitled to a preliminary and permanent injunction against Defendants' further infringing conduct.

## COUNT FIVE

### TRADEMARK DILUTION UNDER NEW YORK LAW
#### (New York General Business Law § 360(l))

84.     Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs of this Complaint as if fully set forth herein.

85.     Plaintiffs' Red Sole Mark has acquired distinctiveness and is widely recognized by the general consuming public of the State of New York as a designation of source of Plaintiffs' goods.

86.     Without Plaintiffs' authorization, Defendants are using outsoles on the Infringing Footwear that are identical and/or substantially similar to Plaintiffs' Red Sole Mark.

87.     As a result of such acts on the part of Defendants, the public is likely to assume that there is an association between the Infringing Footwear and Plaintiffs.

88.     Defendants' manufacture, distribution, promotion, and sale of the Infringing Footwear are therefore likely to dilute and blur the distinctive quality of Plaintiffs' famous Red Sole Mark.

89.     Defendants knew and intended their acts to dilute the Red Sole Mark and to injure Plaintiffs' business and reputation.

90.     Absent injunctive relief, Defendants will continue to dilute and whittle away the reputation and value enjoyed by Plaintiffs in the Red Sole Mark.  Plaintiffs are therefore entitled to injunctive relief.

## COUNT SIX

## UNFAIR COMPETITION IN VIOLATION OF NEW YORK COMMON LAW

91.     Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs of this Complaint as if fully set forth herein.

92.     With knowledge of the fame and distinctiveness of Plaintiffs' federally registered Red Sole Mark, Defendants intended to and did trade on the goodwill associated with the Red Sole Mark by manufacturing, distributing, promoting and selling women's footwear that uses outsoles that are identical and/or substantially similar to Plaintiffs' Red Sole Mark.

93.     Defendants' acts as alleged herein are likely to cause confusion, mistake, and deception to consumers as to the affiliation, connection, or association of Defendants with Plaintiffs, and as to the origin, sponsorship, or approval of the Infringing Footwear by Plaintiffs, all to the detriment and damage of Plaintiffs and the unjust enrichment of Defendants.

94.     Plaintiffs have no adequate remedy at law.  If Defendants' activities are not enjoined, Plaintiffs will suffer immediate and continuing irreparable harm and injury to their reputation and to the goodwill and distinctiveness in the Red Sole Mark.

## COUNT SEVEN

## UNLAWFUL DECEPTIVE ACTS AND PRACTICES
### (New York General Business Law § 349)

95.     Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs of this Complaint as if fully set forth herein.

96.     Without Plaintiffs' authorization or consent, and having knowledge of Plaintiffs' well-known, prior rights in the Red Sole Mark, Defendants manufactured, distributed, promoted, offered for sale and sold to the public Infringing Footwear with outsoles that are identical and/or

highly similar to Plaintiffs' Red Sole Mark, in direct competition with Plaintiffs' genuine merchandise bearing the Red Sole Mark.

97.     Defendants' activities are likely to cause confusion, mistake and deception among consumers as to the origin of the Infringing Footwear, and are likely to materially mislead reasonable consumers into believing that the Infringing Footwear originates from, or is associated with, authorized by or sponsored by Plaintiffs, all to Defendants' profit and Plaintiffs' great damage and injury.

98.     If Defendants' activities are not enjoined, Plaintiffs will suffer immediate and continuing irreparable harm and injury to their reputation and to the goodwill and distinctiveness in the Red Sole Mark.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for the following relief:

1.     That Defendants, their parents, subsidiaries, officers, agents, employees, and all persons acting for, with, by, through or under them be enjoined and restrained, at first preliminarily during the pendency of this action and, thereafter, permanently:

a)     from using in any manner Plaintiffs' Red Sole Mark or any other mark or footwear outsole which so resembles the Red Sole Mark as to be likely to cause confusion, deception, or mistake on or in connection with the manufacture, distribution, promotion, offer for sale, and sale of any product not emanating from Plaintiffs or not authorized by Plaintiffs to be sold in connection with the Red Sole Mark;

b)     from passing off, inducing, or enabling others to sell or pass off any product as and for products produced by Plaintiffs, which are not in fact Plaintiffs' products, or not produced under the control and supervision of Plaintiffs and approved by Plaintiffs for sale under Plaintiffs' Red Sole Mark;

c)      from committing any acts calculated to cause consumers to believe that Defendants' products are sold under the control or supervision of Plaintiffs, or sponsored or approved by, connected with, guaranteed by, or produced under the control and supervision of Plaintiffs;

d)      from further diluting and infringing Plaintiffs' Red Sole Mark and damaging Plaintiffs' reputation and their goodwill in the Red Sole Mark;

e)      from otherwise competing unfairly with Plaintiffs in any manner; and

f)      from shipping, delivering, transferring, or otherwise disposing of, in any manner, products or inventory which bear Plaintiffs' Red Sole Mark or any mark confusingly similar thereto;

2.      That Defendants, be required to file with the Court and serve upon Plaintiffs a written report under oath setting forth in detail the manner in which Defendants have complied with Paragraph 1 within thirty (30) days after service of the preliminary injunction order and within thirty (30) days after service of judgment with notice of entry thereof upon it;

3.      That Defendants account for and pay over to Plaintiffs any profits realized by Defendants by reason of Defendants' unlawful and willful acts as alleged herein;

4.      That Plaintiffs be awarded actual damages in an amount to be proven at trial and punitive damages in an amount to be proven at trial;

5.      That Plaintiffs be awarded statutory damages in the amount of $1,000,000 pursuant to 15 U.S.C. § 1117(c);

6.      That the amount of damages for infringement and dilution of Plaintiffs' federally registered Red Sole Mark be increased by a sum not exceeding three times the amount thereof as provided by law;

7.     That Plaintiffs be awarded interest, including pre-judgment interest, on all damages sums;

8.     That Plaintiffs be awarded their costs and reasonable attorneys' fees and have such other and further relief as the Court may deem equitable, including, but not limited to, any relief set forth under 15 U.S.C. §§ 1116-1118 and N.Y. Gen. Bus. Law §§ 349, 360(l) and 360(m); and

9.     That Plaintiffs have such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule 38(b), Plaintiffs hereby demand a jury trial on all issues so triable that are raised by this Complaint.

Dated: New York, New York
      April 7, 2011

McCARTER & ENGLISH, LLP

By: _____
    Harley I. Lewin
    Lee Carl Bromberg

Harley I. Lewin
245 Park Avenue, 27th Floor
New York, NY 10167
Tel: (212) 609-6800
Fax: (212) 609-6921
hlewin@mccarter.com

Lee Carl Bromberg
McCarter & English, LLP
265 Franklin Street
Boston, MA  02110
Tel:  617-449-6500
Fax:  617-443-6161
lbromberg@mccarter.com

*Attorneys for Plaintiffs Christian Louboutin S.A.,*
*Christian Louboutin, L.L.C., and Christian*
*Louboutin*

```
Court Name: District Court
Division: 1
Receipt Number: 465401003434
Cashier ID: lcurtis
Transaction Date: 04/07/2011
Payer Name: MCCARTER AND ENGLISH LLP

CIVIL FILING FEE
  For: MCCARTER AND ENGLISH LLP
  Case/Party: D-NYS-1-11-CV-002381-001
  Amount:        $350.00

CHECK
  Check/Money Order Num: 100193
  Amt Tendered:  $350.00

Total Due:       $350.00
Total Tendered:  $350.00
Change Amt:      $0.00

11CV2381
JUDGE MARRERO
```