## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CHRISTIAN LOUBOUTIN S.A.; CHRISTIAN LOUBOUTIN, L.L.C.; and CHRISTIAN LOUBOUTIN, | X  Civil Action No.: 11 Civ. 2381 (VM) |
| | :  ECF Case |
| Plaintiffs, | : |
| | : |
| v. | : |
| | : |
| YVES SAINT LAURENT AMERICA, INC.; YVES SAINT LAURENT AMERICA HOLDING, INC.; YVES SAINT LAURENT S.A.S.; YVES SAINT LAURENT (an unincorporated association); JOHN AND JANE DOES A-Z (UNIDENTIFIED); and XYZ COMPANIES 1-10 (UNIDENTIFIED), | : |
| Defendants. | X |

## PLAINTIFFS' AMENDED MEMORANDUM OF LAW IN SUPPORT OF APPLICATION FOR A PRELIMINARY INJUNCTION

Harley I. Lewin
McCARTER & ENGLISH, LLP
245 Park Avenue, 27th Floor
New York, New York  10167
Tel.:  (212) 609-6800
Fax:  (212) 609-6921

Lee Carl Bromberg
McCARTER & ENGLISH, LLP
265 Franklin Street
Boston, Massachusetts  02110
Tel:  (617) 449-6500
Fax: (617) 607-9200

*Attorneys for Plaintiffs Christian Louboutin S.A., Christian Louboutin, L.L.C., and Christian Louboutin*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................................................ iii

PRELIMINARY STATEMENT .......................................................................................1

STATEMENT OF FACTS ...............................................................................................1

    A.    Louboutin's Substantially Exclusive Use of the Red Sole Mark and the Growth of the CHRISTIAN LOUBOUTIN Brand ..................................................1

    B.    Louboutin Has Created Considerable Goodwill and Brand Recognition in the Red Sole Mark ....................................................................................2

    C.    Louboutin's Promotional Activities Have Enhanced the Strength and Distinctiveness of the Red Sole Mark ..................................................................4

    D.    Louboutin's Federal Registration for the Red Sole Mark ........................................7

    E.    The Threat to Louboutin from YSL ..........................................................................7

ARGUMENT .....................................................................................................................9

I.    LOUBOUTIN IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS ...........9

    A.    Louboutin Will Likely Prevail on its Trademark Infringement and Unfair Competition Claims .............................................................................................9

        1.    The Red Sole Mark Is Valid and Protectable ...............................................9

            a.    Length and Exclusivity ..................................................................11

            b.    Unsolicited Media Coverage ..........................................................11

            c.    Advertising Expenditures ...............................................................12

            d.    Sales Success ...................................................................................13

            e.    Attempts to Plagiarize the Mark ....................................................13

            f.    Consumer Studies ...........................................................................13

        2.    YSL's Mark Is Likely to Cause Confusion with the Red Sole Mark ........14

    B.    Louboutin is Likely to Succeed on its Federal Dilution Claim Because YSL's Use of Red Soles Blurs the Distinctiveness of Louboutin's Famous Red Sole Mark. ....................................................................................................21

   C.  Louboutin Will Likely Prevail on its State Law Claims........................................22

II.  LOUBOUTIN WILL BE IRREPARABLY HARMED UNLESS YSL IS ENJOINED FROM SELLING THE INFRINGING FOOTWEAR ................................23

III.  THE BALANCE OF THE HARDSHIPS FAVORS LOUBOUTIN................................24

IV.  ENJOINING YSL FROM USING CONFUSINGLY SIMILAR MARKS TO THE RED SOLE MARK IS CONSISTENT WITH THE PUBLIC INTEREST .............25

CONCLUSION..........................................................................................................................25

ME1 11867601v.2

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Artisan Mfg. Corp. v. All Granite & Marble Corp.*,
  559 F. Supp. 2d 442 (S.D.N.Y. 2008) ........................................................................... 19

*Asia Apparel, LLC v. Ripswear, Inc.*,
  No. 3:02-cv-469, 2004 U.S. Dist. LEXIS 29208 (W.D.N.C. Sept. 17, 2004), *aff'd*,
  118 Fed. Appx. 782 (4th Cir. 2005) ............................................................................... 25

*Banff, Ltd. v. Federated Dep't Stores, Inc.*,
  841 F.2d 486 (2d Cir. 1988) .......................................................................................... 16

*Cartier, Inc. v. Four Star Jewelry Creations, Inc.*,
  348 F. Supp. 2d 217 (S.D.N.Y. 2004) ........................................................................... 14

*Cartier, Inc. v. Four Star Jewelry Creations, Inc.*,
  No. 01 Civ. 11295, 2003 U.S. Dist. LEXIS 7844 ............................................... 11, 16, 17

*Charles of the Ritz v. Quality King Distribs.*,
  832 F.2d 1317 (2d Cir. 1987) ........................................................................................ 19

*Church of Scientology Int'l v. Elmira Mission of the Church of Scientology*, 794 F.2d 38,
  43 (2d Cir. 1986) ............................................................................................................ 23

*Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*,
  598 F.3d 30 (2d Cir. 2010) .............................................................................................. 9

*Corning Glass Works v. Jeanette Glass Co.*, 308 F. Supp. 1321, 1328 (S.D.N.Y.), *aff'd*,
  432 F.2d 784 (2d Cir. 1970) .......................................................................................... 24

*Essie Cosmetics, Ltd. v. Dae Do Int'l, Ltd.*,
  808 F. Supp. 952 (E.D.N.Y. 1992) ................................................................................ 14

*Fabrication Enters. v. Hygenic Corp.*,
  64 F.3d 53 (2d Cir. 1995) .............................................................................................. 14

*Forschner Group, Inc. v. Arrow Trading Co., Inc.*,
  904 F. Supp. 1409 (S.D.N.Y. 1995) .............................................................................. 18

*GMA Accessories, Inc. v. Croscill, Inc.*,
  06-Civ.-6236, 2008 U.S. Dist. LEXIS 16052, at *27 (S.D.N.Y. 2008) ......................... 19

*GTFM, Inc. v. Solid Clothing, Inc.*,
  215 F. Supp. 2d 273 (S.D.N.Y. 2002) ............................................................... 10, 22, 23

*GoSMiLE, Inc. v. Dr. Jonathan Levine, D.M.D.P.C.*,
No. 10-Civ-8663, 2011 U.S. Dist. LEXIS 23474 (S.D.N.Y. Mar. 7, 2011) ........................... 18

*Harris v. Fairweather*,
No. 2011 U.S. Dist. LEXIS 46058 (S.D.N.Y. Apr. 28, 2011) ........................................... 17, 23

*Heisman Trophy Trust v. Smack Apparel Co.*,
595 F. Supp. 2d 320 (S.D.N.Y. 2009) ............................................................................. 10, 16

*Kraft Gen. Foods, Inc. v. Allied Old English, Inc.*,
831 F. Supp. 123 (S.D.N.Y. 1993) ................................................................................. 11, 18

*L.D. Kichler Co. v. Davoil, Inc.*,
192 F.2d 1349 (Fed. Cir. 1999) ............................................................................................ 11

*Lang v. Ret. Living Pub. Co., Inc.*,
949 F.2d 576 (2d Cir. 1991) ................................................................................................. 19

*Lee Myles Auto Group, LLC v. Fiorillo*,
No. 10 Civ. 6267, 2010 U.S. Dist. LEXIS 91582 (S.D.N.Y. Aug. 25, 2010) ........................ 19

*LeSportsac, Inc. v. K Mart Corp.*,
754 F.2d 71 (2d Cir. 1985) .................................................................................................. 24

*Lois Sportswear, U.S.A., Inc. v. Textiles Y Confecciones Europeas, S.A.*,
799 F.2d 867 (2d Cir. 1986) ........................................................................ 15, 16, 17, 21

*McDonald's Corp. v. McBagel's, Inc.*,
649 F. Supp. 1268 (S.D.N.Y. 1986) ..................................................................................... 18

*Metlife, Inc. & Metro. Life Ins. Co. v. Metro. Nat'l Bank*,
388 F. Supp. 2d 223 (S.D.N.Y. 2005) .................................................................................. 18

*Miss Universe, L.P. v. Villegas*,
672 F. Supp. 2d 575 (S.D.N.Y. 2009) .................................................................................. 11

*Mobil Oil Corp. v. Pegasus Petroleum Corp.*,
818 F.2d 254 (2d Cir. 1987) ................................................................................................. 19

*Morningside Group, Ltd. v. Morningside Capital Group, L.L.C.*,
182 F.3d 133 (2d Cir. 1999) ................................................................................................. 21

*Nat'l Distillers Prods. Co., LLC v. Refreshment Brands, Inc.*,
198 F. Supp. 2d 474, 483 (S.D.N.Y. 2002) .......................................................................... 19

*New York City Triathlon, LLC v. NYC Triathlon Club, Inc.*,
704 F. Supp. 2d 305 (S.D.N.Y. 2010) ...................................................................... 11, 15, 25

iv

*In re Owens-Corning Fiberglass Corp.*,
    774 F.2d 1116 (Fed. Cir. 1985)................................................................10

*Paddington Corp. v. Attiki Importers & Distribs., Inc.*,
    996 F.2d 577 (2d Cir. 1993)................................................................19

*Pfizer v. Sachs,*
    652 F. Supp. 2d 512 (S.D.N.Y. 2009)........................................21, 23

*Pfizer v. Sachs*,
    No. 08 Civ. 8065 (WHP), 2008 U.S. Dist. LEXIS 79230 (S.D.N.Y. Oct. 8, 2008)..........17, 19

*Polaroid Corp. v. Polaroid Elecs. Corp.*,
    287 F.2d 492 (2d Cir. 1961)................................................................15

*Qualitex Co. v. Jacobson Prods. Co.*,
    514 U.S. 159 (1995)................................................................ 9-10, 14

*Saban Entm't, Inc., v. 222 World Corp.*,
    865 F. Supp. 1047 (S.D.N.Y. 1994)........................................................23

*Simon & Schuster Inc. v. Dove Audio, Inc.*,
    970 F. Supp. 279 (S.D.N.Y. 1997) ........................................................11

*Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*,
    559 F. Supp. 2d 472, 477 (S.D.N.Y. 2008), *aff'd in part and
    vacated in part on other grounds*, 588 F.3d 97 (2d Cir. 2009)................11

*Stern's Miracle-Gro Prods., Inc. v. Shark Prods., Inc.*,
    823 F. Supp. 1077 (S.D.N.Y. 1993)........................................ 11-12, 24

*Union Carbide Corp. v. Ever-Ready, Inc.*,
    531 F.2d 366 (7th Cir. 1976), superseded on other grounds,
    772 F.2d 1423 (7th Cir. Ill. 1985)........................................................18

*U.S. v. Torkington*,
    812 F.2d 1347 (11th Cir. 1987) ........................................................25

*U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc.*,
    No. 09 Civ. 9476, 2011 U.S. LEXIS 51707 (S.D.N.Y. May 13, 2011)..........16, 17, 18, 22, 23

*Virgin Enters. Ltd. v. Nawab*,
    335 F.3d 141 (2d Cir. 2003)................................................................9

*Warner Bros., Inc. v. Gay Toys, Inc.*,
    724 F.2d 327 (2d Cir. 1983)........................................................14, 19

v

*W.W.W. Pharm. Co. v. Gillette Co.*,
 984 F.2d. 567 (2d Cir. 1993) ............................................................................................. 19

**STATUTES**

15. U.S.C. § 1057(b) ........................................................................................................ 10

15 U.S.C. § 1125(c)(1) ..................................................................................................... 22

15 U.S.C. § 1125(c)(2)(A) .......................................................................................... 21-22

15 U.S.C. § 1125(c)(2)(B) ................................................................................................ 22

**OTHER AUTHORITIES**

Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* (West 2010) ................. 18

ME1 11867601v.2

## PRELIMINARY STATEMENT

Christian Louboutin,[1] a French luxury fashion designer, owns a federally registered trademark for a certain color red used on the outsoles of women's luxury shoes (the "Red Sole Mark").  The red is bright, applied with a shiny lacquered finish and has been used on virtually all Louboutin footwear since 1992.  It has become one of the great visual cues in the world and a widely recognized trademark, including by the former head designer of footwear for defendants,[2] the current YSL worldwide director of women's accessories, the former President of YSL and the current CEO of its parent.  YSL nonetheless maintains that it is entitled to use a virtually identical red sole on its luxury shoes because its shoe "uppers" are also red.  YSL claims that Louboutin's rights are somehow extinguished when red soles are used with red uppers.  YSL's position has neither factual nor legal support.  YSL's continuing importation and distribution of shoes with soles almost identical to Plaintiffs' Red Sole mark will cause consumer confusion and destroy the basis of the Red Sole Mark's special quality, its uniqueness as a visual cue. Louboutin has been left with no choice but to bring this action.

## STATEMENT OF FACTS

### A.   Louboutin's Substantially Exclusive Use of the Red Sole Mark and the Growth of the *CHRISTIAN LOUBOUTIN* Brand

In 1992, Christian Louboutin painted red nail polish on the black sole of a prototype shoe to make it distinct.  *See* Declaration of Alexis Mourot dated April 5, 2011 ("Mourot Dec.") at ¶ 7.  From 1992 to date, Plaintiffs' unique Red Sole Mark has appeared on virtually all *CHRISTIAN LOUBOUTIN* high fashion women's shoe designs.  *Id.* at ¶ 6.  To Louboutin's

---

[1] The plaintiffs are Christian Louboutin S.A., Christian Louboutin, L.L.C. and Christian Louboutin.  For ease of reference, the plaintiffs shall be collectively referred to herein as "Louboutin" or "Plaintiffs".

[2] The defendants are Yves Saint Laurent America, Inc., Yves Saint Laurent America Holding, Inc. and Yves St. Laurent S.A.S.  For ease of reference, the defendants shall be collectively referred to herein as "YSL".

knowledge, no other designer has engaged in significant use of a bright lacquered red outsole on women's shoes in the United States during that time. *Id.* at ¶ 8. The red outsole transformed "an otherwise indistinguishable product" into an "instantly recognizable" item. *Id.* at Ex. B.

*CHRISTIAN LOUBOUTIN* footwear entered the U.S. market in 1992. Sales grew steadily, then dramatically from the early 2000s, and explosively since 2007. The retail sales value of *CHRISTIAN LOUBOUTIN* footwear sold in the U.S. is forecast to reach $135,000,000 in 2011. *Id.* at ¶ 31. Louboutin's commercial success has prompted attempts to plagiarize the Red Sole Mark by counterfeiters, forcing Louboutin to commence legal actions and other enforcement activities to vigorously protect the Red Sole Mark, including in this District.[3]

Louboutin has been vigilant in policing its mark and forcing copyists to stop their unlawful actions. *Id.* at ¶ 32. For example, Louboutin monitors the Internet for shoes that infringe Louboutin's trademarks, including the Red Sole Mark. *Id.*

### B.   Louboutin Has Created Considerable Goodwill and Brand Recognition in the Red Sole Mark

Genuine *CHRISTIAN LOUBOUTIN* products are only sold at *CHRISTIAN LOUBOUTIN* boutiques, exclusive retailers Bergdorf Goodman, Neiman Marcus, Saks Fifth Avenue, Nordstrom and Barneys New York, at the high end Internet retailer Net-A-Porter.com and the Louboutin e-commerce site located at <www.christianlouboutin.com>. *See id.* at ¶ 12.

As a result of strict quality control measures, *Id.* at ¶ 11, *CHRISTIAN LOUBOUTIN* shoes consistently set industry standards for quality, value, performance, style and durability. The Red Sole Mark symbolizes quality and status and is among the world's most famous and widely-recognized brands. *Id.* at ¶ 13. From 2007 to 2010, the Luxury Institute named *CHRISTIAN LOUBOUTIN* as the top brand in the category of Most Prestigious Women's Shoes,

---

[3] See, for example, *Christian Louboutin, S.A., et al. v. Robert Yeganah, et al.,* 11 Civ. 159 (PKC), which was pending in this District and recently concluded.

and *Footwear News* named Mr. Louboutin the 2010 Person of the Year.  *Id.*, Ex. D; Declaration of Shawna Rose dated April 6, 2011 ("Rose Dec.") at ¶ 30, Exs. L, M.

*CHRISTIAN LOUBOUTIN* shoes have been embraced by influencers of public brand awareness such as celebrity stylists and have become favorites among glamorous celebrities, including famous actresses, television personalities, pop music stars and high fashion leaders. Oprah Winfrey, Madonna, Jennifer Lopez and Sarah Jessica Parker, among others, are regularly photographed wearing Plaintiffs' shoes.  *See* Mourot Dec. at ¶ 9.

Substantial unsolicited editorial comment and media exposure have reinforced the Red Sole Mark as a unique and sought-after identifier of the *CHRISTIAN LOUBOUTIN* brand.  The world-renowned Bata Shoe Museum in Toronto, Canada featured Mr. Louboutin and the Red Sole Mark in an exhibit in 2005-2006.  Rose Dec. at ¶ 29.  In 2008, the Museum at the Fashion Institute of Technology in New York City mounted a retrospective of Mr. Louboutin's work, which also prominently featured the Red Sole Mark.  I*d.*

Publications of wide circulation often describe the Red Sole Mark as the identifier of *CHRISTIAN LOUBOUTIN* footwear, including the major fashion magazines, *The New Yorker*, *USA Today*, *Vanity Fair*, the *Los Angeles Times Magazine*, and *The Boston Globe*.  *See* Mourot Dec. at ¶¶ 7, 8; Rose Dec. at ¶ 28.  For example, on October 12, 2006, the *Boston Globe* wrote that "anyone who truly knows fashion [can]spot a real classic  [such as] the red sole of a Christian Louboutin heel."  Mourot Dec. at ¶ 8, Ex. C.  Similarly, the March 28, 2011 issue of the *The New Yorker* states "the red soles" are a "signal," "promising a world of glamour and privilege."  *Id.* at Ex. B.  *The New Yorker* piece is entitled "Sole Mate," itself a reference to the famous red soles.  *Id.*

3

The bright lacquered red outsole is so identified with the *CHRISTIAN LOUBOUTIN* brand that there is even a "Louboutin manicure, in which the underside of the nail is painted with scarlet polish," *id.* at ¶ 22, Ex. B (page 83), and a "Louboutins" song sung by Jennifer Lopez: "Watch these **red bottoms**/ and the back of my jeans; Watch me go, by baby." *Id.* at ¶ 23, Ex. B (page 83) (emphasis added).  Ms. Lopez performed "Louboutins" on a number of nationally broadcast television shows.  On the popular Fox television show *So You Think You Can Dance*, Ms. Lopez emerged from a giant Louboutin shoe.  *See* Rose Dec. at ¶ 22.

Louboutin footwear now occupies more floor space in its high level department store accounts than any other competitor in women's luxury footwear and is first in sales in the United States against its competitors in the same locations.  Declaration of Kara Pfaffenbach dated April 5, 2011 ("Pfaffenbach Dec.") at ¶ 8.

### C.   Louboutin's Promotional Activities Have Enhanced the Strength and Distinctiveness of the Red Sole Mark

Louboutin's extensive promotional and marketing efforts enhance the relationship between Louboutin, the Red Sole Mark and *CHRISTIAN LOUBOUTIN* footwear in the minds of consumers.  A conventional cooperative advertising program with its major retailer customers involves expenditures of approximately $520,000 annually, over $2 million since 2008.  Mourot Dec. at ¶ 15.  An additional $390,000 annually is spent to maintain Louboutin's e-commerce site. *Id.*  The main focus of Louboutin's marketing strategy, however, is the practice of "sample trafficking," handled by the Louboutin press offices.  *Id.* at ¶ 16.  Hundreds of sample shoes bearing the Red Sole Mark are provided each season on a loaner basis in response to requests by editors, producers and stylists for use in movies, on television shows, in magazine fashion photo shoots and editorials, and for use by celebrities at "red carpet" events.  *Id.*  Louboutin's United States press office stocks about 1600 pairs of shoes for the sample trafficking activity, at an

ME1 11867601v.2

annual expenditure of approximately $450,000. An additional $500,000 per year is spent to maintain a team of fashion-savvy personnel who service the requests. *Id.* at ¶ 17. These expenditures, collectively at an annual rate of approximately $ 2 million, continue to build the consumer recognition and fame of Plaintiffs' brand and its signature Red Sole Mark.

To further its brand recognition, Louboutin maintains websites and a strong presence on social media sites like Facebook, where Louboutin has approximately half a million fans. *Id.* at ¶ 26. Special Presentation Days tied to Paris Fashion Week and attended by the editors of virtually all the major U.S. fashion magazines are held at Louboutin's offices in Paris to present Louboutin's new collections. Declaration of Kristina Musailov dated April 6, 2011 ("Musailov Dec.") at ¶ 15. The energetic sample trafficking program puts product in the hands of influencers of fashion trends and consumer awareness, who place Louboutin footwear, showing the Red Sole Mark, in publications, movies, television shows, commercials and fashion shows and at celebrity events. Mourot Dec. at ¶ 16; Musailov Dec. at ¶¶ 11-12.

Mr. Louboutin makes unique personal appearances in the United States to promote his footwear and the Red Sole Mark. Mr. Louboutin has become famous for signing the red soles of his customers' *CHRISTIAN LOUBOUTIN* shoes with special messages, including marriage proposals. *See* Rose Dec. at ¶¶ 25, 27. Even celebrities like singer Patti LaBelle attend Mr. Louboutin's personal appearances and request that he autograph their red soles. *See id.* at ¶ 26.

Together, the success of the product and Louboutin's unique marketing and promotional practices have given *CHRISTIAN LOUBOUTIN* footwear extraordinary, widespread unsolicited media exposure, building the distinctiveness of the Red Sole Mark to a degree not otherwise possible. For example, in 2009, Plaintiffs and the toy company Mattel began a unique, yearlong collaboration to commemorate the fiftieth anniversary of Mattel's BARBIE® doll, which

enhanced the recognition of the Red Soul Mark among millions of consumers.[4]  Mourot Dec. at ¶ 25, Ex. I; Rose Dec. at ¶ 21.

The Red Sole Mark has been featured in the major women's and fashion magazines in the United States and throughout the world, including *Vogue* and *Elle*, in movies and television shows, including *Burlesque*, *The Proposal*, *Sex and the City*, *Sex and the City 2*, *Desperate Housewive*s, *Fairly Legal*, *Harry's Law*, *Real Housewives of Beverly Hills*, and *Gossip Girl*, and on the runway for such fashion designers as Diane von Furstenberg, Roland Mouret, Marchesa, Phillip Lim, Rodarte and Peter Som.  Rose Dec. at ¶¶ 15-16, 20, 28, Ex. J.

Photographs of celebrities wearing Louboutin products at "red carpet" events regularly appear online and in national magazines such as *US Weekly*.  For example, Louboutin was worn at the 2011 Academy Awards by Scarlett Johansson and Halle Berry, at the 2011 Grammy Awards by Gwyneth Paltrow, Beyoncé, Jennifer Lopez, Lea Michele, Jennifer Hudson, Heidi Klum, and Kim Kardashian, and at Super Bowl XLVII by Christina Aguilera while she sang the National Anthem.  *See id.* at ¶¶ 17, 19.

As a result of Louboutin's marketing practices, consumer exposure to the brand and recognition of the Red Sole Mark tied to the brand have soared.  Many of the publications that have featured the Red Sole Mark are read by millions of consumers.  *See* Musailov Dec. at ¶¶ 20-22.  *CHRISTIAN LOUBOUTIN* shoes and the Red Sole Mark are also seen by millions of consumers in movies and television shows.  *See id., e.g.*, at ¶ 19.  Consumers readily recognize shoes bearing the distinctive Red Sole Mark as those of Plaintiffs.  *See* Declaration of Robert

---

[4] Mr. Louboutin designed a special edition of his famous peep-toe pumps in BARBIE® pink, which were worn by models during a BARBIE® runway show at Mercedes Benz Fashion Week (New York City's semi-annual Fashion Week).  Mattel issued three limited edition BARBIE® dolls wearing *CHRISTIAN LOUBOUTIN* shoes with their signature red soles, and a 2010 calendar was also created and offered for sale.  *See* Mourot Dec. at ¶ 25, Ex. I; Rose Dec. at ¶ 21.

Klein dated June 21, 2011 ("Klein Dec.") at Ex. A ("Ninety-six percent (96%) of the [survey] respondents identifying the YSL shoe as coming from Christian Louboutin specifically mentioned the red sole as a reason for their answer.").

###### D.      Louboutin's Federal Registration for the Red Sole Mark

The U.S. Patent and Trademark Office ("USPTO") has awarded Louboutin a federal trademark registration for the Red Sole Mark on the Principal Register, signifying that the Red Sole Mark identifies to the public that Louboutin is the source of women's luxury shoes bearing the Red Sole Mark and distinguishes Plaintiffs' brand women's luxury shoes from those manufactured by other designers.[5] *See* Mourot ¶ 6, Ex. A.

###### E.      The Threat to Louboutin from YSL

In January 2011, Louboutin first learned that YSL, a competitor, was promoting and selling footwear with red outsoles (the "Infringing Footwear") in the United States.  *See id.* at 36.[6]  Louboutin learned that the Infringing Footwear was available at the same high end retail establishments that carry *CHRISTIAN LOUBOUTIN* shoes, and on these stores' websites. Pfaffenbach Dec. at ¶ 10; Declaration of Roman Khaykin dated April 4, 2011 ("Khaykin Dec.").

YSL is owned by the French conglomerate PPR Group, a multi-billion dollar global luxury products business.  YSL directly competes with Louboutin.  YSL's "Tribute" and "Tribtoo" shoe models have led its shoe line in recent years.  In January 2011 YSL introduced the same models with colored outsoles, including a bright lacquered red, even though it knew of the famous Louboutin Red Sole Mark and included photographs of *CHRISTIAN LOUBOUTIN* shoes as the exemplar of a strong visual code for high fashion footwear in its Merchandising

---

[5] The file wrapper for the Red Sole Mark contains a detailed history, which established to the satisfaction of the USPTO that the Red Sole Mark had obtained secondary meaning well before the Certificate of Registration issued on January 1, 2008.  *See* Mourot Dec. at Ex. C.
[6] Louboutin has since learned that YSL is selling another style, Gisele, with red outsoles.  *See* Supplemental Declaration of Roman Khaykin dated June 20, 2011.

Grids, which YSL uses to develop the next season's collection.  Mourot Dec. at ¶¶ 36, 38, Ex. L; Declaration of Harley I. Lewin dated June 21, 2011 ("Lewin Dec.") at Ex. A at 119-20.  YSL's deliberate imitation of the Red Sole Mark unfairly seeks to capture a market created by and through Louboutin's efforts.

By selling shoes with red outsoles, YSL seeks to take unfair advantage of the ready-made goodwill and recognition in the Red Sole Mark that Louboutin has spent almost two decades building.  YSL's use of a red sole on its footwear has impaired Louboutin's ability to control its reputation, and the quality and careful distribution of Louboutin footwear bearing the Red Sole Mark.  The similarity of the marks, the products and the customers, means that confusion will be more than likely to occur.  *See id.* at ¶ 37; *see also* Klein Dec. at ¶ 6, Ex. A at 2 (online survey shows net confusion rate of 47.1% among potential consumers, who believed that YSL shoes with red soles emanated from Louboutin).

The buyers at Louboutin's major retailers were surprised to learn that YSL was selling shoes with red soles resembling Louboutin's signature Red Sole Mark.  Pfaffenbach Dec. at ¶ 12. The buyers stated that none of the samples previewed by YSL had red soles.  *Id.*

Upon learning of YSL's actions, Alexis Mourot, Chief Operating Officer and General Manager of Christian Louboutin, S.A., contacted the then President of YSL to explore a business resolution to avoid litigation.  Even though YSL's parent company acknowledged to Mr. Mourot that it was aware of the fame of the distinctive Red Sole Mark and that the Red Sole Mark is the signature mark of *CHRISTIAN LOUBOUTIN* footwear, no resolution was found, and YSL continues to sell the Infringing Footwear.  *See* Mourot Dec. at ¶ 38.  Accordingly, Louboutin seeks this Court's assistance in preserving and protecting the Red Sole Mark, together with the goodwill and recognition symbolized by the Mark.

**ARGUMENT**

Louboutin seeks a preliminary injunction to stop YSL from selling women's luxury footwear bearing red soles that infringe, unfairly compete with, and dilute Louboutin's federally registered and famous Red Sole Mark. YSL's recent introduction of red soles on directly competing high fashion footwear harms Louboutin's exclusive rights in its iconic Red Sole Mark and will cause confusion among customers.  To obtain a preliminary injunction, Louboutin must "show (a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010) (internal quotation marks omitted).

Because Louboutin satisfies this test, the Court should enjoin YSL from selling shoes with outsoles that are confusingly similar to the Red Sole Mark and from further damaging and diluting Louboutin's significant goodwill and reputation.

**I.      LOUBOUTIN IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS**

**A.      Louboutin Will Likely Prevail on its Trademark Infringement and Unfair Competition Claims**

To succeed on its trademark infringement and unfair competition claims, Louboutin must demonstrate that:  (1) the Red Sole Mark is valid and entitled to protection, and (2) YSL's use of a red sole on its high fashion women's designer footwear is likely to cause confusion with Louboutin's distinctive and famous Red Sole Mark.  *See Virgin Enters. Ltd. v. Nawab*, 335 F.3d 141, 146 (2d Cir. 2003).

**1.      The Red Sole Mark Is Valid and Protectable**

It is firmly established that color is protectable as a trademark.  *See Qualitex Co. v.*

*Jacobson Prods. Co.*, 514 U.S. 159, 163-64, 174 (1995) (green-gold color on dry cleaning press pads); *In re Owens-Corning Fiberglass Corp.*, 774 F.2d 1116, 1128 (Fed. Cir. 1985) (pink for fiber glass insulation).

Plaintiffs' registration issued by the USPTO on January 1, 2008 (Mourot Dec. at Ex. A) establishes by statute, 15 U.S.C. § 1057(b), "the presumption that the purchasing public regards the [Red Sole Mark] as inherently distinctive." *Heisman Trophy Trust v. Smack Apparel Co.*, 595 F. Supp. 2d 320, 326 (S.D.N.Y. 2009)

Even YSL admits that the Red Sole Mark is distinctive. *See* Mourot Dec. at ¶ 38, Ex. L; Lewin Dec. at ¶ Ex. E at 9. YSL acknowledges that the Red Sole Mark is famous and the signature of *CHRISTIAN LOUBOUTIN* shoes. Mourot Dec. at Ex. L; Lewin Dec. at Ex. A at 165-66, B (at YSL 0004698 - "la semelle rouge de Louboutin"), C (at YSL0004709 - "semelle rouge de Louboutin"), and D (at YSL 0004717 - image of Louboutin boots with signature red soles). These YSL documents and witnesses hold up the Red Sole Mark as the very exemplar of a strong visual code for high fashion women's footwear. *See also* Lewin Dec. at Ex. E at 9, 42-43, 73-75. Yet, YSL contends that Plaintiffs' rights disappear when a red sole is put on a shoe with a red upper. YSL's logic is incongruous and has no support in the law.

Overwhelming evidence proves that the Red Sole Mark has attained significant secondary meaning due to its widespread exposure since 1992. Under the familiar standard, secondary meaning is proven by evidence of: (1) the length and exclusivity of the mark's use; (2) unsolicited media coverage; (3) advertising expenditures; (4) sales success; (5) attempts to plagiarize the mark; and (6) consumer studies linking the mark to a source. *GTFM, Inc. v. Solid Clothing, Inc.*, 215 F. Supp. 2d 273, 294 (S.D.N.Y. 2002) (quoting *Centaur Comm'ns, Ltd. v. A/S/M Comm'ns, Inc.*, 830 F.2d 1217, 1222 (2d Cir. 1985)).

### a.      Length and Exclusivity

Louboutin has made substantially exclusive use of the Red Sole Mark since 1992. Mourot Dec. at ¶ 8, Ex. C.  Consumers perceive the Red Sole Mark as identifying Louboutin as the source of the women's footwear on which it appears.  *See also Simon & Schuster Inc. v. Dove Audio, Inc.*, 970 F. Supp. 279, 295 (S.D.N.Y. 1997) (secondary meaning after fifteen months of use); *Kraft Gen. Foods, Inc. v. Allied Old English, Inc.*, 831 F. Supp. 123, 126, 129 (S.D.N.Y. 1993) (secondary meaning with eight years of use); *New York City Triathlon, LLC v. NYC Triathlon Club, Inc.*, 704 F. Supp. 2d 305, 330 (S.D.N.Y. 2010) (secondary meaning from ten years of use).

To Louboutin's knowledge, no other designer has used a red outsole on women's shoes on a significant or continuous basis during that time.  *Id.*   All such third party use has been infringing, which does not invalidate Louboutin's claim.  *L.D. Kichler Co. v. Davoil, Inc.*, 192 F.2d 1349, 1352 (Fed. Cir. 1999); *Miss Universe, L.P. v.* Villegas, 672 F. Supp. 2d 575, 594 (S.D.N.Y. 2009).  Louboutin aggressively polices unauthorized use of the Red Sole Mark and undertakes extensive advertising efforts to promote the mark.  *See Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 559 F. Supp. 2d 472, 477 (S.D.N.Y. 2008), *aff'd in part and vacated in part on other grounds*, 588 F.3d 97 (2d Cir. 2009).

### b.      Unsolicited Media Coverage

The extraordinary and unsolicited media coverage of the Red Sole Mark clearly supports a finding of secondary meaning.  *See, e.g.*, *New York City Triathlon*, 704 F. Supp. 2d at 330 (secondary meaning evident from television and newspaper coverage of plaintiff's race); *Cartier, Inc. v. Four Star Jewelry Creations, Inc.*, No. 01 Civ. 11295, 2003 U.S. Dist. LEXIS 7844, at *25 (extensive exposure in newspapers, magazines and trade publications); *Simon & Schuster*, 970 F. Supp. at 294 (significant national and local media coverage); *Stern's Miracle-Gro Prods.,*

11

*Inc. v. Shark Prods., Inc.*, 823 F. Supp. 1077, 1085 (S.D.N.Y. 1993) (widespread, unsolicited media coverage).

As summarized above, the Red Sole Mark has enjoyed widespread unsolicited media attention over the past several years.  The Red Sole Mark has been recognized as the identifier of *CHRISTIAN LOUBOUTIN* footwear in major publications.  Mourot Dec. at ¶¶ 7, 8; Rose Dec. at ¶ 28.  The Red Sole Mark has also been featured in movies and television shows, on the runway and in song lyrics.  Rose Dec. at ¶ 23, Ex. B (page 83).  *CHRISTIAN LOUBOUTIN* shoes with their signature red soles are also regularly photographed on glamorous celebrities.  Rose Dec. at ¶¶ 15-16, 20, 22, 28, Ex. J; Mourot Dec. at ¶¶ 9, 20.  Louboutin has half a million fans on Facebook and over forty thousand followers on Twitter.  Mourot Dec. at ¶ 26.  The famous Red Sole Mark has been the subject of two museum retrospectives.  Rose Dec. at ¶ 29.  Further, the media has recognized and written numerous articles about Mr. Louboutin, his history and innovative fashion designs.  *See, e.g.*, *id.* at ¶ 28, Ex. J; Mourot Dec. at Exs. B, D.

Mr. Louboutin and the *CHRISTIAN LOUBOUTIN* brand have also received numerous honors.  Mr. Louboutin has been named the Footwear News person of the year for 2010.  From 2007 to 2010, the Luxury Institute recognized the *CHRISTIAN LOUBOUTIN* brand as the top brand in its annual Luxury Brand Index in the category of Most Prestigious Women's Shoes.  Mourot Dec. at ¶ 13, Ex. D, Ex. E; Rose Dec. at ¶ 30.

### c.    Advertising Expenditures

Plaintiffs' unique marketing and promotional practices have generated media exposure of incalculable value, in part because third party unsolicited endorsements have greater credibility.  Nonetheless, Plaintiffs devote approximately $2 million each year to promote their shoes and the Red Sole Mark through a cooperative advertising program, running its e-commerce site, stocking its United States press office for sample trafficking activity and employing a team of fashion-

12

savvy personnel to service the requests.  Mourot Dec. at ¶¶ 15, 17.  Mr. Louboutin's personal appearances in the U.S. promote the brand, as do unique collaborations designed to increase the exposure of the *CHRISTIAN LOUBOUTIN* brand, such as the BARBIE® event described above. Rose Dec. at ¶¶ 21, 25-27; Mourot Dec. at ¶ 25, Ex. I.

### d.      Sales Success

Louboutin has enjoyed great and increasing commercial success, selling more than half a million pairs of shoes a year worldwide, and 240,000 pairs of shoes a year in the U.S., its largest market.  The retail sales value of Louboutin shoes in the U.S. market is expected to reach $135 million in 2011.  Mourot Dec. at ¶¶ 30-31.  In its large retail accounts, *e.g.,* Neiman Marcus, Bergdorf Goodman, Saks Fifth Avenue and Barneys New York, Louboutin Footwear is the number one seller of women's designer luxury footwear and is given more floor space in those same locations than any of its competitors.  Pfaffenbach Dec. at ¶ 8.

### e.      Attempts to Plagiarize the Mark

Success generates copyists.  Louboutin vigilantly polices the marketplace in order to protect the public from deception, to protect the reputation and goodwill acquired by Louboutin and to maintain the integrity and distinctiveness of the Red Sole Mark.  Louboutin's website at <http://stopfake.christianlouboutin.com> discusses Plaintiffs' enforcement measures, which include sending cease and desist letters, commencing legal actions, taking action against almost three hundred thousand individual auction sites containing product that infringes upon the Red Sole Mark since August 2009 and instituting Uniform Domain Name Dispute Resolution proceedings.  Mourot Dec. at ¶ 32.

### f.      Consumer Studies

Louboutin's survey evidence also proves the Red Sole Mark has strong secondary meaning.  96% of respondents who associated a red-soled YSL Tribute Stingray shoe with

13

Louboutin stated they held this belief due to the red sole.  Klein Dec. at ¶ 8, Ex. A at 3, 11.  58% of all respondents who saw the same shoe, but did not indicate Louboutin as the source, also concluded the red sole was a source identifier.  *Id*.  Over 50% consumer recognition is sufficient to show secondary meaning.  *Essie Cosmetics, Ltd. v. Dae Do Int'l, Ltd.*, 808 F. Supp. 952, 959 (E.D.N.Y. 1992); *Cartier, Inc. v. Four Star Jewelry Creations, Inc.*, 348 F. Supp. 2d 217, 230 (S.D.N.Y. 2004) (recognition by 50-60% of consumers proves secondary meaning).

The color red is not essential to the use or purpose of a shoe's outsole.  *Qualitex Co.*, 514 U.S. at 165 (citations omitted).  The Red Sole Mark does not make the outsole more absorbent or more durable.  Mourot Dec. at Ex. C.  Nor does Louboutin's use of a red outsole inhibit competition.  *See id.; Fabrication Enters. v. Hygenic Corp.*, 64 F.3d 53, 59 (2d Cir. 1995).  The market for luxury high fashion women's footwear remains highly competitive.  Rose Dec. at ¶ 30, Ex. M; Mourot Dec. at ¶ 13, Ex. E.  Versace, Valentino, Jimmy Choo and Manolo Blahnik, among others, all compete without any need to copy  the Red Sole Mark.

Only Louboutin has consistently and continuously used a lacquered red outsole for the past two decades.  Mourot Dec. at ¶ 8.  The bright lacquered red and the placement of the red on the outsole identify Louboutin as the source of the shoes.  *Qualitex*, 514 U.S. at 166; *Warner Bros., Inc. v. Gay Toys, Inc.*, 724 F.2d 327, 332 (2d Cir. 1983) (functions "which serve merely to identify" are not considered in determining functionality").  Other than to usurp Louboutin's significant goodwill in the Red Sole Mark and to create a likelihood of confusion, there is no justification for YSL using a confusingly similar mark on its shoes.

### 2.  YSL's Mark Is Likely to Cause Confusion with the Red Sole Mark

Likelihood of confusion, the *sine qua non* of the Lanham Act infringement and unfair competition analysis, is determined using the following eight factors:

> (1) the strength of the mark; (2) the degree of similarity between the marks at issue; (3) the competitive proximity of the products; (4) the likelihood that Louboutin will bridge the gap; (5) evidence of actual confusion; (6) YSL's bad faith in adopting its mark; (7) the quality of YSL products; and (8) the sophistication of the purchasers.

*See Polaroid Corp. v. Polaroid Elecs. Corp.*, 287 F.2d 492, 295 (2d Cir. 1961).  Although "no single [*Polaroid*] factor is determinative," "the first three factors are 'perhaps the most significant'." *New York City Triathlon*, 704 F. Supp. 2d at 333, 341 (quotations omitted).  Also, "the public's belief that the mark's owner sponsored or otherwise approved the use of the trademark satisfies the confusion requirement." *Id.* (quotation omitted).  Both a likelihood of confusion as to source at the point of sale and post-sale is actionable.  *Lois Sportswear, U.S.A., Inc. v. Textiles Y Confecciones Europeas, S.A.*, 799 F.2d 867, 872-73 (2d Cir. 1986).

Likelihood of confusion here is established by the first four Polaroid factors: (1) the Red Sole Mark is strong, (2) YSL's red sole is identical, and (3 and 4) the parties' products are women's high end luxury shoes at a similar price point and thus there is no gap to bridge between the products.

Importantly, these factors are all established by explicit admissions of YSL.  As YSL acknowledges, the Red Sole Mark is famous and the signature of *CHRISTIAN LOUBOUTIN* brand shoes.  Mourot Dec. at Ex. L; Lewin Dec. at Ex. A at 165-66, B (at YSL 0004698 - "la semelle rouge de Louboutin"), C (at YSL0004709 - "semelle rouge de Louboutin"), and D (at YSL 0004717 - image of Louboutin boots with signature red soles).  These YSL documents and witnesses hold up the Red Sole Mark as the very exemplar of a strong visual code for high fashion women's footwear.  *See also* Lewin Dec. at Ex. E at 9, 42-43, 73-75.

YSL also admits using a red outsole on its own shoes.  The similarity between the Red Sole Mark and the red outsoles of YSL's Infringing Footwear, both in color and configuration, is

self-evident.  *Compare* Rose Dec. at Ex. C, *with* Mourot Dec. at Ex. K.  YSL also admits that YSL high fashion women's footwear competes directly with Louboutin high fashion women's footwear and is sold in the same high end retail outlets.  *See, e.g.*, Lewin Dec. at Ex. A at 122, 143.

YSL nonetheless maintains that despite these admissions and the registered status of Louboutin's Red Sole mark, it, YSL, has the right to use the virtually identical red sole on YSL luxury shoes because the YSL shoe "uppers" are also red.  YSL maintains that Louboutin's rights are somehow extinguished when a red sole is used with red uppers by a direct competitor.

YSL's position has no support in the law.  When a competitor copies a strong mark, "it is much more likely that consumers will assume wrongly that it is somehow associated with [the trademark owner's product]").  *Lois Sportswear*, 799 F.2d at 874.  Similarity shows likelihood of confusion.  *Cartier*, 2003 U.S. Dist. LEXIS 7844, at *31 (similarity in the watches' design); *see also Heisman Trophy Trust v. Smack Apparel Co.*, 595 F. Supp. 2d 320, 327 (S.D.N.Y. 2009) (HEISMAN similar to HE15MAN and HE.is.the.MAN).  The Red Sole Mark and YSL's red soles on the Infringing Footwear create the same overall impression such that consumers would conclude that they share a common source, affiliation, connection or sponsorship.  *Banff, Ltd. v. Federated Dep't Stores, Inc.*, 841 F.2d 486, 492 (2d Cir. 1988).

When the goods are the same, the possibility for confusion is increased.  *U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc.*, No. 09 Civ. 9476, 2011 U.S. LEXIS 51707, at *32 (S.D.N.Y. May 13, 2011).  Here, YSL and Louboutin are direct competitors, the goods at issue are the same, and *CHRISTIAN LOUBOUTIN* and YSL high fashion women's designer footwear are sold at the same exclusive retail establishments, at similar price points, and over the Internet. Pfaffenbach Dec. at ¶ 10; Khaykin Dec.  Because Louboutin and YSL shoes are in direct

competition, there is no gap to bridge. *See U.S. Polo Ass'n*, 2011 U.S. Dist. LEXIS 51707, at *33 (parties are already "competitively proximate"); *Harris v. Fairweather*, No. 2011 U.S. Dist. LEXIS 46058, at *9-10 (S.D.N.Y. Apr. 28, 2011); *Cartier*, 2003 U.S. Dist. LEXIS 7844, at *32.

A net rate of 47.1% of the respondents to Louboutin's survey identified a YSL shoe with a red outsole "as coming from Christian Louboutin," and 96% of these respondents stated that the shoe emanated from Louboutin because it had a red sole. Klein Dec. at ¶¶ 6-7; *see also U.S. Polo Ass'n*, 2011 U.S. Dist. LEXIS 51707, at *23-24 (awareness of POLO marks is commercially strong). It follows that the Red Sole Mark must be considered strong. *See, e.g.*, *Pfizer v. Sachs*, No. 08 Civ. 8065 (WHP), 2008 U.S. Dist. LEXIS 79230, at *7-8 (S.D.N.Y. Oct. 8, 2008) (granting preliminary injunction and stating that "[t]he commercial success of a product reinforces the strength of the mark") (quotation omitted). The Red Sole Mark has also become famous, further indicating its strength. *See infra* at I.B.

YSL's admissions establish the distinctiveness and fame of the Red Sole Mark and YSL's use of the identical mark on directly competing goods. But in addition, the fifth *Polaroid* factor, actual confusion, strongly favors Louboutin.[7]

An overwhelming net rate of 47.1% of the participants in an online survey thought that YSL shoes with red outsoles originated from Louboutin, and were thus confused.[8] *See* Klein Dec. at ¶ 6. 96% of the survey participants who were confused stated that red soles indicated

---

[7] "It is black letter law that actual confusion need not be shown to prevail under the Lanham Act." *Lois Sportswear*, 799 F.2d at 875.
[8] The 47.1% rate was achieved by subtracting the 2.5% of the respondents in the control group who identified the shoes with the black sole as Louboutin shoes from 49.6% of the test group who stated that Louboutin made the YSL shoe red outsoles shown. Klein Dec. at Ex. A at 2.

that Louboutin made the YSL shoes shown to them.  *See id.* at ¶ 7.[9]  Surveys are direct evidence

of actual confusion.  *See, e.g., Metlife, Inc. & Metro. Life Ins. Co. v. Metro. Nat'l Bank*, 388 F.

Supp. 2d 223, 233 (S.D.N.Y. 2005); *U.S. Polo Ass'n*, 2011 U.S. Dist. LEXIS 51707, at *35;

*GoSMiLE, Inc. v. Dr. Jonathan Levine, D.M.D.P.C.*, No. 10-Civ-8663, 2011 U.S. Dist. LEXIS

23474, at *24 (S.D.N.Y. Mar. 7, 2011).  The use of online surveys has been approved by this

Court.  *See, e.g.*, *GoSMiLE, Inc.*, 2011 U.S. Dist. LEXIS 23474, at *25-26 (online surveys found

to be reliable).[10]

A 47.1% net rate of confusion far exceeds the rate this Court has accepted as probative of

actual consumer confusion.  *See, e.g.*, *Metlife*, 388 F. Supp. 2d at 233-34 (34% probative of

confusion); *see also Forschner Group, Inc. v. Arrow Trading Co., Inc.*, 904 F. Supp. 1409, 1427

(S.D.N.Y. 1995) (21.5% "probative of confusion"); *Kraft General Foods, Inc. v. Allied Old*

*English, Inc.*, 831 F. Supp. 123, 131 (S.D.N.Y. 1993) (26% rate of confusion); *McDonald's*

*Corp. v. McBagel's, Inc.*, 649 F. Supp. 1268, 1277 (S.D.N.Y. 1986) (24.6% of U.S. sample and

36.4% of New York sample).

The survey was conducted using the "Eveready" method, which is appropriate where, as

here, the senior user's mark is strong and widely recognized.[11]  The Eveready method is accepted

---

[9] Survey invitations were directed to females living in households with incomes of $150,000 and
up.  *Id*. at Ex. A at 4.  The link to the survey contained an embedded identification number that
assured each respondent could only complete the survey once.  *Id*.
[10] The "Internet was particularly appropriate way to reach the population" surveyed because the
purchase of shoes as expensive as the YSL shoes is rare.  *Id.*.
[11] Surveys using the Eveready method do not identify the senior user's mark to the respondents
and assume that the respondents are aware of the mark.  Thomas McCarthy, *McCarthy on
Trademarks and Unfair Competition*, § 32:173.50, 32-371 (West 2010) (the surveyor shows
defendant's product and then asks open-ended questions about who or what company the
respondents believe makes or produces the product); *see also Union Carbide Corp. v. Ever-
Ready, Inc.*, 531 F.2d 366 (7th Cir. 1976), superseded on other grounds, 772 F.2d 1423 (7th Cir.
Ill. 1985) (survey on whether consumers were likely to confuse the source of EVER-READY
lamps with EVEREADY batteries, flashlights and bulbs).

ME1 11867601v.2

by this Court.  *See, e.g., GMA Accessories, Inc. v. Croscill, Inc.*, 06-Civ.-6236, 2008 U.S. Dist. LEXIS 16052, at *27 (S.D.N.Y. 2008) (quoting *McCarthy* in approval); *Nat'l Distillers Prods. Co., LLC v. Refreshment Brands, Inc.*, 198 F. Supp. 2d 474, 483 (S.D.N.Y. 2002).  The survey was structured to simulate market conditions whereby potential consumers in the post-sale context see the flash of red on shoes as a woman walks down the street.  Klein Dec. at Ex. A at 5.

The sixth *Polaroid* factor (bad faith) "considers whether the defendant adopted its mark with the intention of capitalizing on [the] plaintiff's reputation and goodwill and [on] any confusion between his and the senior user's product."  *W.W.W. Pharm. Co. v. Gillette Co.*, 984 F.2d 567, 575 (2d Cir. 1993); *see also Lang v. Ret. Living Pub. Co., Inc.*, 949 F.2d 576, 583 (2d Cir. 1991); *Lee Myles Auto Group, LLC v. Fiorillo*, No. 10 Civ. 6267, 2010 U.S. Dist. LEXIS 91582, at *13 (S.D.N.Y. Aug. 25, 2010).

Bad faith may be inferred from the junior user's actual or constructive knowledge of the senior user's mark.  *Paddington Corp. v. Attiki Importers & Distribs., Inc.*, 996 F.2d 577, 587 (2d Cir. 1993); *Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 258-59 (2d Cir. 1987); *Artisan Mfg. Corp. v. All Granite & Marble Corp.*, 559 F. Supp. 2d 442, 452 (S.D.N.Y. 2008); see also *Pfizer*, 2008 U.S. Dist. LEXIS 79230, at *10 (noting defendants' awareness of plaintiff's marks and that defendants used plaintiff's marks for self-promotion purposes and finding bad faith).  Intentional copying may raise a presumption of consumer confusion. *Paddington Corp.*, 996 F.2d at 586; see also *Warner Bros. Inc. v. Am. Broadcasting Cos.*, 720 F.2d 231, 246-47 (2d Cir. 1983) ("Where a second-comer acts in bad faith and intentionally copies a trademark or trade dress, a presumption arises that the copier has succeeded in causing confusion."); *Charles of the Ritz v. Quality King Distribs.*, 832 F.2d 1317, 1322 (2d Cir. 1987) (intentional copying "bolsters a finding of consumer confusion").

YSL has acted in bad faith. YSL admits the fame and distinctiveness of the Red Sole Mark and that the Red Sole Mark was the "signature" of the *CHRISTIAN LOUBOUTIN* brand. *See, e.g.*, Mourot Dec. at Ex. L ("the notoriety of the distinctive signature constituted by the red sole of LOUBOUTIN models. . ."); Lewin Dec. at Exs. B-D.  The Prefall 2008 merchandising grid noted with approval that Louboutin had found a way to sign its shoes with a strong signature: the "semelle rouge de Louboutin" (red sole of Louboutin).  Lewin Dec. at Ex. B at YSL0004698.  Similarly, the Prefall 2009 merchandising grid cited Louboutin's success in signing its shoe: the red outsole of Louboutin.  *Id.* at Ex. C at YSL0004709.  The Prefall 2010 merchandising grid restated the importance of a strong visual code for footwear, and included an image of a Louboutin boot as inspiration.  *Id.* at Ex. D at YSL0004717.  Both Natalia Vaissie, YSL's director of women's accessories, and Francesco Russo, the former YSL shoe designer, admit discussing together the importance of a strong visual code for shoes and the Red Sole Mark of Louboutin as an exemplar of same.  When YSL put red outsoles on its shoes, it sought to dress them in Louboutin's signature mark.

The conclusion that YSL deliberately sought to copy the Red Sole Mark follows.  YSL was acutely aware of the popularity of Louboutin's shoes and the market demand for the Red Sole Mark created by Louboutin's goodwill.  YSL recognized the strong visual code that the Red Sole Mark represented and sought to mimic Louboutin's success.  That YSL did not show department stores samples of its Tribute, Tribtoo, Palais and Woodstock styles with red outsoles prior to the department store's placing their orders (*see* Pfaffenbach Dec. at ¶ 12) implies guilty knowledge that the use of a red sole would be of concern to such retailers.  *See generally id.*

The clear inference from YSL's actions is that YSL sought to attract and confuse customers' attention with a flash of red, similar to that of Louboutin.  More particularly, YSL

ME1 11867601v.2

sought to feed off of Louboutin's success and goodwill by deliberately copying the Red Sole Mark. This gives rise to a strong presumption of bad faith on the part of YSL.

The seventh *Polaroid* factor favors Louboutin. In the post sale context, it is likely that sophisticated consumers, seeing the Red Sole Mark on a quality YSL shoe, would be led to believe they were viewing Plaintiffs' shoes. *See Lois Sportswear*, 799 F.2d at 875 ("consumers easily could assume that quality jeans bearing . . . appellee's trademark stitching pattern to be a Levi's product."). Louboutin's survey, which recreated the post-sale market, resulted in a 47.1% net rate of consumer confusion and 96% who reported being confused identified the red sole as Louboutin. *See* Klein Dec. at ¶¶ 6-7.

The eighth Polaroid factor also favors Louboutin because the goods and the marks at issue are virtually identical. *Morningside Group, Ltd. v. Morningside Capital Group, L.L.C.*, 182 F.3d 133, 143 (2d Cir. 1999) (buyer sophistication "cannot be relied on to prevent confusion" if goods and marks are extremely similar); *Pfizer v. Sachs*, 652 F. Supp. 2d 512, 524 (S.D.N.Y. 2009) ("even a highly sophisticated and discriminating class of consumers cannot be relied upon to allay confusion when the marks . . . are nearly identical") (quotation omitted).

Because YSL admits the fame and distinctiveness of the Red Sole Mark, appropriated it on the same goods sold in the same channels of commerce at the same price points, and because survey evidence proves actual confusion, the *Polaroid* factors weigh heavily in favor of a finding of likely confusion. Louboutin is likely to succeed on the merits of its trademark infringement and unfair competition claims.

**B.  Louboutin is Likely to Succeed on its Federal Dilution Claim Because YSL's Use of Red Soles Blurs the Distinctiveness of Louboutin's Famous Red Sole Mark.**

The Red Sole Mark is "widely recognized by the general consuming public . . . as a designation of source of the goods . . . of [Louboutin,] the mark's owner." 15 U.S.C. §

21

1125(c)(2)(A).  By YSL's own admission, the Red Sole Mark became famous long before YSL began selling the Infringing Footwear in January 2011.  The great commercial success of the Louboutin brand -- U.S. sales of 240,000 pairs, and a retail sales value in the U.S. market for 2011 projected at $135 million -- reflects its fame.  Mourot Dec. at ¶¶ 30-31.  Because YSL's sale of shoes containing red soles will likely cause dilution of the famous Red Sole Mark, an injunction against YSL is appropriate.  *See* 15 U.S.C. § 1125(c)(1).

YSL's use of red soles on its high fashion footwear dilutes the famous Red Sole Mark by blurring which impairs the distinctiveness of the famous Red Sole Mark.  *See* 15 U.S.C. § 1125(c)(2)(B).  All statutory factors, 15 U.S.C. § 1125(c)(2)(B)(i)-(vi), are proven here. As discussed above:  (i) YSL's red soles are virtually identical to the Red Sole Mark; (ii) the Red Sole Mark has a high degree of distinctiveness; (iii) use has been substantially exclusive; (iv) the Red Sole Mark is widely recognized as the signature for *CHRISTIAN LOUBOUTIN* brand footwear ; and (v) YSL explicitly sought a "strong visual code" and thus intended to create an association with the Red Sole Mark.  *See, e.g.*, Lewin Dec. at Ex. B at. YSL0004698.

The evidence thus shows that continued sale of YSL's Infringing Footwear will severely dilute the distinctive quality and value of the famous Red Sole Mark, and Louboutin's goodwill in this mark.  Accordingly, it is likely that Louboutin will succeed on its dilution claim.

### C.   Louboutin Will Likely Prevail on its State Law Claims

Trademark infringement under New York common law requires proof of likelihood of confusion.  *GTFM, Inc.*, 215 F. Supp. 2d 273, 300 (S.D.N.Y. 2002).  A claim of unfair competition under New York common law requires proof of  a likelihood of confusion and that YSL acted in bad faith.  *See id.*  The evidence of likely confusion and bad faith by YSL, outlined above,  establish  trademark  infringement  and  unfair  competition  claims  under  New  York

common law.  *See U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc.*, No. 09 Civ. 9476, 2011 U.S. LEXIS 51707, at *55 (S.D.N.Y. May 13, 2011).

Louboutin is also likely to succeed on its state dilution claim.  "To establish a dilution claim under New York law, [Louboutin] must establish (1) ownership of a distinctive mark, and (2) likelihood of dilution."  *Pfizer*, 652 F. Supp. 2d at 526.  YSL's use of red soles on its high fashion women's designer shoes diminishes the Red Sole Mark's "capacity . . . to serve as a unique identifier of [*CHRISTIAN LOUBOUTIN*] products."  *GTFM, Inc.*, 215 F. Supp. 2d at 301 (quotation omitted).

## II.  LOUBOUTIN WILL BE IRREPARABLY HARMED UNLESS YSL IS ENJOINED FROM SELLING THE INFRINGING FOOTWEAR

A trademark owner's loss of goodwill and ability to control its reputation constitutes irreparable harm sufficient to satisfy the preliminary injunction standard.  *See Church of Scientology Int'l v. Elmira Mission of the Church of Scientology*, 794 F.2d 38, 43 (2d Cir. 1986) ("[I]rreparable harm exists . . . when the party seeking the injunction shows that it will lose control over the reputation of its trademark pending trial."); *Harris v. Fairweather*, No. 11 Civ. 2152, 2011 U.S. Dist. LEXIS 46058 (S.D.N.Y. Apr. 28, 2011) (loss of control of mark demonstrates irreparable harm).  Harm to goodwill and reputation is the sort of harm that is impossible to quantify.  *See Saban Entm't, Inc., v. 222 World Corp.*, 865 F. Supp. 1047 , 1056 (S.D.N.Y. 1994).

Louboutin has amassed substantial goodwill and a remarkable reputation selling shoes bearing the Red Sole Mark.  Every day that YSL sells red-soled shoes, the ability of Louboutin to identify its goods and control its reputation by the Red Sole Mark is lessened.  In the post-sale market, consumer confusion will multiply.  *See* Klein Dec. at ¶ 5.  Thus, the harm to Louboutin is both immediate and irreparable and will continue unless enjoined by this Court.

### III.    THE BALANCE OF THE HARDSHIPS FAVORS LOUBOUTIN

The balance of the hardships favors Louboutin.  If left unremedied, the harm to Louboutin from YSL's sale of the Infringing Footwear is irreparable, which would surpass any potential harm to YSL from an improperly granted injunction.  *LeSportsac, Inc. v. K Mart Corp.*, 754 F.2d 71, 79 (2d Cir. 1985) (potential damage to mark and goodwill in absence of a preliminary injunction outweighs any short-term economic harm).

The value of the Red Sole Mark as a source identifier has been, and continues to be, diminished through YSL's unauthorized use of red soles on its footwear.  Once YSL started selling the Infringing Footwear, Louboutin faced losing the goodwill it has built in its brand over two decades, the loss of control over the quality, appearance and distinctiveness of its products; and the loss of the exclusive use of the Red Sole Mark.  Because the Red Sole Mark is a signature of Louboutin's worldwide business, YSL's infringing behavior greatly damages Louboutin.

To Louboutin's knowledge, YSL only began offering the Infringing Footwear in the United States in January 2011.[12]  Thus, YSL has a limited investment in the use of a mark that is confusingly similar to the Red Sole Mark.  Also, if YSL experiences any harm, it brought such harm on itself by its infringing conduct.  Yet, YSL was obliged to avoid confusion with Louboutin's existing rights.  *Stern's Miracle-Gro Prods., Inc. v. Shark Prods., Inc.*, 823 F. Supp. 1077, 1093-94 (S.D.N.Y. 1993).  Thus, "this is a loss which [YSL] may justifiably be called upon to bear." *Corning Glass Works v. Jeanette Glass Co.,* 308 F. Supp. 1321, 1328 (S.D.N.Y.), *aff'd*, 432 F.2d 784 (2d Cir. 1970).

---

[12] To the extent that YSL previously used red outsoles on its footwear, such use was not continuous or significant.

IV.     **ENJOINING YSL FROM USING CONFUSINGLY SIMILAR MARKS TO THE RED SOLE MARK IS CONSISTENT WITH THE PUBLIC INTEREST**

Courts have a strong public interest in preventing consumer confusion.  *See New York City Triathlon, LLC v. NYC Triathlon Club, Inc.*, 704 F. Supp. 2d 305, 344 (S.D.N.Y. 2010) (the public has an interest in not being deceived); *Asia Apparel, LLC v. Ripswear, Inc.,* No. 3:02-cv-469, 2004 U.S. Dist. LEXIS 29208, at *15 (W.D.N.C. Sept. 17, 2004), *aff'd*, 118 Fed. Appx. 782 (4th Cir. 2005); *U.S. v. Torkington*, 812 F.2d 1347, 1353 n.6 (11th Cir. 1987).  Louboutin has shown that consumers are likely to be confused by YSL's use of red soles on the Infringing Footwear.  Unless YSL is enjoined, consumers will likely mistakenly believe that the Infringing Footwear is the product of, associated with, sponsored by, and/or warranted by Louboutin.

## CONCLUSION

For the foregoing reasons, this Court should enter an order preliminarily enjoining YSL from selling the Infringing Footwear.

Dated: June 21, 2011              McCARTER & ENGLISH, LLP


                                 By:/s/Lee Carl Bromberg_____
                                    Harley I. Lewin
                                    Lee Carl Bromberg

                                 Harley I. Lewin              Lee Carl Bromberg
                                 245 Park Avenue, 27th Floor  265 Franklin Street
                                 New York, NY  10167          Boston, MA  02110
                                 Tel: (212) 609-6800          Tel:  617-449-6500
                                 Fax: (212) 609-6921          Fax:  617-443-6161
                                 hlewin@mccarter.com          lbromberg@mccarter.com

                                 *Attorneys for Plaintiffs Christian Louboutin S.A., Christian Louboutin, L.L.C., and Christian Louboutin*

ME1 11867601v.2