David H. Bernstein (dhbernstein@debevoise.com)
Jyotin Hamid (jhamid@debevoise.com)
Jill van Berg (jvanberg@debevoise.com)
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, New York 10022
(212) 909-6696

*Attorneys for Yves Saint Laurent America, Inc.,
Yves Saint Laurent America Holding, Inc.,
and Yves Saint Laurent S.A.S.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | | |
|---|---|---|
| Christian Louboutin S.A., Christian Louboutin, L.L.C. and Christian Louboutin | : | |
| | : | |
| Plaintiffs/Counterclaim-Defendants, | : | |
| vs. | : | Civil Action Number 11-cv-2381 (VM) |
| | : | ECF Case |
| Yves Saint Laurent America, Inc., Yves Saint Laurent America Holding, Inc., and Yves Saint Laurent S.A.S., et al. | : | |
| | : | |
| Defendants/Counterclaim-Plaintiffs. | | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**DEFENDANTS/COUNTERCLAIM-PLAINTIFFS'
FIRST AMENDED COUNTERCLAIMS**

Defendants/Counterclaim-Plaintiffs Yves Saint Laurent America, Inc., Yves Saint Laurent America Holding, Inc. and Yves Saint Laurent S.A.S. (collectively, "YSL"), by their undersigned attorneys, Debevoise & Plimpton LLP, for their First Amended Counterclaims against Plaintiffs/Counterclaim-Defendants Christian Louboutin S.A., Christian Louboutin L.L.C. and Christian Louboutin (collectively, "Louboutin"), state as follows:

**Introduction**

1.     These counterclaims arise from Louboutin's assertion of trademark rights that are based on fraudulently obtained, invalid trademark registrations (the "Contested Marks").

Louboutin claims to have the exclusive right to use red outsoles on women's footwear – even on shoes, like all the YSL models challenged in this lawsuit, that are entirely red.  Louboutin's attempt to monopolize the use of red outsoles – even to the extent of claiming that no other designer can make an all-red shoe – is unsupported by law, defies common sense and would unduly restrict the design options available to competitors in this market.

2. Red outsoles are a commonly used ornamental design feature in footwear, dating as far back as the red shoes worn by King Louis XIV in the 1600s and the ruby red shoes that carried Dorothy home in *The Wizard of Oz* in the 1939 film.  During the past forty years, red outsoles have been used for their ornamental qualities by dozens of designers of women's high fashion footwear sold in the United States.  YSL, for example, has made numerous models of women's footwear using red outsoles dating back to the 1970s, since long before Louboutin's use of red outsoles for its shoes.  Many of the models of footwear with red outsoles made by YSL and third parties have garnered attention in widely followed fashion industry publications over the years.  In light of the longstanding, widespread and well known use of red outsoles in the industry, Louboutin cannot plausibly assert that red outsoles are singularly associated with the Louboutin brand.

3. Even the specific YSL shoes challenged in this lawsuit have been sold for years.  Contrary to Louboutin's assertion that YSL "just beg[a]n selling" the challenged shoes in January 2011, two of the four models of monochrome shoes that Louboutin has challenged have been available in red (as well as a line-up of other colors) for several years.  Louboutin's reckless assertion that YSL has only just begun to use red outsoles for its shoes is thus demonstrably wrong.

4.       Louboutin's Contested Marks are invalid for several reasons. Mr. Louboutin's sworn statement to the U.S. Patent & Trademark Office ("USPTO") in support of the Contested Marks – to the effect that Louboutin's use of a red outsole is "exclusive" – was demonstrably false when made. In addition, the Contested Marks lack distinctiveness and are functional and merely ornamental.

5.       Louboutin also cannot demonstrate any likelihood of confusion. Two of the four models of YSL footwear challenged in this lawsuit – the Tribute and the Tribtoo – have been sold in the United States for years. Yet Louboutin admits that it is unaware of a single instance of consumer confusion, despite years of co-existence. Louboutin also admits that relevant consumers of these shoes (which cost many hundreds, and in some cases thousands, of dollars) are sophisticated and are likely to exercise great care in purchasing these expensive products.

6.       Nor can Louboutin demonstrate bad faith on the part of YSL. On the models challenged by Louboutin, YSL does not use a red outsole in the same manner that Louboutin claims to use that feature – namely, as a "signature" element contrasted sharply against the rest of the shoe (nor does YSL use the same glossy, laquered red used by Louboutin.) The design concept behind the YSL models, by contrast, is monochrome – that is, the color of the insole, outsole, heel and upper is all the same. YSL offers each model in a line-up of eye-catching colors that are used on the entire shoe: The red version is all red, including a red outsole, the blue version is all blue, including a blue outsole, the purple version is all purple, and so on. Far from reflecting a desire to mimic Louboutin's use of red, YSL's use of red reflects an entirely different design concept – namely to offer a line-up of monochromatic shoes. As such, YSL's use of red is fair, descriptive, ornamental and unlikely to confuse any relevant consumer into believing that YSL shoes are made by or associated with Louboutin.

7. Despite the invalidity of its Contested Marks and the absence of any shred of evidence of confusion after many years of co-existence, Louboutin has brought this lawsuit as one part of an anti-competitive campaign to monopolize use of a common design feature and thereby inappropriately limit the design options available to competitors. Louboutin also has engaged in aggressive and unlawful interference with YSL's business as another part of its anti-competitive campaign. Specifically, before filing suit, Louboutin pressured the major third-party retailers to stop selling certain YSL footwear and to return the products in question to YSL. Louboutin's unlawful tactics forced the return not only of the models challenged in this lawsuit but also of models that Louboutin has not even challenged.

8. Accordingly, YSL brings these counterclaims seeking cancellation of Louboutin's Contested Marks and recovery of the damages caused by Louboutin's tortious interference.

## Jurisdiction and Venue

9. This Court has subject matter jurisdiction over these counterclaims pursuant to 28 U.S.C. §§ 1331, 1338(a), 1367(a), 2201(a) and 2202.

10. This Court has personal jurisdiction over Louboutin pursuant to N.Y. C.P.L.R. § 302(a)(l) and because Louboutin has submitted itself to the personal jurisdiction of this Court by commencing this action.

11. Venue is proper in this district under 28 U.S.C. § 1391. Louboutin filed its Complaint in this District and thus has consented to venue in this Court.

## The Parties

12. Counterclaim-Plaintiff Yves Saint Laurent America, Inc. is a New York corporation with its principal place of business at 3 East 57th Street, New York, New York 10022.

13. Counterclaim-Plaintiff Yves Saint Laurent America Holding, Inc. is a New York corporation with its principal place of business at 3 East 57th Street, New York, New York 10022.

14. Counterclaim-Plaintiff Yves Saint Laurent S.A.S. is organized under the laws of France as a Société par Actions Simplifiée and has its principal place of business at 7, Avenue George V, Paris 75008, France.

15. Counterclaim-Defendant Christian Louboutin S.A. is a corporation, organized and existing under the laws of France, having its principal place of business at 19 rue de Jean-Jacques Rousseau, Paris, France 75001.

16. Counterclaim-Defendant Christian Louboutin, L.L.C. is a New York corporation with its principal place of business at 306 West 38th Street, New York, New York 10018.

17. Counterclaim-Defendant Christian Louboutin is an individual and a citizen of the country of France with an address at 1 rue Volney, Paris, France 75002.

**The YSL Brand**

18. The YSL brand was founded by famed fashion designer Mr. Yves Saint Laurent and his partner, Mr. Pierre Bergé, in 1962.  The fashion house, and specifically Mr. Saint Laurent, has been credited with popularizing the concept of ready-to-wear clothing lines, as well as a range of other innovations including "le smoking," his legendary smoking suit, the reefer jacket (1962), the sheer blouse (1966), and the jumpsuit (1968).  The YSL brand is one of the most famous fashion brands in the world, and has been for almost 50 years.  YSL has produced seasonal shoe collections since the brand's inception.

19. In 1999, the Gucci Group, a wholly-owned subsidiary of PPR (commonly referred to as "PPR Group" and formerly known as "Pinault-Printemps-Redoute"), purchased the YSL brand and remains the sole owner of the fashion house to this day.

20. In addition to its shoe collection, YSL currently produces ready-to-wear clothing, jewelry, handbags, leather goods and other accessories. YSL sells its products in various locations throughout the world, including Tokyo, New York, London and Paris.

### YSL's Historical Use of Red Outsoles

21. Red has been a significant color throughout YSL's history and as such, has been frequently represented across YSL's various product lines. YSL first used the color red on the outsoles of women's footwear as far back as the 1970s. Since then, YSL frequently has designed, produced, distributed, marketed, sold and used footwear with red outsoles.

22. In the past decade, YSL has designed, promoted or sold in the United States numerous models of women's footwear with red outsoles.

23. YSL's Fall/Winter 2004 collection included the Taï Taï and Lotus models. These models, which had bright red outsoles, were featured in a print advertising campaign in the United States and were unveiled at a YSL runway show attended by Mr. Louboutin himself.

| Tai Tai-Fall/Winter 2005 | Lotus-Fall/Winter 2005 |
|---|---|
|  |  |

24. Another prominent example is the Saint Germain model, which was included in YSL's Spring/Summer 2005 collection. The Saint Germain was a monochromatic shoe offered in

a line-up of eye-catching colors, including red.  The Saint Germain was featured in a print advertising campaign in the United States and was unveiled at a widely followed YSL runway show.

**Saint Germain-Spring/Summer 2005**



There are numerous other examples of YSL shoes with red outsoles promoted and/or sold in the United States.

25.	Two of the footwear models challenged by Louboutin in this lawsuit have been available for years with red outsoles.  The Tribute was offered in red in YSL's Cruise 2008 and Fall/Winter 2009 collections

| **Tribute-Cruise 2008** | **Tribute- Fall/Winter 2009** |

 

and the Tribtoo was offered in red in YSL's Fall/Winter 2009 collection.

**Tribtoo-Fall/Winter 2009**



26. YSL's decision to use red outsoles has always been the result of purely aesthetic considerations. On each of the four models of footwear challenged by Louboutin in this lawsuit – the Tribute, the Tribtoo, the Palais and the Woodstock – as well as nearly all other YSL models of footwear with red outsoles, the key design concept has been to offer monochromatic footwear in a line-up of eye-catching colors. Consistent with this design concept, the shoes are characterized by the use of the same solid color for the entire shoe: the insole, outsole, heel and upper.

27. YSL footwear models with red outsoles have been well known in the industry and among relevant consumers for years, including because of their exposure in industry publications.

### Third Party Use of Red Outsoles

28. YSL is not alone in using the color red as a design choice for its shoes. Dozens of parties have designed, produced, distributed, marketed, sold or used women's footwear with red

outsoles for years, and continue to do so today. Many of these models of footwear have received broad exposure in industry publications.

### Louboutin's Contested Marks

29.     Although Louboutin claims that it has been using red outsoles as a trademark since 1992, Mr. Louboutin did not apply to register the red outsoles as a trademark in the United States until 2001. In the process of pursuing those applications, Mr. Louboutin made false statements that constitute fraud on the USPTO and render the registrations invalid.

30.     Mr. Louboutin applied to the USPTO to register marks depicting red outsoles for footwear on three separate occasions. In response to Mr. Louboutin's first application, the USPTO refused registration on the grounds that the proposed mark was "merely an ornamental feature of the goods." Mr. Louboutin abandoned that application rather than responding to the USPTO's office action. A second application was approved by the USPTO on January 1, 2008, and subsequently matured into U.S. Registration No. 3,361,597. This is the registration cited by Louboutin in its Complaint and upon which Louboutin purports to base its primary cause of action against YSL in this lawsuit. Mr. Louboutin also applied to register a third mark by filing with the USPTO a "request for extension of protection" relating to a trademark Mr. Louboutin had previously registered with French authorities. The USPTO approved that third application on January 29, 2008; it subsequently matured into U.S. Registration No. 3,376,197.

31.     Mr. Louboutin, who is listed personally as the owner of the registrations, made demonstrably false statements in the sworn declarations that he submitted to the USPTO in support of the Contested Marks. Most seriously, in a sworn declaration submitted to the USPTO on March 14, 2007, Mr. Louboutin asserted under oath that he had been the "substantially exclusive" user of

red outsoles on women's footwear since 1992.  That was a false statement when made and remains false today.

32.     Mr. Louboutin knew his statement was false at the time he made it in 2007.  Just three years earlier, in 2004, Mr. Louboutin personally attended a YSL runway show at which YSL unveiled to the fashion world and the media YSL's Taï Taï and Lotus models, both of which included several individual styles all featuring bright red outsoles.  In December 2005, only 15 months before his sworn statement to the USPTO, Mr. Louboutin contributed to a special fashion feature in *Vogue* magazine inspired by *The Wizard of Oz* by designing red high heel shoes reminiscent of Dorothy's ruby-red slippers.  But Mr. Louboutin was not the only fashion designer to contribute red-soled shoes inspired by the movie to that issue of *Vogue*.  On several other occasions, red-soled shoes made by other fashion designers have been featured in the very same issues of fashion publications with Louboutin shoes with red outsoles.  Based on his personal attendance at a YSL runway show in which several styles of YSL shoes with red outsoles were launched and his personal participation in a fashion portfolio in *Vogue* magazine in which third-party red-soled shoes were also featured, Mr. Louboutin knew that he was not the "substantially exclusive" user of red outsoles on women's footwear at the time he made that false assertion to the USPTO.  Moreover, as an industry leader who has devoted his entire professional life to women's footwear, Mr. Louboutin no doubt was exposed to some or all of the dozens of other footwear models with red outsoles that rendered his sworn statement false (including through issues of fashion magazines that featured both his shoes and shoes with red outsoles by other designers).

33.     In the same March 14, 2007, declaration submitted to the USPTO, Mr. Louboutin also falsely asserted that "all" shoes he has designed since 1992 have used a red outsole.  That too

was a deliberate false statement to the USPTO. Mr. Louboutin had designed and sold shoes with blue outsoles, silver outsoles and pink outsoles.

### Louboutin's Bad Faith and Unlawful Interference with YSL's Business

34. Louboutin first contacted YSL in January 2011 to object to YSL's monochromatic Tribute, Tribtoo, Palais and Woodstock models to the extent they are available in red. Contrary to the egregious mischaracterizations contained in Louboutin's motion papers filed with this Court, YSL never acknowledged the "fame" or "distinctiveness" of the so-called "Red Sole Mark." The February 3 letter to which Louboutin refers made no such acknowledgment. Rather, the February 3 letter noted that Louboutin's "signature" is use of a red sole specifically as contrasted against a different color for the rest of the shoe, particularly the upper. The letter further made clear that the challenged YSL models reflected a completely different design concept and conveyed a completely different look insofar as they were monochromatic and because they did not even use a shade of red similar to that used by Louboutin. YSL therefore declined to acquiesce to Louboutin's unreasonable demands.

35. Five weeks later, on March 14, Louboutin sent a self-serving letter, presumably "for the record," mischaracterizing the substance of the February 3 letter, and another three weeks after that, on April 7, Louboutin filed its Complaint and motion papers.

36. In the meantime, while it delayed filing suit, Louboutin was embarked on an unlawful campaign to intimidate department stores into ceasing sales of YSL footwear. As a result of pressure exerted by Louboutin, several retailers refused to continue selling a range of YSL footwear and returned their inventory to YSL.

37. Louboutin used improper and wrongful means to persuade the stores to return the products. In effect, Louboutin organized an anti-competitive "group boycott" of YSL's products,

thereby shutting YSL out of one of its most important distribution channels – high-end department stores.  On information and belief, Louboutin accomplished this goal by making false or misleading claims to the retailers about its rights to prevent them from selling YSL products.  The models of footwear that Louboutin improperly pressured the retailers to return included not only the models challenged by Louboutin in this lawsuit but also additional models that Louboutin has never challenged.

38.     As a result of Louboutin's conduct, YSL suffered significant losses, including unnecessary storage and shipping costs and lost revenue on the returned inventory.

## First Counterclaim
### Cancellation of Marks under 15 U.S.C. §§ 1119, 1052(f) [Lack of Distinctiveness]

39.     YSL repeats and realleges each of the foregoing paragraphs as though fully set forth herein.

40.     Louboutin asserts trademark rights in the color red for the outsoles of women's high-fashion shoes, as shown in the Contested Marks.

41.     Louboutin's Contested Marks do not constitute valid and protectable trademarks because they are aesthetic, ornamental, decorative design elements that lack distinctiveness and do not serve as source identifiers for Louboutin.

42.     The Contested Marks have not acquired distinctiveness through substantially exclusive and continuous use because YSL, as well as dozens of non-parties, have produced women's footwear with red outsoles both before and since the registrations of the Contested Marks became effective, and before and since Louboutin's claimed first use of the color red for outsoles.

43.     YSL is being and will continue to be damaged by Louboutin's continued registration of the Contested Marks, as such registrations form the basis for Louboutin's meritless claims of, among other things, infringement, dilution, counterfeiting and unfair competition, and

because such registrations are being cited by Louboutin in connection with its tortious interference with YSL's business relations with major retailers.

44. In light of the foregoing, the Court should declare Louboutin's purported marks invalid and cancelled pursuant to 28 U.S.C. §§ 2201 and 2202, 15 U.S.C. §§ 1119 and 1052(f).

**Second Counterclaim**
**Cancellation of Marks under 15 U.S.C. §§ 1119, 1052(f) [Ornamental]**

45. YSL repeats and realleges each of the foregoing paragraphs as though fully set forth herein.

46. Louboutin asserts trademark rights in the color red for the outsoles of women's high-fashion shoes, as shown in the Contested Marks.

47. Louboutin's Contested Marks do not constitute valid and protectable trademarks because they are aesthetic, ornamental, decorative design elements that lack distinctiveness and do not serve as source identifiers for Louboutin.

48. The Contested Marks have not acquired distinctiveness through substantially exclusive and continuous use because YSL, as well as dozens of non-parties, have produced women's footwear with red outsoles both before and since the registrations of the Contested Marks became effective, and before and since Louboutin's claimed first use of the color red for outsoles.

49. YSL is being and will continue to be damaged by Louboutin's continued registration of the Contested Marks, as such registrations form the basis for Louboutin's meritless claims of, among other things, infringement, dilution, counterfeiting and unfair competition, and because such registrations are being cited by Louboutin in connection with its tortious interference with YSL's business relations with major retailers.

50. In light of the foregoing, the Court should declare Louboutin's purported marks invalid and cancelled pursuant to 28 U.S.C. §§ 2201 and 2202, 15 U.S.C. §§ 1119, 1052 and 1157.

### Third Counterclaim
### Cancellation of Marks under §§ 15 U.S.C. 1119, 1064(3) [Fraud on the USPTO]

51.     YSL repeats and realleges each of the foregoing paragraphs as though fully set forth herein.

52.     In his submissions seeking federal registration of the Contested Marks, Mr. Louboutin knowingly made incomplete, misleading and fraudulent assertions, as detailed above.

53.     These false assertions were material to the USPTO's decision to register the Contested Marks because they were the basis for Mr. Louboutin's claim that the Contested Marks qualified for registration under a theory of acquired distinctiveness.

54.     YSL is being and will continue to be damaged by Louboutin's continued registration of the Contested Marks, as such registrations form the basis for Louboutin's meritless claims of, among other things, infringement, dilution, counterfeiting and unfair competition, and because such registrations are being cited by Louboutin in connection with its tortious interference with YSL's business relations with major retailers.

55.     In light of the foregoing, the Court should declare Louboutin's purported marks invalid and cancelled pursuant to 28 U.S.C. §§ 2201 and 2202 and 15 U.S.C. §§ 1119 and 1064(3).

### Fourth Counterclaim
### Cancellation of Marks under 15 U.S.C §§ 1119, 1064(3) [Functionality]

56.     YSL repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

57.     The use of a red outsole in fashion is functional and thus not eligible for trademark protection.

58.     YSL is being and will continue to be damaged by Louboutin's continued registration of the Contested Marks, as such registrations form the basis for Louboutin's meritless

claims of, among other things, infringement, dilution, counterfeiting and unfair competition, and because such registrations are being cited by Louboutin in connection with its tortious interference with YSL's business relations with major retailers.

59.     In light of the foregoing, the Court should declare Louboutin's purported marks invalid and cancelled pursuant to 28 U.S.C. §§ 2201 and 2202 and 15 U.S.C. §§ 1119 and 1064(3).

### Fifth Counterclaim
### Tortious Interference with Business Relations

60.     YSL repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

61.     Louboutin has knowledge of YSL's particular and existing business relations with its high-end department store retailers.

62.     Louboutin, as described above, has intentionally and maliciously interfered with YSL's business relationships by improper and wrongful means.

63.     The acts of Louboutin, as described above, have damaged YSL in an amount to be determined at trial.

### Sixth Counterclaim
### Unfair Competition

64.     YSL repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

65.     Louboutin has, in bad faith, engaged in and continues to engage in unfair competition with YSL through a variety of improper means alleged herein.

66.     As a result of Louboutin's conduct, YSL suffered significant losses, including unnecessary storage and shipping costs and lost revenue on returned inventory.

**Prayer for Relief**

**WHEREFORE,** Counterclaim-Plaintiffs respectfully request that this Court enter a judgment as follows:

(a) dismissing the Complaint in its entirety;

(b) canceling Louboutin's federal registrations for the Contested Marks;

(c) granting judgment in YSL's favor on all Counterclaims;

(d) awarding to YSL compensatory damages on its claims in an amount to be proven at trial, including up to three times the amount of compensatory damages assessed by the Court, as applicable;

(e) awarding to YSL their attorney's fees and expenses and the costs and disbursements of defending this action;

(f) awarding to YSL punitive damages on account of Louboutin's malicious, willful, tortious interference and unfair competition; and

(g) granting such other and further relief as the Court deems just and proper.

Dated: New York, New York
June 27, 2011

Respectfully submitted,

___/s/ [David H. Bernstein]_____
David H. Bernstein (dhbernstein@debevoise.com)
Jyotin Hamid (jhamid@debevoise.com)
Jill van Berg (jvanberg@debevoise.com)
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, New York 10022
(212) 909-6696
*Attorneys for Yves Saint Laurent America, Inc.,*
*Yves Saint Laurent America Holding, Inc.,*
*and Yves Saint Laurent S.A.S.*