David H. Bernstein (dhbernstein@debevoise.com)
Jyotin Hamid (jhamid@debevoise.com)
Jill van Berg (jvanberg@debevoise.com)
Rayna S. Feldman (rsfeldman@debevoise.com)
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, New York 10022
(212) 909-6696

*Attorneys for Yves Saint Laurent America, Inc.,*
*Yves Saint Laurent America Holding, Inc.,*
*and Yves Saint Laurent S.A.S.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Christian Louboutin S.A., Christian Louboutin,     :
L.L.C. and Christian Louboutin,                    :
                                                   :
       Plaintiffs/Counterclaim-Defendants,  :
                                                   :
   vs.                                           :     Civil Action Number 11-cv-2381
                                                   :                  (VM)
Yves Saint Laurent America, Inc., Yves Saint       :
Laurent America Holding, Inc., and Yves Saint      :              ECF Case
Laurent S.A.S., et al.,                            :
                                                   :
      Defendants/Counterclaim-Plaintiffs.  :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DECLARATION OF HAL PORET

    I, Hal Poret, declare as follows:

    1.    I submit this Declaration, based on personal knowledge, on behalf of Yves

Saint Laurent America, Inc., Yves Saint Laurent America Holding, Inc. and Yves Saint

Laurent S.A.S. in opposition to the motion for a preliminary injunction of Christian

Louboutin S.A., Christian Louboutin, L.L.C. and Christian Louboutin (together,

"Louboutin").

2.      Debevoise & Plimpton LLP, attorneys for YSL, asked me to review and comment on a survey conducted by Robert L. Klein on behalf of Louboutin, which purports to show a likelihood of post-sale confusion (and concludes that a red sole has acquired secondary meaning as a Louboutin trademark), and to conduct my own survey to determine whether or not post-sale confusion is likely. My report, attached hereto as Exhibit A, contains my opinions regarding the Klein survey and details the methodology and results of my own survey.

3.      In the text of this Declaration, I provide a high-level summary of the opinions detailed in the attached Report.

### Klein's Survey

4.      It is my opinion that the photos of the YSL shoe used in the Klein survey, in combination with the way respondents were questioned, was too leading for the survey to have reliably measured whether real-world confusion is likely.

5.      The image of the YSL shoe shown to respondents in the Klein survey does not fairly represent the manner in which women would typically see a shoe in a post-sale environment. The image that was on the screen when the respondent was asked the questions was basically a close-up of the sole of the shoe from foot level (that shows little else). This creates two major problems that transformed the survey into an artificial game rather than a simulation of a realistic situation. First, as shown below, the image is a clear cue that the sole is the focus of the survey and that respondents should think about

the sole:



This image is highly leading and cannot reliably measure the perception a woman would have upon seeing another woman wearing these shoes in the real world. The image all but tells the respondent to look at the sole and answer based on the sole. A woman who knows that Christian Louboutin makes shoes with red soles would be likely to assume that this is the point of the survey and that Louboutin is the desired response. Second, the images do not allow respondents to see the front, sides, or top of the shoes, or to get a fair look of the overall style and appearance, which makes it impossible for any respondent to react to the shoes in a realistic manner. Women who see another woman wearing the YSL shoes in the real world, and who have any interest in the shoes, would likely be able to see the entire shoe, including the top, front and sides, from various vantage points. Any glimpse of the sole that might be seen on the street would be seen in the context of the overall style and appearance of the whole shoe. Here, on the other hand, respondents were not allowed to see what the front, top or sides of the shoe looked like or get a fair sense of the overall style or appearance of the shoe.

6.      In my opinion, the use of these images did not simulate any realistic exposure to the YSL shoe in a post-sale context. The clear focus of these images on the sole and the inability to see the rest of the shoe makes the survey the equivalent of simply asking respondents what they think of when they see a red sole on a shoe – a question

that obviously would be highly leading and inappropriate.

7.      This problem is worsened by the fact that the images of the shoes were still on respondents' computer screens while they were being asked the questions. Accordingly, respondents who had no reaction as to the source of the shoe when originally looking at the image were cued to look again at the image to find an answer after hearing the question.  Again, posing a question about the maker of the shoe with the leading image still viewable on the screen is the equivalent of asking respondents to look at and answer based on the red sole.

8.      Due to these serious flaws, it is my opinion that the results of the survey do not indicate a likelihood of real-world confusion.  It merely shows that Christian Louboutin is likely to come to mind when purchasers of high-end women's shoes are prompted to think about red soles.  The Klein report's conclusion that actual post-sale confusion is likely is unsupported.

9.      Mr. Klein's conclusion that the survey shows secondary meaning is also unsupportable.  It is critical to note the distinction between Christian Louboutin being known as **a** source of red-soled shoes and being perceived as the **only** source of red-soled shoes.  While the Klein survey undoubtedly shows that Christian Louboutin is known within the universe surveyed as **a** source of red-soled shoes – perhaps even the most prominent source – the survey does nothing to address the question of whether a red sole indicates Louboutin as a **single** source of red-soled shoes.

10.     There are standard questions used to assess whether a mark has secondary meaning, which specifically inquire as to whether the respondent associates the mark

with **only one** source or with **more than one** source, or does not know. Klein's question, on the other hand, was a confusion question. By asking the respondent "who" or "what company" makes this shoe, the question inherently suggests the shoe comes from one particular source, which goes against the core principle of measuring secondary meaning -- i.e., to find out whether or not a name or look indicates one or more than one source. Since respondents were asked to name a single shoe maker, the claim that respondents who did so perceive that shoe maker to be the only source of red soles is entirely circular. In fact, there is no way to know whether the respondents who named Louboutin perceive Louboutin as the only source of red-soled shoes or merely the most prominent one.

## My Survey

11.     In order to test my opinions regarding the Klein survey and to assess the likelihood of post-sale confusion using a methodology that I feel is more reliable, I designed and conducted a survey to correct the most significant errors in the Klein study. In order to focus on the effects of the most significant methodological flaws of the Klein survey, my survey used essentially the same universe (including the same online panel), the same sampling methodology, and the same screening criteria as the Klein survey so that none of these could be considered factors in any differences in results between the two surveys. Likewise, my survey asked essentially the same confusion question – who or what company puts out the shoes shown in the survey? – so that the wording of the key question would also not be a factor.

12.     The key differences between my survey and the Klein survey were as follows: (1) rather than seeing a still photograph focused on the sole of the shoe, respondents were shown a video (twice) of a woman walking in the shoes that showed clear views of the sole but also showed other views of the shoe in a more realistic context; (2) the source-related question was asked while the shoe was no longer viewable so that respondents could only answer based on genuine impressions they formed while viewing the shoe before hearing the questions; and (3) a filter question was added so that only respondents who had an opinion about the source of the shoes were asked to name a shoe maker (to discourage guessing).

13.     The purpose of showing a video of a woman walking down the street wearing the shoes was to simulate a more realistic exposure to the YSL shoe in a post-sale situation. The video allowed respondents to view the various parts of the shoe, to view the shoe from a variety of angles, and to get a sense of the overall style of the shoe. The video includes segments clearly showing the red soles, but also segments that show other parts of the shoe, and allows respondents to see the overall style and appearance of the shoe. This ensured that respondents would have a fair exposure to the red soles, but also a fair and realistic view of the overall shoe that does not cue them to focus on any aspect of the shoe. Since each respondent watched the video twice, a total of approximately forty seconds of viewing, there was more than sufficient opportunity to see the red soles of the shoes in addition to any other parts of the shoes. I personally tested the appearance of the video in the survey on computer screens and it was easily viewable.

14.    The key findings of my survey were as follows:

- Seven of the 200 respondents (3.5%) expressed the belief that the YSL Tribute shoe shown in the video is made or put out by Christian Louboutin.

- Two other respondents answered that the shoes <u>might be</u> from Christian Louboutin but expressed uncertainty, and one other respondent did not name Louboutin but mentioned the red soles and may have been thinking of Louboutin.  If these three respondents were included as confused, the total confusion level would be 5.0%.

- Two other respondents mentioned Louboutin but understood that the shoe was not a Louboutin.

- Nine respondents identified YSL.

- Several other shoe brands were named by multiple respondents, including Steve Madden (2%), Prada (1.5%), Payless (1.5%), Michael Kors (1%), Manolo Blahnik (1%), Nordstroms (1.0%), Aerosole (1.0%), and Chinese Laundry (1.0%).  These results indicate an internal 1% to 2% measurement of the survey noise level.  Subtracting noise in this range from the rates of naming Louboutin as the source of the YSL shoe yields net post-sale confusion in the range of 1.5% to 4.0%.

- Post-sale confusion in this range is below any threshold I have ever seen courts or researchers use to determine that actual consumer confusion is likely.

15.    Based on the results of the survey I conducted, it is my opinion that: (1) the results of the Klein survey do not indicate a likelihood of real-world confusion but rather indicate only that women who purchase high-end shoes are reasonably likely to mention Louboutin when cued about red soles; and (2) no more than a negligible level of post-sale confusion is likely – confusion results below 5% are typically treated as *de minimis* by the standards courts and researchers have applied.

## My Background

16.     I have personally designed, supervised, and implemented over 350 consumer surveys concerning consumer perception, opinion, and behavior.  Over 150 of these surveys have concerned consumer perception regarding trademarks.  I have personally designed numerous studies that have been admitted as evidence in legal proceedings and I have been accepted as an expert in survey research on numerous occasions by U.S. District Courts, the Trademark Trial and Appeal Board, the FTC, and the National Advertising Division of the Council of Better Business Bureaus (NAD).

17.     I have frequently spoken at major intellectual property law and legal conferences on the topic of how to design and conduct surveys that meet legal evidentiary standards for reliability, including conferences held by the International Trademark Association (INTA), American Intellectual Property Law Association, Practicing Law Institute, Managing Intellectual Property, Promotions Marketing Association, American Conference Institute, and various bar organizations.  Most recently, I moderated a session on the use of online surveys as evidence in trademark disputes at the May 2011 INTA annual conference in San Francisco.  I was also the survey expert selected by INTA to speak at its 2009 annual conference on the topic of trademark surveys.

18.     In 2010, I published an article regarding the use of online and other trademark surveys in The Trademark Reporter, a journal published by the International Trademark Association.  I have also recently been made a Senior Research Fellow at the

McCarthy Institute for Intellectual Property and Technology Law at the University of San Francisco School of Law.

Pursuant to 28 U.S.C. § 1746, I hereby declare under penalty of perjury that the foregoing is true and correct. Executed this 7th day of July, 2011 at New York, New York.

Hal Poret

9