# Exhibit A

**EXPERT REPORT OF HAL PORET IN MATTER OF CHRISTIAN LOUBOUTIN S.A., et al. v. YVES SAINT LAURENT AMERICA, INC., et al.**

**RESPONSE TO EXPERT REPORT OF ROBERT KLEIN AND REPORT ON SURVEY TO MEASURE WHETHER THERE IS A LIKELIHOOD OF POST-SALE CONFUSION BETWEEN YVES SAINT LAURENT RED-SOLE SHOE AND CHRISTIAN LOUBOUTIN**

REPORT PREPARED FOR:
Debevoise & Plimpton LLP
919 Third Avenue
New York, NY 10022
Attorneys for Yves Saint Laurent

PREPARED BY:
Hal Poret
ORC International
625 Avenue of the Americas
New York, NY   10011

July, 2011

## *TABLE OF CONTENTS*

Page #

BACKGROUND AND PURPOSE--------------------------------------------------- 1
REPORT AUTHORSHIP AND QUALIFICATIONS--------------------------- 2
BRIEF OVERVIEW OF KLEIN SURVEY------------------------------------------- 4
COMMENTARY ON KLEIN SURVEY -------------------------------------------- 6
OVERVIEW OF PORET SURVEY --------------------------------------------------- 11
SPECIFIC SURVEY DESIGN ---------------------------------------------------------- 12
SUMMARY OF KEY FINDINGS OF PORET SURVEY ----------------------- 21
METHODOLOGY-------------------------------------------------------------------------- 22
    THE RELEVANT UNIVERSE OF INTEREST -------------------------- 22
    SAMPLING PLAN ------------------------------------------------------------ 25
    DOUBLE-BLIND INTERVIEWING--------------------------------------- 27
    INTERVIEWING PROCEDURES------------------------------------------- 27
    DATA PROCESSING---------------------------------------------------------- 27
    INTERVIEWING PERIOD --------------------------------------------------- 27
    VALIDATION/QUALITY CONTROL--------------------------------------- 28
DETAILED FINDINGS------------------------------------------------------------------- 29
CONCLUSION------------------------------------------------------------------------------ 32

APPENDIX A:   CURRICULUM VITAE OF STUDY'S AUTHOR
APPENDIX B:   QUESTIONNAIRES
APPENDIX C :   MATERIALS REVIEWED/FEES CHARGED
APPENDIX D:   SURVEY DATA FILE (to be provided electronically)
APPENDIX E :   VIDEO USED IN SURVEY (to be provided electronically)
APPENDIX F :   SCREENSHOTS OF SURVEY (to be provided electronically)

## *BACKGROUND AND PURPOSE*

Christian Louboutin S.A., Christian Louboutin, L.L.C. and Christian Louboutin ("CL") manufactures and sells high-fashion designer women's shoes with a red sole. Yves Saint Laurent America, Inc., Yves Saint Laurent America Holding, Inc., Yves Saint Laurent S.A.S. ("YSL") manufactures and sells high-fashion designer clothing and shoes. YSL sells several models of high-fashion designer women's shoes which are entirely red in color, including red soles.

CL has filed suit against YSL based on YSL's marketing of shoes with a red sole. CL has claimed that it has trademark rights in a red sole on high-fashion designer women's shoes and that the use of a red sole on YSL shoes is likely to cause confusion with CL, especially in a post-sale environment. CL has alleged that the following YSL shoes are infringing: Tribute (Flame, Lobster and Fragola Rosa colors), Tribtoo (Rouge color), Palais (Lobster and Rouge colors) and Woodstock (Rouge color).

Debevoise & Plimpton LLP, attorneys for YSL, asked me to review and comment on a survey conducted by Robert L. Klein on behalf of CL, which purports to show a likelihood of post-sale confusion (and concludes that a red sole has acquired secondary meaning as a CL trademark), and, if appropriate, to conduct my own survey to determine whether or not post-sale confusion is likely. This report contains my opinions regarding the Klein survey and details the methodology and results of my own survey.

1

## REPORT/STUDY AUTHORSHIP AND QUALIFICATIONS

This report was prepared by, and the study discussed herein, was designed and implemented under the supervision of, Hal L. Poret, Senior Vice President, ORC International.

I have personally designed, supervised, and implemented over 350 consumer surveys concerning consumer perception, opinion, and behavior.  Over 150 of these surveys have concerned consumer perception regarding trademarks.  I have personally designed numerous studies that have been admitted as evidence in legal proceedings and I have been accepted as an expert in survey research on numerous occasions by U.S. District Courts, the Trademark Trial and Appeal Board, the FTC, and the National Advertising Division of the Council of Better Business Bureaus (NAD).

I have frequently spoken at major intellectual property law and legal conferences on the topic of how to design and conduct surveys that meet legal evidentiary standards for reliability, including conferences held by the International Trademark Association (INTA), American Intellectual Property Law Association, Practicing Law Institute, Managing Intellectual Property, Promotions Marketing Association, American Conference Institute, and various bar organizations.  Most recently, I moderated a session on the use of online surveys as evidence in trademark disputes at the May 2011 INTA annual meeting in San Francisco.  I was also the survey expert selected by INTA to speak at its 2009 annual conference on the topic of trademark surveys.

In 2010, I published an article regarding the use of online and other trademark surveys in a scholarly journal published by the International Trademark Association.  I have also recently been made a Senior Research Fellow at the Center for the Empirical Study of Trademark Law, a research center established by the McCarthy Institute for Intellectual Property and Technology Law at the University of San Francisco School of Law.

2

In addition to my survey research experience, I hold bachelors and masters degrees in mathematics and a J.D. from Harvard Law School.  Additional biographical material, including lists of testimony and publications, is provided in Appendix A.

Hal Poret

Dated:  July 8, 2011

## BRIEF OVERVIEW OF KLEIN SURVEY

The Klein survey was an online panel survey among women with a household income of $150,000 or more and who have spent at least $400 in the past three years on a pair of shoes of certain types.[1]  The Klein report states that the survey was designed to test for post-sale confusion.

Respondents in the Klein survey were shown two images of a women wearing the YSL Tribute model in the Fragola Rosa color (also called Stingray).  Both images show the shoes from directly behind so that the respondent can primarily see only the sole and the heel.  The second image is shown from a low vantage point so that respondent is looking directly at the sole of the shoe from near the street level.  The following are the pictures that were shown:



_____

[1] The Klein Report states that the screening criterion was that respondents have spent $400 or more.  The actual questionnaire included in the Appendix to the Klein Report states that the criterion was $500 or more.  As the Klein report includes a specific rationale for using a $400 screening criterion, it is my assumption that this criterion was actually used and that the reference to a $500 criterion in the questionnaire included with the report is an error.

4

With the second image of the shoe (the one on the right) still on the screen, respondents were then asked the following question:

Who or what company do you believe makes or puts out these shoes?

Respondents were then asked questions to explain their answers:

Why do you say that?

Any other reasons?

Respondents were also asked a closed-ended question:

Although you may have already answered this, which, if any, of the following do you believe makes or puts out these shoes?

Christian Louboutin
Yves Saint Laurent
Manolo Blahnik
Oscar de la Renta
Valentino
Elizabeth and James
Jimmy Choo
Dior
None of the above

Respondents were required to select only one choice.

The survey also included a Control Group, in which the sole of the shoe shown to respondents was black instead of red.

The Klein report states that 49.6% of respondents gave open-ended answers stating that Christian Louboutin is the source of the shoe shown (or a net of 47.1% after subtracting the Control result). From this, Klein concludes both that there is a likelihood of post-sale confusion and that the red sole has acquired secondary

5

meaning as a trademark of Christian Louboutin.

## COMMENTARY ON KLEIN SURVEY

I agree that Mr. Klein's general use of an online panel survey was a reasonable methodology. While there are bases to disagree with his decision to draw his sample only from women with household income of $150,000 or over,[2] and with the specific screening questions he used to reach the relevant universe,[3] I have not focused on such disagreements. On the other hand, it is my opinion that the photos of the YSL shoe used in the survey, in combination with the way respondents were questioned, was so very leading that the resulting survey did not reliably measure whether real world confusion is likely, and that the Control Group could not cure a problem of this magnitude.

The image of the YSL shoe shown to respondents in the Klein survey does not fairly represent the manner in which women would typically see a shoe in a post-sale environment. The image that is on the screen when the respondent is asked the question is basically a close-up of the sole of the shoe from foot level (that shows little else). This creates two major problems that make the survey into an artificial game rather than a simulation of a realistic situation. First, the image is a clear cue that the sole is the focus of the survey and that respondents should think about the sole:

_____

[2] It is important to note, however, that the survey does not cover the overall universe of women who might see the YSL shoe in a post-sale environment. The survey was limited to the tiny minority of women who might see the YSL shoe in a post-sale environment and are past purchasers of high-fashion designer shoes. Given that the survey was limited to women in households with income of $150,000 or more and that only 3% of such women qualified, it is evident that the survey pertains to less than 1% of women who could encounter the YSL shoe in a post-sale context.

[3] The most notable concern about the screening questions is that respondents were permitted into the survey even if they answered that they were not likely to spend $500 or more on a pair of shoes in the next 12 months. Mr. Klein's basis for using a $400 threshold for past purchases was that this indicates a potential willingness to spend over $500 on a pair of shoes, but many such respondents specifically answered that they were not likely to do so.

6



This image is highly leading and cannot reliably measure the perception a woman would have upon seeing another woman wearing these shoes in the real world. The image all but tells the respondent to look at the sole and answer based on the sole. A woman who knows that Christian Louboutin makes shoes with red soles would be likely to assume that this is the point of the survey and that Louboutin is the desired response.

Second, the images do not allow respondents to see the front, sides, or top of the shoes, or to get a fair look of the overall style and appearance, which makes it impossible for any respondent to react to the shoes in a realistic manner. Women who see another woman wearing the YSL shoes in the real world and who have any interest in the shoes would likely be able to see the entire shoe, including the top, front and sides, from various vantage points. Any glimpse of the sole that might be seen on the street would be seen in the context of the overall style and appearance of the whole shoe. Here, on the other hand, respondents were not allowed to see what the front, top or sides of the shoe looked like or get a fair sense of the overall style or appearance of the shoe.

7

In my opinion, the use of these images did not simulate any realistic exposure to the YSL shoe in a post-sale context.  The clear focus of these images on the sole and the inability to see the rest of the shoe makes the survey the equivalent of simply asking respondents what they think of when they see a red sole on a shoe.

This problem is worsened by the fact that the images of the shoes were still on respondents' computer screens while they were being asked the questions.  Accordingly, respondents who had no reaction as to the source of the shoe when originally looking at the image were cued to look again at the image to find an answer after hearing the question.[4]  Again, posing this question with the leading image still viewable on the screen is the equivalent of asking respondents to look at and answer based on the sole.[5]

The Control Group was not capable of curing the leadingness of the survey.  Changing the sole of the shoe from red to black for the Control Group does affirm that the color red is the reason respondents in the Test Group named Louboutin.  The Control Group does not, however, address the fact that respondents were not posed with a realistic scenario in the first place, but rather an artificial test that cued them to focus on the sole.  The Control Group confirms that the red sole is the reason they named Louboutin, but not that this indicates a likelihood of real world confusion as opposed to the demand effects of a highly suggestive survey.

_____

[4] Although the Klein survey does not rely heavily on the closed-ended Question 4, it is worth noting that Question 4 also suffers from the problem of being leading in that it literally suggests "Christian Louboutin" as an answer choice and only permits respondents to select one answer choice even if respondents thought the red-soled shoe could come from more than one source.
[5] On the other hand, asking the question with the image no longer on the screen would have at least required the respondent to have thought of Louboutin prior to hearing the question about source, as opposed to merely reviewing the picture again to find a clue about the source after hearing that this was the point of the survey.  Another safeguard, which might have somewhat reduced the leadingness of this procedure, would have been to ask a filter question before asking the respondent who makes the shoes: -- i.e., asking (with the image no longer on the screen) whether the respondent had a belief about who makes the shoes before asking them to name a maker.  This would have been less leading then simply starting off by asking who or what company they believe makes the shoes, a question that suggests they should have a belief.

Due to these serious flaws, it is my opinion that the results of the survey do not indicate a likelihood of real-world confusion.  It merely shows that Christian Louboutin is likely to come to mind when purchasers of high-fashion designer women's shoes are prompted to think about red soles.  The Klein report's conclusion that actual post-sale confusion is likely is unsupported.

Mr. Klein's conclusion that the survey shows <u>secondary meaning</u> is also unsupportable. It is critical to note the distinction between Christian Louboutin being known as **<u>a</u>** source of red-soled shoes and being perceived as the **<u>only</u>** source of red-soled shoes. While the Klein survey undoubtedly shows that Christian Louboutin is known within the universe surveyed as **<u>a</u>** source of red-soled shoes -- perhaps even the most prominent source – the survey does nothing to address the question of whether a red sole indicates Louboutin as a **<u>single</u>** source of red-soled shoes.

There are standard questions used to assess whether a mark has secondary meaning, which specifically inquire as to whether the respondent associates the mark with **<u>only one</u>** source or with **<u>more than one</u>** source, or does not know.  Klein's question, on the other hand, was a confusion question.  By asking the respondent "who" or "what company" makes this shoe, the question inherently suggests the shoe comes from one particular source, which goes against the core principle of measuring secondary meaning -- i.e., to find out whether or not a name or look indicates one or more than one source.  Since respondents were asked to name a single shoe maker, the claim that respondents who did so perceive that shoe maker to be the <u>only</u> source of red soles is entirely circular.  In fact, there is no way to know whether the respondents who named Louboutin perceive Louboutin as the only source of red-soled shoes or merely the most prominent one.

The Trademark Trial and Appeal Board has made this very point in rejecting a survey purportedly showing secondary meaning in the Fender guitar shape.  Fender's survey

9

showed respondents the shape of a guitar and asked who makes a guitar in that shape. The majority naturally named Fender.  The TTAB properly rejected this as proof of secondary meaning, as it merely showed that Fender is most highly associated with the guitar shape shown, but did not determine whether that shape identifies Fender as a single source of guitars embodying that shape.  Just as consumers might highly associate a shape with Fender while believing that other guitar makers also use the same shape, shoe consumers might associate red soles with Louboutin but believe that a variety of shoe makers make or can make shoes with a red sole.

A simple thought experiment easily illustrates this point as well.  Imagine that respondents in a survey are shown a plain red soda can and asked who or what company makes soda in a can like the one shown.  Undoubtedly many respondents would think of and name Coca-Cola because the can is red.  This, however, would not prove that Coca-Cola has secondary meaning in a red soda can.  It would merely mean that Coca-Cola is the most prominent maker of soda in a red can and, accordingly, that Coca-Cola is likely to come to mind when shown a red soda can.

Finally, it is worth noting that the Klein survey also does not assess whether the alleged red sole mark is famous for the purposes of federal dilution law.  This is not a flaw in the Klein survey, as it was not intended to measure fame.  However, since CL's Memorandum of Law in Support of Application for a Preliminary Injunction asserts that the red-soled mark is famous, it is important to note that the Klein survey does not support this assertion.  Under federal dilution law, a mark is considered famous if it is widely known by the general consuming public.  As discussed above, the Klein survey covered less than 0.5% of the general consuming public: women whose households have income of over $150,000 and have spent $400 or more on shoes in the past 3 years.  It does not provide any basis for determining whether the red sole mark is known within the other 99.5% of the general consuming public.

10

A final point regarding the Klein survey is that I understand that the YSL Tribute Fragola Rosa (also known as Stingray) shoe depicted in the survey is one that has had relatively few sales. While I would not say it is inappropriate to run a survey using this shoe, it does not seem the most useful shoe to survey, as compared to the YSL models that have sold in much higher numbers and are, accordingly, more likely to be seen in the post-sale context.

## OVERVIEW OF PORET SURVEY

In order to test my opinion regarding the Klein survey and to assess the likelihood of post-sale confusion using a methodology that I feel is more reliable, I also designed and conducted a survey as a companion to my critiques of the Klein survey. As discussed in more detail below, in order to focus on the effects of the most significant methodological flaws of Klein's survey, my survey used essentially the same universe (including the same online panel), sampling methodology and screening criteria as the Klein survey so that none of these could be considered factors in any differences in results between the two surveys. Likewise, my survey asked essentially the same confusion question – who or what company puts out the shoes shown in the survey? – so that the wording of the key question would also not be a factor. As described below, the key differences between my survey and the Klein survey were as follows: (1) rather than seeing a still photograph focused on the sole of the shoe, respondents were shown a video (twice) of a woman walking in the shoes that showed clear views of the sole but also showed other views of the shoe in a more realistic context; (2) the source-related question was asked while the shoe was no longer viewable so that respondents could only answer based on genuine impressions they formed while viewing the shoe before hearing the questions; and (3) a filter question was added so that only respondents who had an opinion about the source of the shoes were asked to name a shoe maker. In addition, rather than using the Tribute Stingray shoe, of which YSL has only sold small amounts, the YSL model with the highest sales volume was used in the survey – the Tribute Flame shoe.

11

## SPECIFIC SURVEY DESIGN

A total of 200 qualified prospective consumers of high-fashion designer shoes (as defined in the Klein survey) participated in this online survey. As discussed in greater detail below, the survey respondents were women who have shopped and are likely to shop for platform, pumps, platform sandals, or evening shoes and who have spent at least $400 on a pair of shoes in the past three years.[6] The survey employed a version of the Eveready-style survey design used by Mr. Klein for his study.

The survey involved showing each respondent a video approximately 20 seconds in length of a woman walking down the street wearing the YSL Tribute Flame Sandal.

It is my understanding that CL has asserted and that Mr. Louboutin has personally testified that the YSL Tribute Flame shoe embodies and infringes the alleged red sole mark. Materials I reviewed also indicate that the YSL Tribute Flame has the most units sold of the allegedly infringing YSL shoes.

Each respondent viewed the video twice and was subsequently asked questions to determine whether the respondent confused the shoe shown with Louboutin. The video, which was created in accordance with my instructions, will be produced in its original electronic form so that it can be viewed as it was by respondents in the survey.

The purpose of showing a video of a woman walking down the street wearing the shoes was to simulate a more realistic exposure to the YSL shoe in a post-sale situation. The video allowed respondents to view the various parts of the shoe, to view the shoe from a variety of angles, and to get a sense of the overall style of the shoe. The video includes

---

[6] See Relevant Universe and Sampling sections below for more specific information on the screening criteria and the respondents who participated in the survey. A total of 13,528 respondents were screened but did not qualify for the survey because they did not meet the screening criteria.

12

segments clearly showing the red soles, but also segments that show other parts of the shoe, and allows respondents to see the overall style and appearance of the shoe.  This ensured that respondents would have a fair exposure to the red soles, but also a fair and realistic view of the overall shoe that does not cue them to focus on any aspect of the shoe.  Since each respondent watched the video twice, a total of approximately forty seconds of viewing, there was more than sufficient opportunity to see the red soles of the shoes in addition to any other parts of the shoes.

I personally tested the appearance of the video in the survey on computer screens and it was easily viewable.  To give a sense of the video in this report, screenshots taken at various intervals of the video are included on the following pages (although the video can only be properly experienced in its full, electronic form).

13





14







After completing the screening questions, respondents were first shown the following instruction:[7]

> In a moment you are going to watch a 20-second video of a woman walking on the street. Please watch as you would if you were actually seeing this woman walking on the street. After the video, we will ask you some questions about what you saw. If for any question, you don't know the answer or have no opinion, please indicate so. Please do not guess.

On the next screen, respondents were shown the video. The video was a large, high quality video. The woman wearing the shoes appeared prominently throughout the video and was easy to see. Above the video, the following instruction appeared:

> Please click the play icon to watch the video.

Below the video, respondents were instructed:

_____

[7] See Appendix F (provided electronically) for all screenshots from the online survey.

Please click below to continue.  Or if you were not able to view the video clearly, please indicate so.

Respondents who finished viewing the video successfully selected the option, "able to view video clearly," and then clicked the continue button and proceeded to additional questions.[8]  On the next screen, respondents were instructed:

Now we'd like you to watch the same video of the woman you just finished watching one more time.  Please click the play icon to watch the video a second time.

Below the video, respondents were again instructed:

Please click below to continue.  Or if you were not able to view the video clearly, please indicate so.

Respondents who finished viewing the video successfully a second time again selected the option, "able to view video clearly," and then clicked the continue button and proceeded to additional questions.[9]  With the video of the shoes no longer on the screen, respondents were then asked the following:

Do you have a belief about who or what company makes or puts out the shoes that the woman in the video was wearing?

This was a filter question designed to determine whether or not the respondent had any belief about the source of the shoes prior to asking them to name a source.  As the survey was not simulating a purchase scenario but rather an exposure to a woman

_____

[8] Only one respondent indicated they could not view the video clearly. This person was terminated from the survey.

[9] No respondents indicated they could not view the video clearly the second time.

17

walking down the street in the shoes – a scenario in which a real viewer may not have any reason to have a belief about the source of the shoe – it was particularly appropriate to have a filter question.  Such a question ensured that respondents only offered genuinely held opinions and were not asked to name a brand or company if they did not have any belief about the shoe's source while watching the video.

As suggested earlier, the purpose of asking the questions while the shoe was not viewable on the screen was to ensure that the survey was eliciting genuine perceptions respondents had while originally looking at the shoe, rather than allowing them to look back at the shoes for a clue as to the source after hearing the questions.

Respondents who answered "yes" – that they had a belief – were next asked:

> Who or what company do you believe makes or puts out the shoes that the
> woman in the video was wearing?

Respondents were allowed to either type in text or select a "Don't know/No opinion" option.

All respondents who entered any text were then asked:

> Why do you say that?

Respondents were again given an option to either type in text or select a "Don't know/No opinion" option.  Respondents who typed in text here were next asked:

> Any other reasons?

Here respondents were also given an option to either type in a response, or select a "Don't know/No opinion" option.

18

The purpose of these questions was to determine whether the respondent mistakenly perceived the shoe to come from Louboutin.  A respondent who is looking at the YSL shoes and confusing them with shoes made by or put out by Louboutin would be expected to answer that Louboutin makes or puts out the shoes and to identify the red sole as the reason they believe CL makes or puts out these shoes.

Then, all respondents were asked the question:

> Have you seen or heard anything recently in the news about the shoes that the woman in the video was wearing?

Respondents who responded with "Yes," were then asked:

> What have you seen or heard in the news about the shoes that the woman in the video was wearing?

A text box was provided for respondents to type in their response.  The purpose of these questions was to determine whether or not any respondents had previously been made aware of the case between YSL and CL.

Lastly, all respondents were asked:

> In the past two months, have you taken another online survey where you were shown a picture of a woman wearing shoes and were asked who or what company makes the shoes in the picture?

As discussed below, the sample was drawn in a manner to exclude any respondents who had already been contacted for the Klein survey.  As an extra precaution, however,

19

the above question was asked to identify any respondents who had possibly taken the recent survey conducted by Klein.[10]

See Appendix B for the full questionnaires used in the survey.

A Control Group was initially contemplated for the survey.  However, given that the Test Group showed a very low level of confusion, there was no purpose in running a control, which would only have served to measure survey noise and reduce the already low confusion level.

_____

[10] Six respondents answered that they have taken an online survey in the past two months where they were shown a picture of a woman wearing shoes and were asked who or what company makes the shoes in the picture.  These respondents were not removed from the data as it is unlikely they took the Klein survey.  If such respondents were removed, it would slightly lower the net confusion result reported below.

## *SUMMARY OF KEY FINDINGS OF PORET SURVEY*

1) Seven of the 200 respondents (3.5%) answered that the YSL Tribute Flame shoe shown in the video is made or put out by Christian Louboutin.

2) Two other respondents answered that the shoes <u>might be</u> from Christian Louboutin but expressed uncertainty, and one other respondent did not name Louboutin but mentioned the red soles and may have been thinking of Louboutin.  If these three respondents were included as confused, the total confusion level would be 5.0%.

3) Two other respondents mentioned Louboutin but understood that the shoe was not a Louboutin.

4) Nine respondents identified YSL.

5) Several other shoe brands were named by multiple respondents, including Steve Madden (2%), Prada (1.5%), Payless (1.5%), Michael Kors (1%), Manolo Blahnik (1%), Nordstroms (1.0%), Aerosole (1.0%), and Chinese Laundry (1.0%).  These results indicate an internal 1% to 2% measurement of the survey noise level.  Subtracting noise in this range from the rates of naming Louboutin as the source of the YSL shoe yields net post-sale confusion in the range of 1.5% to 4.0%.

6) Post-sale confusion in this range is below any threshold I have seen courts or researchers use to determine that actual consumer confusion is likely.

<u>See</u> Detailed Findings section below for additional information on results.  The full data will be provided in electronic form.

21

## *METHODOLOGY*

### THE RELEVANT UNIVERSE OF INTEREST

Consistent with the Klein survey, the relevant universe for the survey consisted of individuals who meet the following criteria: (1) is a women, age 18 or older; (2) have shopped or purchased shoes in the past 3 years; and (3) have purchased either platforms, pumps, platform sandals, or evening shoes in the past 3 years; and (4) have paid at least $400 for a pair of shoes in the past 3 years; and (5) are likely to shop for or purchase either platforms, pumps, platform sandals, or evening shoes in the next 12 months.

These criteria were used in order to keep the sample for the two surveys in line with each other.  Respondents were asked a series of screening questions (the same ones used in the Klein survey) to determine whether they meet the relevant criteria.

Specifically, prospective respondents were asked what products, if any, they have shopped for or purchased in the past 3 years and were provided the following list:

1. Shoes
2. Flat screen television
3. New car
4. Cashmere sweater
5. Cocktail dress
6. Washing machine
7. None of the above

With the exception of the "None," option, the order of items on the list was randomized so that it differed from respondent to respondent.  Only those who indicated "Shoes" continued with the remaining screening questions.  Such respondents were next asked the following:

22

Which, if any, of the following types of shoes have you shopped for or purchased in the past 3 years?

A list of types of shoes was provided.  In order to continue with the survey, respondents had to select at least one of: platforms, pumps, platform sandals, or evening.

Then respondents were asked:

What is the <u>most</u> that you have paid for a pair of shoes in the past 3 years?

Respondents were shown price ranges starting at "less than $100," and going up to "$1000 or more" and were also given a "Don't know/can't remember" option.  Only respondents who selected $400 or more were able to continue.

Next respondents were asked:

Which, if any, of the following types of shoes are you likely to shop for or purchase in the next 12 months?

Respondents were shown a list of the same types of shoes as in the earlier screening question regarding shoe types and again had to select at least one of: platforms, pumps, platform sandals, or evening in order to continue.

Respondents were also asked:

What is the <u>most</u> that you are likely to spend for a pair of shoes in the next 12 months?

23

Respondents were shown the same price ranges as in the earlier pricing question which asked how much they had spent, but respondents were not required to select a specific amount here in order to continue with the survey.

Respondents were excluded from participation if they or anyone in their household work in market research, or for a company or store that sells or manufactures women's clothing, shoes and accessories, or for a law firm.

The actual wording of all screening questions used is shown in Appendix B.

24

**SAMPLING PLAN**

The sampling plan involved selection of consumers who are part of an online panel. Online surveys are well-accepted in the field of survey research as a standard, reliable methodology.  Indeed, online surveys are now the most common method of conducting market research among consumers.  Businesses and other organizations routinely make decisions of importance based on the results of online survey research, and online surveys have been accepted in evidence in numerous U.S. District Court proceedings. Online surveys are commonly used to test perception of products that are sold in retail stores, and the products and marks tested here were easily displayed and viewed on a computer monitor.  Mr. Klein also conducted his survey online and sampled from an online panel.

The sample of panelists used in the survey was provided by Research Now, an e-Rewards company, and leading supplier of online sample.  Research Now has data on its panelists that permitted it to pre-identify women with household incomes of $150,000 or more (a household income Mr. Klein targeted sample for in his survey). Additionally, materials made available from Mr. Klein's survey indicated that e-Rewards was used for his survey.[11]  By using Research Now and e-Rewards, we were able to ensure that sample used in Mr. Klein's survey was excluded from sample for this survey.[12]  In order to keep in line with the sampling and screening criteria used in Mr. Klein's survey, this survey also targeted women with household incomes of $150,000 or more (after excluding panelists who could have participated in Mr. Klein's survey), and email invitations to available panelists were distributed.

_____

[11] It is not clear whether e-Rewards was used for all or only part of Klein's survey population.
[12] No one from ORC discussed any details of the Klein survey with e-Rewards.  We merely required that e-Rewards exclude from sampling any panelists that had been invited to take a survey conducted during the time period that the Klein survey was in the field and that related in any way to shoes.

25

It is frequently a challenge to reach high income individuals for market research, including in the context of online panels.  As discussed in the Klein report, the challenge of reaching high income individuals is particularly difficult when only 2 to 3% of those reached will qualify as a purchaser of very expensive shoes.  In order to be certain that the survey would reach the desire sample size of 200, I allowed for a relatively small number of women in households with income of $100,000 to $149,999 to be included in the survey.  This ensured that enough panelists could be invited and qualify for the survey (all individual respondents needed to meet the previously mentioned screening criteria) in order to obtain the desired sample size.  Of the final 200 qualified respondents:

- 167 came from targeting a household income of $150,000 or more, and
- 33 came from targeting a household income of $100,000 to $149,999.[13]

The age distribution of the final sample breaks out as follows:

| Age Range | Qualifying Completes | |
|:---:|:---:|:---:|
| | # | % |
| 18-34 | 57 | 28.5 |
| 35-49 | 71 | 36.5 |
| 50-64 | 64 | 32 |
| 65+ | 8 | 4 |

---

[13] The inclusion of a small minority of women in the $100,000 to $149,999 household income range did not impact the survey results.  If limited to only the 167 respondents with $150,000 or higher household income, the results would be virtually the same (within a fraction of a percent).

## DOUBLE-BLIND INTERVIEWING

It is important to point out that the study was administered under "double-blind" conditions.  That is, not only were the respondents kept uninformed as to the purpose and sponsorship of the study, but the services involved in providing the sample and administering the online interviews were similarly "blind" with respect to the study's purpose and sponsorship.

## INTERVIEWING PROCEDURES

The online survey was programmed and hosted by Decipher, a marketing research services provider, specializing in online survey programming and data collection, among other survey-related services.  I thoroughly tested the programmed survey prior to any potential respondents receiving the invitation to participate in the survey.

## DATA PROCESSING

Data was collected by Decipher and made available to me through its online reporting tool and electronic portal.  The data set showing each respondent's answers to all questions will be provided in electronic form.

## INTERVIEWING PERIOD

Interviewing was conducted from June 13, 2011 through June 20, 2011.

**VALIDATION/QUALITY CONTROL**

Respondents were asked several validation/quality control questions. Respondents were required to enter their date of birth to enter the survey and the date needed to match the birth date of the panelist. Respondents were also asked their age range, which needed to match the birth date of the panelist. These procedures reasonably ensure the identity of the respondent and minimized the chance that any surveys were completed by individuals other than invited panelists to a negligible level.[14]

In a later question, respondents were instructed to select the answer choice "South" from a list of the following choices: North, South, East and West, in order to continue. This question permitted us to screen out respondents who were paying insufficient attention or clicking responses indiscriminately. Review of all open-ended responses also ensured that no respondents had typed in non-responsive comments or gibberish in response to the survey questions.

---

[14] Telephone validation of completed interviews is not standard practice for online surveys as online surveys are more suitably validated using procedures such as those described above.

## *DETAILED FINDINGS*

Seven respondents (3.5% of the total) answered that the shoes shown in the video are Louboutin shoes.[15]

| Resp. Record | Q230 Who or what company do you believe makes or puts out the shoes that the woman in the video was wearing? |
|---|---|
| 4314 | Christian Louboutin |
| 3705 | Christian Louboutan because of the red bottom |
| 1764 | Christian Loubouton |
| 3951 | Christin Louboutin |
| 9455 | christina loubitun |
| 3687 | Leboutien |
| 601 | Louboutin |

An additional 2 respondents (1% of the total) indicated that the shoes in the video might be Louboutin shoes, but also indicated uncertainty and a belief that they might not be from Louboutin:

| Resp. Record | Q230 Who or what company do you believe makes or puts out the shoes that the woman in the video was wearing? |
|---|---|
| 8125 | Could be really cheap like Rampage or could be Louboutins |
| 2798 | Maybe Christian Louboutin - the soles were red. Unless its someone knocking of their signuature look. |

As respondent 8125 initially mentioned that the shoes could be a cheap brand and named Rampage, it does not seem appropriate to view this response as meaningful confusion with Louboutin.  A respondent who was genuinely confused with Louboutin would be unlikely to consider that the shoes might be very cheap.  Respondent 2798 mentioned only Louboutin, but was uncertain and indicated the shoe could be a knock off of Louboutin's look.

---

[15] The verbatim answers shown below are the actual answers as typed in by respondents, including their typos and spelling errors.

One additional respondent indicated a belief that the shoes are from a source known for red soles, but could not come up with a name:

| Resp. Record | Q230 Who or what company do you believe makes or puts out the shoes that the woman in the video was wearing? |
| --- | --- |
| 12637 | I can't quite remember the brand name.  Would be able to choose from a list. Only company who makes RED soles! |

Respondent 12637 seems to believe the shoes come from a particular unnamed source of red soles, and may have been thinking of Louboutin even if unable to come up with the name.

If all of these latter three respondents were counted as confused, it would result in a total of 10 (5%) confused respondents.

Two other respondents mentioned Louboutin but were not confused:

| Resp. Record | Q230 Who or what company do you believe makes or puts out the shoes that the woman in the video was wearing? |
| --- | --- |
| 915 | the red soles should mean it's a louboutin, but it happens to be the silhouette of the ysl tribute sandal |
| 5849 | I think it Might be Charles Davis...  They look like Christian Laboutin shoes, but there is not red on the bottom of the shoe.... |

Respondent 915 stated in response to a follow-up question that: "louboutin wants to sue YSL for using a red bottom, but any fashion lover knows that they clearly are YSL's." Respondent 5849 indicated that they look like Louboutin shoes but did not believe they are from Louboutin.

Two other respondents mentioned Louboutin only in response to the question asking whether they had heard anything in the news about the shoes shown in the video. Respondent 5537 first answered that she had no belief about who or what company

30

makes the shoes. She subsequently stated that she suspects the survey is related to a lawsuit by Louboutin and that the shoes in the video "could never be mistaken for beautiful Louboutins." Respondent 683 answered that the shoes are made by YSL and subsequently answered that they are aware Louboutin is suing YSL for using a red sole.

No other respondents mentioned Louboutin at any point in the survey.

Nine respondents named YSL and several other brands were each named by multiple respondents:

| Maker/brand named by multiple respondents | # (%) of respondents |
|---|---|
| YSL | 9 (4.5%) |
| Steve Madden | 4 (2.0%) |
| Nine West | 4 (2.0%) |
| Prada | 3 (1.5%) |
| Payless | 3 (1.5%) |
| Manolo Blahnik | 2 (1.0%) |
| Nordstroms | 2 (1.0%) |
| Michael Kors | 2 (1.0%) |
| Aerosoles | 2 (1.0%) |
| DSW | 2 (1.0%) |
| Chinese Laundry | 2 (1.0%) |

Although there was no reason to run a separate Control Group given the low level of confusion, the 1% to 2% rate of naming these other shoe makers represents an internal measurement of the noise level. Using this noise range to appropriately discount the rate of naming Louboutin yields a net confusion level in the range of 1.5% to 4.0%.

138 respondents (69%) had no belief about who or what company makes or puts out the shoe shown in the video.

A total of 10 respondents selected "yes" in Q250 when asked "Have you seen or heard anything recently in the news about the shoes that the woman in the video was wearing?" Four of these 10 respondents (683, 915, 4314 and 5537) then specified in the

31

follow-up question that what they heard was something to do with a lawsuit with CL or red soles. One of these four respondents (4314) is also one of the seven respondents who named Louboutin as the source of the shoe. Accordingly, if these four respondents were removed from the data, it would reduce the resulting confusion level.

There are 6 additional respondents (3% of the total) who responded "yes" to the question, "In the past two months, have you taken another online survey where you were shown a picture of a woman wearing shoes and were asked who or what company makes the shoes in the picture?" One of these six respondents (3951) is also one of the seven respondents who named Louboutin as the source of the shoe. Accordingly, if these six respondents were removed from the data, it would reduce the resulting confusion level.

While the survey was not designed to measure secondary meaning, it is also worth noting that the results contradict the results that the Klein Report relies on to improperly conclude that the red sole has acquired secondary meaning as an indicator of Christian Louboutin. The majority of respondents (69%) had no belief about the source of the shoe despite it having a red sole that Mr. Louboutin has identified as embodying his mark. An additional 53 respondents (26.5%) named shoe sources other than Christian Louboutin after viewing the video of the YSL Tribute Flame shoe, including 9 naming YSL. It seems evident from these results that the red sole did not function as an indicator of a single source for the large majority of survey respondents.

### CONCLUSION

Based on the results of the survey I conducted, it is my opinion that: (1) the result of the Klein survey does not indicate a likelihood of real world confusion but merely that women who purchase high-fashion designer shoes are reasonably likely to mention Louboutin when cued about red soles; and (2) no more than a negligible level of post-sale confusion is likely – confusion results below 5% are typically treated as de minimis by the standards courts and researchers have applied.

32

## APPENDIX A

## CURRICULUM VITAE OF STUDY'S AUTHOR

### Hal L. Poret
*(hal.poret@orcinternational.com; 212-329-1018; 914-772-5087)*

**Education**

1998       Harvard Law School, J.D., *cum laude*
- Editor/Writer – Harvard Law Record
- Research Assistant to Professor Martha Minow

1995       S.U.N.Y. Albany, M.A. in Mathematics, *summa cum laude*
- Statistics
- Taught calculus/precalculus/statistics

1993       Union College, B.S. in Mathematics with honors, *magna cum laude*
- Phi Beta Kappa
- Resch Award for Achievement in Mathematical Research

**Employment**

2004  -       Senior Vice President, ORC International (formerly Guideline)
- Designed, supervised, and analyzed over 350 consumer surveys, including Trademark, Trade Dress, Advertising Perception, Fraud/Consumer Deception, Claims Substantiation studies, Damages, and Corporate Market Research Surveys
- Provided expert testimony at deposition and/or trial regarding survey research in over 40 U.S. District Court litigations and proceedings in front of TTAB, NAD and the FTC.
- Review and comment on third party surveys

2003 – 2004       Internet Sports Advantage
- Developed and marketed proprietary internet sports product, and licensed trademark and intellectual property rights.

1998 – 2003       Attorney, Foley Hoag & Eliot, Boston, MA
- Represented corporations and individuals in trademark, trade dress, advertising, product, and related legal disputes.
- Worked with survey experts in developing and using surveys as evidence in trademark, trade dress and advertising disputes.
- Advised clients in the selection, adoption, use, licensing, and protection of trademarks/trade dress; represented clients in trademark/trade dress litigations, administrative proceedings before the Trademark Trial and Appeal Board and United States Patent and Trademark Office, and domain name proceedings under the Uniform Domain-Name Dispute-Resolution Policy.

*Testimony at Trial or by Deposition*

| | | |
|---|---|---|
| 2011 | Aviva Sports v. Manley | USDC District of Minnesota |
| 2011 | GAP Inc. v. G.A.P. Adventures | USDC Southern District of NY |
| 2011 | American Express v. Black Card LLC | USDC Southern District of NY |
| 2011 | Gosmile v. Dr. Levine | USDC Southern District of NY |
| 2010 | Nat'l Western Life v. Western Nat'l Life | USDC Western District of TX |
| 2010 | 3M v. Mohan | USDC District of Minnesota |
| 2010 | Active Network v. EA Sports | USDC Central District of CA |
| 2010 | FIJI Water Co. v. FIJI Mineral USA | USDC Central District of CA |
| 2010 | Hansen Beverage v. CytoSport | USDC Central District of CA |
| 2010 | PeoplesBank v. People's United Bank | USDC District of CT |
| 2010 | Don Henley v. Charles Devore | USDC Central District of CA |
| 2010 | Pegasus v. Allscripts | USDC Middle District of FL |
| 2010 | Jelmar, Inc. v. Zep Commercial | USDC Northern District of IL |
| 2010 | Dollar Bank v. Emigrant Bank | USDC Western District of PA |
| 2009 | LG Electronics v. Whirlpool | USDC District of DE |
| 2009 | Farberware v. Meyer Marketing | USDC  Southern District of NY |
| 2009 | NEC v. Ampad | USDC Southern District of NY |
| 2009 | Lumber Liquidators v. Stone Mntn | USDC  Eastern District of VA |
| 2009 | CytoSport v. Vital Pharmaceuticals | USDC Eastern District of CA |
| 2009 | REDC v. NHA | USDC  Southern District of CA |
| 2008 | 1800Contacts v. Lens.com | USDC District of UT |
| 2008 | Tokidoki v. Fortune Dynamic | USDC Central District of CA |

| 2008 | Brighton Collectibles v. Dynasty | USDC Southern District of CA |
| 2007 | Johnson & Johnson v. Perrigo | USDC Southern District of NY |
| 2007 | Johnson & Johnson v. Actavis Group | USDC Southern District of NY |
| 2007 | M.D. Skincare v. Bare Escentuals | USDC Southern District of NY |
| 2007 | Doctor's Associates v. QIP Holders | USDC District of CT |
| 2006 | S.C. Johnson v. BuzzOff Insect Shield | USDC Middle District of NC |
| 2006 | Wenger Corp. v. Stadium Chair | USDC Western District of TX |
| 2006 | Wenger Corp. v. Melhart Music | USDC Eastern District of TX |
| 2006 | Electrolux Home Care v. IMIG, Inc. | USDC Eastern District of NY |

*Presentations*

Online Surveys as Evidence in Trademark Disputes (International Trademark Association Annual Conference, May 2011)

Managing Intellectual Property Trademark Roundtable (April 7, 2010)

Recent Trends in Trademark Surveys (Virginia State Bar Intellectual Property Conference, October 2009)

Trademark Surveys in US Litigation (presentation for International Trademark Association Annual Conference) (May 2009)

How to Conduct Surveys for use in Trademark Disputes (Practicing Law Institute Advanced Trademark Law Conference) (May 2009)

Trademark and Advertising Perception Studies for Legal Disputes (Opinion Research Corporation Seminar, June 2008)

Understanding Advertising Perception Surveys (Promotions Marketing Association Annual Law Conference) (November 2007)

Designing and Implementing Studies to Substantiate Advertising Claims (American Conference Institute Claims Substantiation Conference, October 2007)

Surveys in Trademark and False Advertising Disputes (InfoUSA Webinar, June 2007)

Measuring Consumer Perception in False Advertising and Trademark Cases, (multiple presentations) (2007)

Potential Errors to Avoid In Designing a Trademark Dilution Survey (American Intellectual Property Association paper, April 2007)

Consumer Surveys in Trademark and Advertising Cases (presentation at Promotions Marketing Association Annual Law Conference) (December 2006)

Use of Survey Research and Expert Testimony in Trademark Litigation, (International Trademark Association Annual Conference, May 2006)

Survey Research as Evidence in Trademark/Trade Dress Disputes (multiple presentations) (2006)

Using Surveys to Measure Secondary Meaning of Trade Dress, Legal Education Seminar, Boston, April 2006

*Publications/Papers*

A Comparative Empirical Analysis of Online Versus Mall and Phone Methodologies for Trademark Surveys, 100 TMR 756 (May-June 2010)

Recent Trends in Trademark Surveys (paper for Virginia State Bar Intellectual Property conference, October 2009)

Trademark Dilution Revision Act breathes new life into dilution surveys (In Brief PLI website, June 2009)

The Mark (Survey Newsletter; three editions 2009)

Hot Topics in Trademark Surveys (paper for Practicing Law Institute Advanced Trademark Law Conference) (May 2009)

The Mark (Survey Newsletter, 2008)

Trademark and Advertising Survey Report (Summer 2007)

Avoiding Pitfalls in Dilution Surveys under TDRA (AIPLA Spring Conference, Boston, May 2007)

*Commentary*

Comment on Hotels.com case (on TTABLOG.COM, July 24, 2009)

Comment on Nextel v. Motorola (on TTABLOG.COM, June 19, 2009)

PLI All-Star Briefing Newsletter, "What does the Trademark Dilution Revision Act mean for the future of Dilution Surveys?" (June 2009)

Can I Get By Without a Survey, Managing Intellectual Property (May 2009)

### *Professional Memberships/Affiliations*

Senior Research Fellow at McCarthy Institute of IP and Technology Law's Center for Empirical Research in trademark Law

Council of American Survey Research Organizations

International Trademark Association

Promotions Marketing Association

National Advertising Division of Council of Better Business Bureaus

# APPENDIX B

# QUESTIONNAIRES

| SCREENER SECTION |
| --- |

**BASE: ALL RESPONDENTS**
100.   Please enter your date of birth **[PROGRAMMER: TERMINATE IF DOES NOT MATCH PANELIST'S PRELOAD]**

**BASE: ALL NON-TERMINATES**
105.   Are you…
    1. Female
    2. Male **[terminate]**

**BASE: ALL NON-TERMINATES**
110.   What type of electronic device are you using to complete this survey?
    1.   Desktop computer
    2.   Laptop/notebook computer
    3.   Tablet computer → terminate
    4.   Mobile phone → terminate
    5.   Other mobile device → terminate

**BASE: ALL NON-TERMINATES**
115.   In what state do you live?
    **[PROGRAMMER: Drop down menu of states.]**

**BASE: ALL NON-TERMINATES**
120.   Do you or does anyone in your household work in any of the following areas?
    *(Select all that apply)*
    [RANDOMIZE]
    1.   For a computer manufacturer
    2.   An automobile dealer or car rental company
    3.   A company that sells or manufactures women's clothing, shoes and accessories **[TERMINATE]**
    4.   A bar or restaurant
    5.   A law firm **[TERMINATE]**
    6.   A market research company **[TERMINATE]**
    7.   None of the above **[ANCHOR; EXCLUSIVE]**

**BASE: ALL NON-TERMINATES**
130.   Which, if any, of the following products have you shopped for or purchased in the last 3 years?
    *(Select all that apply)*
    [RANDOMIZE]
    8.  Shoes **[MUST SELECT TO CONTINUE]**
    9.  Flat screen television
    10. New car
    11. Cashmere sweater
    12. Cocktail dress
    13. Washing machine
    14. None of the above **[ANCHOR; EXCLUSIVE]**

**BASE: SHOES SELECTED IN 130**
135.    Which, if any, of the following types of shoes have you shopped for or purchased in the past 3 years? *(Select all that apply)*
1.   Platforms
2.   Pumps
3.   Platform sandals
4.   Evening
5.   Flat sandals
6.   Flats
7.   Wedges
8.   None of the above **[EXCLUSIVE]**

**[MUST SELECT EITHER PLATFORMS, PUMPS, PLATFORM SANDALS, EVENING, OR MORE THAN ONE OF THESE TO CONTINUE]**

**BASE: Platforms, Pumps, Platform Sandals, and/or Evening in 135**
140.    What is the <u>most</u> that you have paid for a pair of shoes in the past 3 years? *(Select one only)*
1.   Less than $100
2.   $100 to $199
3.   $200 to $299
4.   $300 to $399
5.   $400 to $499
6.   $500 to $599
7.   $600 to $699
8.   $700 to $799
9.   $800 to $899
10.  $900 to $999
11.  $1000 or more
12.  Don't know/can't remember

**[MUST SELECT $400 OR HIGHER TO CONTINUE]**

**BASE: $400 OR HIGHER IN 140**
145.    Which, if any, of the following types of shoes are you likely to shop for or purchase in the next 12 months? *(Select all that apply)*
1.   Platforms
2.   Pumps
3.   Platform sandals
4.   Evening
5.   Flat sandals
6.   Flats
7.   Wedges
8.   None of the above **[EXCLUSIVE]**

**[MUST SELECT EITHER PLATFORMS, PUMPS, PLATFORM SANDALS, EVENING, OR MORE THAN ONE OF THESE TO CONTINUE]**

**BASE: Platforms, Pumps, Platform Sandals, and/or Evening in 145**
150.    What is the most that you are likely to spend for a pair of shoes in the next 12 months? *(Select one only)*

1. Less than $100
2. $100 to $199
3. $200 to $299
4. $300 to $399
5. $400 to $499
6. $500 to $599
7. $600 to $699
8. $700 to $799
9. $800 to $899
10. $900 to $999
11. $1000 or more
12. Don't know/unsure

**BASE: ALL NON-TERMINATES**
160.    Which of these age ranges includes your age?
1. Under 18 **[DOES NOT QUALIFY]**
2. 18-34
3. 35-49
4. 50-64
5. 65 and older

**[TERMINATE IF AGE RANGE DOES NOT MATCH AGE BASED ON BIRTH DATE]**

**BASE: ALL NON-TERMINATES**
165.    Please select South from the following list in order to continue with this survey.
[RANDOMIZE]
1. North
2. South [must select to continue]
3. East
4. West

QUALIFYING CRITERIA FOR MAIN SURVEY:
- Q100 DOB matches preload in URL
- Q105/1 Female
- Q110/1-2 Survey taken on desktop or laptop/notebook computer
- Q120/NOT3-NOT5-NOT6 Does not work for "a company that sells or manufactures women's clothing, shoes, and accessories," "a law firm," or "a market research company."
- Q130/1 Must have purchased Shoes
- Q135/1-4 Must have purchased "platforms," or "pumps," or "platform sandals," or "evening" shoes in past 3 years.
- Q140/5-11 Must have spent at least $400 in past three years
- Q145/1-4 Must be likely to purchased "platforms," or "pumps," or "platform sandals," or "evening" shoes in next 12 months.
- Q160 Age range must match the DOB entered in Q100
- Q165/2 Must select South

MAIN SURVEY

**BASE: ALL QUALIFIED RESPONDENTS**
200.    In a moment you are going to watch a 20-second video of a woman walking on the street.  Please watch as you would if you were actually seeing this woman walking on the street.  After the video, we will ask you some questions about what you saw.  If for any question, you don't know the answer or have no opinion, please indicate so.  Please do not guess.

**BASE: ALL QUALIFIED RESPONDENTS**
210.    Please click the play icon to watch the video.

**[PROGRAMMER: RANDOMIZE RESPONDENTS TO CELL 1 OR CELL 2.**
**IF CELL 1, PLAY VIDEO 1 (start with quota=100)**
**IF CELL 2, PLAY VIDEO 2 (Video will be sent at a later date) (start with quota=0)**
**After video plays, display text and options.]**

Please click below to continue.  Or if you were not able to view the video clearly, please indicate so.

   **[Include button to click to continue, but make sure button is active only _after_ video has played]**
   **[Include "Could not view video clearly" option] → terminate if selected.**

**BASE: VIEWED VIDEO CLEARLY AND CONTINUED IN 210**
213.   Now we'd like you to watch the same video of the woman you just finished watching one more time.  Please click the play icon to watch the video a second time.

**[PROGRAMMER:  PLAY VIDEO 1 FOR CELL 1, OR VIDEO 2 FOR CELL 2; after video plays, display text and options:]**

Please click below to continue.  Or if you were not able to view the video clearly, please indicate so.

   **[Include button to click to continue, but make sure button is active only _after_ video has played]**
   **[Include "Could not view video clearly" option] → terminate if selected.**

**BASE: VIEWED VIDEO CLEARLY AND CONTINUED IN 213**
215.    **[PROGRAMMER – VIDEO SHOULD NOT BE ON SCREEN FOR ANY REMAINING QUESTIONS]**

Do you have a belief about who or what company makes or puts out the <u>shoes</u> that the woman in the video was wearing?

      1.   Yes, I do → go to 230
      2.   No, I do not → skip to 250
      3.   Don't know → skip to 250

**BASE: (YES IN 215)**
230.    Who or what company do you believe makes or puts out the shoes that the woman in the video was wearing?
*(large text box for answer)*
*(don't know/no opinion)*

**BASE: ENTERED TEXT IN 230**
240.    Why do you say that?
*(Large text box for answer)*
*(don't know/no opinion)*

**BASE: ENTERED TEXT IN 240**
245.    Any other reasons?
*(Large text box for answer)*
*(don't know/no opinion)*

**BASE: ALL QUALIFIED RESPONDENTS**
**250.**    Have you seen or heard anything recently in the news about the shoes that the woman in the video was wearing?
   1.  **Yes → go to 260**
   2.  **No → go to 270**
   3.  **Don't know → go to 270**

**BASE: YES IN 250**
**260.**    What have you seen or heard in the news about the shoes that the woman in the video was wearing?
*(large text box for answer)*

**BASE: ALL QUALIFIED RESPONDENTS**
**270.**    In the past two months, have you taken another online survey where you were shown a picture of a woman wearing shoes and were asked who or what company makes the shoes in the picture?
   1.  **Yes**
   2.  **No**
   3.  **Don't know**

# APPENDIX C

# MATERIALS REVIEWED/FEES CHARGED

In designing the survey and preparing this report, I reviewed the following materials:

(1) Complaint

(2) Plaintiff's Amended Memorandum of Law in Support of Application for a Preliminary Injunction

(3) Expert Report of Robert Klein

(4) Declaration of Robert Klein in Support of Application for a Preliminary Injunction

(5) Louboutin Website

(6) YSL website

(7) Neiman Marcus website

(8) A Chart showing sales data for the allegedly infringing YSL shoes

(9) Images of the allegedly infringing YSL shoes

The fee charged for the review and analysis of the Klein survey, the design and conduct of my survey, and the preparation of this report was $58,500.  Any additional time incurred in connection with this matter will be charged at my ordinary rate of $500/hr.

**APPENDIX D**

**DATA (to be provided electronically)**

**APPENDIX E :    VIDEO USED IN SURVEY**
**(to be provided electronically)**

**APPENDIX F:    SCREENSHOTS OF SURVEY**
**(to be provided electronically)**