UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------X

CHRISTIAN LOUBOUTIN S.A. et al.,  :

                  Plaintiffs,  :

    - against -  :

YVES SAINT LAURENT AMERICA, INC.  :
et al.,  :

                 Defendants.  :

------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FIL.
DOC #: _____
DATE FILED: 8/10/11

11 Civ. 2381 (VM)

**DECISION AND ORDER**

**ORIGINAL**

**VICTOR MARRERO, United States District Judge.**

     Plaintiffs Christian Louboutin S.A., Christian Louboutin, L.L.C. and Christian Louboutin individually (collectively, "Louboutin") brought this action against Yves Saint Laurent America, Inc., Yves Saint Laurent America Holding, Inc., Yves Saint Laurent S.A.S., Yves Saint Laurent, John and Jane Does A-Z and unidentified XYZ Companies 1-10 (collectively, "YSL"), asserting various claims under the Lanham Act, 15 U.S.C. § 1051 et seq. and New York law. YSL's opposition asserts various counterclaims seeking cancellation of Louboutin's trademark registration and damages. Louboutin now moves under Rule 65 of the Federal Rules of Civil Procedure for a preliminary injunction. For the reasons discussed below, Louboutin's motion is DENIED.

## I. BACKGROUND[1]

Sometime around 1992 designer Christian Louboutin had a bright idea. He began coloring glossy vivid red the outsoles of his high fashion women's shoes. Whether inspired by a stroke of original genius or, as competitor YSL retorts, copied from King Louis XIV's red-heeled dancing shoes, or Dorothy's famous ruby slippers in "The Wizard of Oz," or other styles long available in the contemporary market -- including those sold by YSL -- Christian Louboutin deviated from industry custom. In his own words, this diversion was meant to give his line of shoes "energy," a purpose for which he chose a shade of red because he regarded it as "engaging, flirtatious, memorable and the color of passion," as well as "sexy." (Mourot Decl. Ex. C (Docket No. 22-7) ¶ 3; id. (Docket No. 22-12) at 4.)   In pursuit of the red sole's virtues, Louboutin invested substantial amounts of capital building a reputation and good will, as well as promoting and

---

[1] The factual summary below is derived from the following documents: Plaintiff's Amended Memorandum of Law in Support of Application for a Preliminary Injunction, dated June 21, 2011, and any exhibits and declarations attached thereto; Defendants/Counterclaim-Plaintiffs' Memorandum of Law in Opposition to Motion for Preliminary Injunction, dated July 12, 2011, and any exhibits and declarations attached thereto; and Plaintiff's Reply Memorandum of Law in Support of Application for a Preliminary Injunction, dated July 19, 2011, and any exhibits and declarations attached thereto. The Court will make no further citations to these sources unless otherwise specified.

protecting Louboutin's claim to exclusive ownership of the mark as its signature in women's high fashion footwear.

Over the years, the high fashion industry responded. Christian Louboutin's bold divergence from the worn path paid its dividends. Louboutin succeeded to the point where, in the high-stakes commercial markets and social circles in which these things matter a great deal, the red outsole became closely associated with Louboutin. Leading designers have said it, including YSL, however begrudgingly. Film stars and other A-list notables equally pay homage, at prices that for some styles command as much as $1,000 a pair. And even at that expense, a respectable niche of consumers wears the brand, to the tune of about 240,000 pairs a year sold in the United States, with revenues of approximately $135 million projected for 2011. When Hollywood starlets cross red carpets and high fashion models strut down runways, and heads turn and eyes drop to the celebrities' feet, lacquered red outsoles on high-heeled, black shoes flaunt a glamorous statement that pops out at once. For those in the know, cognitive bulbs instantly flash to associate: "Louboutin." This recognition is acknowledged, for instance, at least by a

clientele of the well-heeled, in the words of a lyrical stylist of modern times:

> Boy, watch me walk it out
> . . . Walk this right up out the house
> I'm throwin' on my Louboutins . . .[2]

And as an equally marked sign of Louboutin's success, competitors and black market infringers, while denying any offense, mimic and market its red sole fashion.

No doubt, then, Christian Louboutin broke ground and made inroads in a narrow market.  He departed from longstanding conventions and norms of his industry, transforming the staid black or beige bottom of a shoe into a red brand with worldwide recognition at the high end of women's wear, a product visually so eccentric and striking that it is easily perceived and remembered.

The law, like the marketplace, applauds innovators. It rewards the trend-setters, the market-makers, the path-finding non-conformists who march to the beat of their own drums.  To foster such creativity, statutes and common law rules accord to inspired pioneers various means of recompense and incentives.  Through grants of patents and trademark registrations, the law protects ingenuity and penalizes unfair competition.  In this case, the United

---

[2] Jennifer Lopez, _Louboutins_ (Epic Records 2009).

-4-

States Patent and Trademark Office ("PTO"), perhaps swayed in part by the widespread recognition the red sole had already attained, invested Louboutin's brand with legal distinction in 2008 by approving registration of the mark. The issue now before the Court is whether, despite Christian Louboutin's acknowledged innovation and the broad association of the high fashion red outsole with him as its source, trademark protection should not have been granted to that registration.

The PTO awarded a trademark with Registration No. 3,361,597 (the "Red Sole Mark") to Louboutin on January 1, 2008. The certificate of registration includes both a verbal description of the mark and a line drawing intended to show placement of the mark as indicated below:



The verbal description reads:

> FOR: WOMEN'S HIGH FASHION DESIGNER FOOTWEAR, IN CLASS 25 (U.S. CLS. 22 AND 39).
>
> FIRST USE 0-0-1992; IN COMMERCE 0-0-1992.

-5-

> THE COLOR(S) RED IS/ARE CLAIMED AS A FEATURE OF THE
> MARK.
>
> THE MARK CONSISTS OF A LACQUERED RED SOLE ON FOOTWEAR.
> THE DOTTED LINES ARE NOT PART OF THE MARK BUT ARE
> INTENDED ONLY TO SHOW PLACEMENT OF THE MARK.

(Mourot Decl. Ex. A (Docket No. 22-1).)

Louboutin approached YSL in January 2011 to discuss several models of shoes offered by YSL that Louboutin claims use the same or a confusingly similar shade of red as that protected by the Red Sole Mark. YSL, a fashion house founded in 1962, produces seasonal collections that include footwear. According to YSL, red outsoles have appeared occasionally in YSL collections dating back to the 1970s. Louboutin takes issue with four shoes from YSL's Cruise[3] 2011 collection: the Tribute, Tribtoo, Palais and Woodstock models. Each of the challenged models bears a bright red outsole as part of a monochromatic design in which the shoe is entirely red (or entirely blue, or entirely yellow, etc.). An all-red version of the Tribute previously appeared in YSL's Cruise 2008 collection.

After YSL refused to withdraw the challenged models from the market, Louboutin filed this action asserting claims under the Lanham Act for (1) trademark infringement

---

[3] "Cruise" in this context refers to the fashion season between winter and spring, which is sold in stores beginning in November of each year. (Vaissié Decl. (Docket No. 34) ¶ 11.)

and counterfeiting, (2) false designation of origin and unfair competition and (3) trademark dilution, as well as state law claims for (4) trademark infringement, (5) trademark dilution, (6) unfair competition and (7) unlawful deceptive acts and practices.  In response, YSL asserted counterclaims seeking (1) cancellation of the Red Sole Mark on the grounds that it is (a) not distinctive, (b) ornamental, (c) functional, and (d) was secured by fraud on the PTO, as well as (2) damages for (a) tortious interference with business relations and (b) unfair competition.

Louboutin now seeks a preliminary injunction preventing YSL from marketing during the pendency of this action any shoes that use the same or a confusingly similar shade of red as that protected by the Red Sole Mark. Hence, this case poses a Whitmanesque question. Paraphrased for adaptation to the heuristics of the law, it could be framed like this. A lawyer said *What is the red on the outsole of a woman's shoe?* and fetching it to court with full hands asks the judge to rule it is

> [A] gift and remembrancer designedly dropt,
> Bearing the owner's name someway in the corners, that we may
>      see and remark, and say *Whose*?[4]

Because in the fashion industry color serves ornamental and aesthetic functions vital to robust competition, the Court finds that Louboutin is unlikely to be able to prove that its red outsole brand is entitled to trademark protection, even if it has gained enough public recognition in the market to have acquired secondary meaning. The Court therefore concludes that Louboutin has not established a likelihood that it will succeed on its claims that YSL infringed the Red Sole Mark to warrant the relief that it seeks.

## II. DISCUSSION

To obtain a preliminary injunction, Louboutin must establish "(1) irreparable harm and (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in [its favor]." Monserrate v.

---

[4] Walt Whitman, Leaves of Grass 195 (Karen Karbiener ed., 2004). The text from which this passage derives (italics in the original) reads:

> A child said *What is the grass*? fetching it to me with full hands
> . . . .
> . . . I guess it is the handkerchief of the Lord,
> A scented gift and remembrancer designedly dropt,
> Bearing the owner's name someway in the corners, that we may
>      see and remark and say *Whose*?

N.Y. State Senate, 599 F.3d 148, 154 (2d Cir. 2010) (emphasis added); Zino Davidoff SA v. CVS Corp., 571 F.3d 238, 242 (2d Cir. 2009).

A.  TRADEMARK INFRINGEMENT AND UNFAIR COMPETITION UNDER THE LANHAM ACT

To succeed on its claims for trademark infringement and unfair competition under the Lanham Act, Louboutin must demonstrate that (1) its Red Sole Mark merits protection and (2) YSL's use of the same or a sufficiently similar mark is likely to cause consumer confusion as to the origin or sponsorship of YSL's shoes.  See Starbucks Corp. v. Wolfe's Borough Coffee, Inc., 588 F.3d 97, 114 (2d Cir. 2009); Louis Vuitton Malletier v. Dooney & Burke, Inc., 454 F.3d 108, 115 (2d Cir. 2006).

The first question, therefore, is whether Louboutin's Red Sole Mark merits protection.  The Lanham Act permits the registration of a "trademark," which it defines as

> any word, name, symbol, or device, or any combination thereof . . . [,] which a person has a bona fide intention to use in commerce and applies to register . . . , to identify and distinguish his or her goods . . . from those manufactured and sold by others and to indicate the source of the goods.

15 U.S.C. § 1127.  Louboutin's certificate of registration of the Red Sole Mark gives rise to a statutory presumption that the mark is valid.  See 15 U.S.C. § 1057(b); Lane

-9-

<u>Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc.</u>, 192 F.3d 337, 345 (2d Cir. 1999).   However, that presumption of validity may be rebutted.   <u>See</u> <u>Lane Capital Mgmt.</u>, 192 F.3d at 345.

Color alone "<u>sometimes</u>" may be protectable as a trademark, "where that color has attained 'secondary meaning' and therefore identifies and distinguishes a particular brand (and thus indicates its 'source')." <u>Qualitex Co. v. Jacobson Prods. Co.</u>, 514 U.S. 159, 161, 163 (1995) (emphasis added); <u>Louis Vuitton Malletier</u>, 454 F.3d at 115.   Conversely, color may not be protectable where it is "functional," meaning that the color is essential to the use or purpose of the product, or affects the cost or quality of the product.   <u>Qualitex</u>, 514 U.S. at 165.   In short, color can meet the legal requirements for a trademark if it "act[s] as a symbol that distinguishes a firm's goods and identifies their source, <u>without serving any other significant function</u>."   <u>Id.</u> at 166 (emphasis added). As defined in the Restatement (Third) of Unfair Competition, a design is functional if its "aesthetic value" is able to "confe[r] a significant benefit that cannot practically be duplicated by the use of alternative

designs."   Id. at 170 (quoting Restatement (Third) of
Unfair Competition § 17 cmt. c (1993)).

Applying these principles, courts have approved the
use of a single color as a trademark for industrial
products. See, e.g., id. at 160 (green-gold for pads used
on dry cleaning presses); In re Owens-Corning Fiberglas
Corp., 774 F.2d 1116, 1123 (Fed. Cir. 1985) (pink for
fibrous glass insulation).  In some industrial markets the
design, shape and general composition of the goods are
relatively uniform, so as to conform to industry-wide
standards.  Steel bolts, fiber glass wall insulation and
cleaning press pads, for example, are what they are
regardless of which manufacturer produces them.  The
application of color to the product can be isolated to a
single purpose:   to change the article's external
appearance so as to distinguish one source from another.

But, whatever commercial purposes may support
extending trademark protection to a single color for
industrial goods do not easily fit the unique
characteristics and needs -- the creativity, aesthetics,
taste, and seasonal change -- that define production of
articles of fashion.  That distinction may be readily
visualized through an image of the incongruity presented by

-11-

use of color in other industries in contrast to fashion. Can one imagine industrial models sashaying down the runways in displays of the designs and shades of the season's collections of wall insulation?  The difference for Lanham Act purposes, as elaborated below, is that in fashion markets color serves not solely to identify sponsorship or source, but is used in designs primarily to advance expressive, ornamental and aesthetic purposes.

In the fashion industry, the Lanham Act has been upheld to permit the registration of the use of color in a trademark, but only in distinct patterns or combinations of shades that manifest a conscious effort to design a uniquely identifiable mark embedded in the goods.  See, e.g., Louis Vuitton Malletier, 454 F.3d at 116 ("LV" monogram combined in a pattern of rows with 33 bright colors); Burberry Ltd. v. Euro Moda, Inc., No. 08 Civ. 5781, 2009 WL 1675080, at *5 (S.D.N.Y. June 10, 2009) (registered Burberry check pattern entitled to statutory presumption of validity).  In these cases the courts clearly point out that the approved trademark applies to color not as an abstract concept, or to a specific single shade, but to the arrangement of different colors and thus their synergy to create a distinct recognizable image

-12-

purposely intended to identify a source while at the same time serving as an expressive, ornamental or decorative concept.

The narrow question presented here is whether the Lanham Act extends protection to a trademark composed of a single color used as an expressive and defining quality of an article of wear produced in the fashion industry. In other words, the Court must decide whether there is something unique about the fashion world that militates against extending trademark protection to a single color, although such registrations have sometimes been upheld in other industries.

To answer this question, and recognizing the fanciful business from which this lawsuit arises, the Court begins with a fanciful hypothetical. Suppose that Monet, having just painted his water lilies, encounters a legal challenge from Picasso, who seeks by injunction to bar display or sale of those works. In his complaint, Picasso alleges that Monet, in depicting the color of water, used a distinctive indigo that Picasso claims was the same or too close to the exquisite shade that Picasso declares is "the color of melancholy," the hallmark of his Blue Period, and is the one Picasso applied in his images of water in

paintings of that collection. By virtue of his longstanding prior use of that unique tinge of blue in context, affirmed by its registration by the trademark office, Picasso asserts exclusive ownership of the specific tone to portray that color of water in canvas painting. Should a court grant Picasso relief?

Putting aside the thousand technicalities lawyers would conjure and quibble about in arguing why the imagined case is inapposite or distinguishable from the real controversy before the Court, the example contains some analytic parallels perhaps helpful in resolving this actual dispute.

Painting and fashion design stem from related creative stock, and thus share many central features. Both find common ground and goals in two vital fields of human endeavor, art and commerce. For the ultimate ends they serve in these spheres, both integrally depend on creativity. Fashion designers and painters both regard themselves, and others regard them, as being engaged in labors for which artistic talent, as well as personal expression as a means to channel it, are vital. Moreover, the items generated by both painters and fashion designers acquire commercial value as they gain recognition.

-14-

Louboutin himself would probably feel his sense of *honneur* wounded if he were considered merely a cobbler, rather than an *artiste*.  But, as a matter differing only in degrees and order of priority, Louboutin and Picasso both may also be properly labeled as men of commerce, each in his particular market.

The creative energies of painter and fashion designer are devoted to appeal to the same sense in the beholder and wearer: aesthetics.  Both strive to please patrons and markets by creating objects that not only serve a commercial purpose but also possess ornamental beauty (subjectively perceived and defined).  Quintessentially, both painting and fashion embrace matters of taste.  In consequence, they share vicissitudes natural to any matter of palate or palette.  They change as the seasons change. Styles, features, whole lines come and go with passing likes and dislikes, to be replaced by new articles with origins from regions where genius charts a different course.  Items fall in and out of fashion in all nuances of the word, conveying not only currency but seasonality and transience. Perhaps capturing something of that relative inconstancy, painting and fashion share a vocabulary.  They speak in ethereal terms like fanciful, inventive,

eccentric, whimsical, visionary, and, to quote Louboutin again, "engaging, flirtatious" (Mourot Decl. Ex. C (Docket No. 22-7) ¶ 3) -- all words which also have in common an aim to evoke and affect things of the moment.

These creative means also share a dependence on color as an indispensable medium. Color constitutes a critical attribute of the goods each form designs. Alone, in combinations, in harmonious or even incongruous blends, in varying patterns and shapes, the whole spectrum of light serves as a primal ingredient without which neither painting nor fashion design as expressive and ornamental art would flourish. For, color depicts elemental properties. As it projects expression of the artist's mental world, it captures the mutability, the fancy, the moods of the visual world, in both spheres working as a means to execute singular concepts born of imagination for which not just any other shade will do. Hence, color in this context plays a unique role. It is a feature purposely given to an article of art or design to depict the idea as the creator conceived it, and to evoke an effect intended. In ornamenting, it draws attention to itself, and to the object for which its tone forms a distinct expressive feature. From these perspectives,

-16-

color in turn elementally performs a creative function; it aims to please or be useful, not to identify and advertise a commercial source.

But, as an offshoot of color, perhaps most crucial among the features painting and fashion design share as commerce and art, are two interrelated qualities that both creative fields depend upon to thrive, and indeed to survive: artistic freedom and fair competition.  In both forms, the greatest range for creative outlet exists with its highest, most vibrant and all-encompassing energies where every pigment of the spectrum is freely available for the creator to apply, where every painter and designer in producing artful works enjoys equal freedom to pick and choose color from every streak of the rainbow.  The contrary also holds.  Placing off limit signs on any given chromatic band by allowing one artist or designer to appropriate an entire shade and hang an ambiguous threatening cloud over a swath of other neighboring hues, thus delimiting zones where other imaginations may not veer or wander, would unduly hinder not just commerce and competition, but art as well.

The thrust and implications of the Court's analogy are clear.  No one would argue that a painter should be barred

-17-

from employing a color intended to convey a basic concept because another painter, while using that shade as an expressive feature of a similar work, also staked out a claim to it as a trademark in that context.  If as a principle this proposition holds as applied to high art, it should extend with equal force to high fashion. The law should not countenance restraints that would interfere with creativity and stifle competition by one designer, while granting another a monopoly invested with the right to exclude use of an ornamental or functional medium necessary for freest and most productive artistic expression by all engaged in the same enterprise.

The question of whether the use of a single color in the fashion industry can constitute a valid mark necessarily raises another one:  whether a single color may be "functional" in that context.   "The functionality doctrine . . . forbids the use of a product's feature as a trademark where doing so will put a competitor at a significant disadvantage because the feature is "'essential to the use or purpose of the article' or 'affects [its] cost or quality.'"  Qualitex, 514 U.S. at 169 (quoting Inwood Labs., Inc. v. Ives, 456 U.S. 844, 850 n.10 (1982)). Use of a single color has been held functional, and

-18-

therefore not protectable under the Lanham Act, in other contexts. See, e.g., Brunswick Corp. v. British Seagull Ltd., 35 F.3d 1527, 1533 (Fed. Cir. 1994) (black for marine outboard engines held functional because it is "compatib[le] with a wide variety of boat colors and [can] make objects appear smaller"); Deere & Co. v. Farmhand, Inc., 560 F. Supp. 85, 98 (S.D. Iowa 1982) (green for farm equipment held functional because farmers "prefer to match their loaders to their tractor"), aff'd, 721 F.2d 253 (8th Cir. 1983). These cases illustrate the principle that "[a]esthetic appeal can be functional; often we value products for their looks." Eco Mfg. LLC v. Honeywell Int'l Inc., 357 F.3d 649, 653 (7th Cir. 2003) (emphasis in original).

Christian Louboutin himself has acknowledged significant, nontrademark functions for choosing red for his outsoles. As already quoted above, he stated that he chose the color to give his shoe styles "energy" and because it is "engaging." (Mourot Decl. Ex. C (Docket No. 22-7) ¶ 3.) He has also said that red is "sexy" and "attracts men to the women who wear my shoes." (Id.; Mourot Decl. Ex. C (Docket No. 22-12) at 4.) YSL, for its part, has used red to evoke Chinese design elements. For

-19-

the Cruise 2011 collection, YSL employed the monochromatic
style that it indicates is part of the brand's history,
meaning that each of the challenged shoe models is entirely
red.  The shoes also coordinate with clothing items offered
in the same collection.  Color serves an additional
significant nontrademark function: "to satisfy the 'noble
instinct for giving the right touch of beauty to common and
necessary things.'"  Qualitex, 514 U.S. at 170 (quoting G.
Chesterton, Simplicity and Tolstoy 61 (1912)).  The outsole
of a shoe is, almost literally, a pedestrian thing.  Yet,
coated in a bright and unexpected color, the outsole
becomes decorative, an object of beauty.  To attract, to
reference, to stand out, to blend in, to beautify, to endow
with sex appeal -- all comprise nontrademark functions of
color in fashion.

        The red outsole also affects the cost of the shoe,
although perhaps not in the way Qualitex envisioned.
Arguably, adding the red lacquered finish to a plain raw
leather sole is more expensive, not less, than producing
shoes otherwise identical but without that extra ornamental
finish.   (See Mourot Decl. Ex. C (Docket No. 22-7) ¶ 3.)
Yet, for high fashion designers such as Louboutin and YSL,

the higher cost of production is desirable because it makes
the final creation that much more exclusive, and costly.

Because the use of red outsoles serves nontrademark
functions other than as a source identifier, and affects
the cost and quality of the shoe, the Court must examine
whether granting trademark rights for Louboutin's use of
the color red as a brand would "significantly hinder
competition," that is, "permit one competitor (or a group)
to interfere with legitimate (nontrademark-related)
competition through actual or potential exclusive use of an
important product ingredient." Qualitex, 514 U.S. at 170.
Here, Christian Louboutin singularly claimed "the color
red" as a feature of the mark, and he registered a
"lacquered red sole" for "women's high fashion designer
footwear." (Mourot Decl. Ex. A (Docket No. 22-1).) Both
components of the mark pose serious legal concerns as well
as threats to legitimate competition in the designer shoe
market.

Louboutin's claim to "the color red" is, without some
limitation, overly broad and inconsistent with the scheme
of trademark registration established by the Lanham Act.
Awarding one participant in the designer shoe market a
monopoly on the color red would impermissibly hinder

-21-

competition among other participants.   YSL has various
reasons for seeking to use red on its outsoles -- for
example, to reference traditional Chinese lacquer ware, to
create a monochromatic shoe, and to create a cohesive look
consisting of color-coordinating shoes and garments.
Presumably, if Louboutin were to succeed on its claim of
trademark infringement, YSL and other designers would be
prohibited from achieving those stylistic goals.   In this
respect, Louboutin's ownership claim to a red outsole would
hinder competition not only in high fashion shoes, but
potentially in the markets for other women's wear articles
as well.   Designers of dresses, coats, bags, hats and
gloves who may conceive a red shade for those articles with
matching monochromatic shoes would face the shadow or
reality of litigation in choosing bands of red to give
expression to their ideas.

    The effects of this specter -- the uncertainty and
apprehension it generates -- are especially acute in the
fashion industry because of its grounding on the creative
elements discussed above.   Fashion is dependent on colors.
It is subject to temporal change.   It is susceptible to
taste, to idiosyncrasies and whims and moods, both of
designers and consumers.   Thus, at any moment when the

-22-

market and the deities of design, by whatever fancy they decide those things, proclaim that "passion" is in for a given season and must be expressed in reds in the year's various collections, Louboutin's claim would cast a red cloud over the whole industry, cramping what other designers could do, while allowing Louboutin to paint with a full palette. Louboutin would thus be able to market a total outfit in his red, while other designers would not. And this impediment would apply not just with respect to Louboutin's registered "the color red," but, on its theory as pressed in this litigation, to a broader band of various other shades of red which would be available to Louboutin but which it could bar others from using.

Louboutin asserts that it is the color depicted in the registration's drawing, and not the verbal reference to the "color red," that controls. In its reply brief, Louboutin identified that color for the first time as Pantone No. 18-1663 TP, or "Chinese Red," part of the PANTONE TEXTILE color system.[5] Yet that identification raises additional issues. Louboutin cannot amend or augment its PTO registration by representations it makes in this

---

[5] The TEXTILE color system assists designers in selecting and specifying color to be used in the manufacture of textiles and apparel. In 2003, the TEXTILE color system was replaced with the FASHION + HOME color system, and the suffix of each color was changed from "TP" to "TPX."

litigation.   Accordingly,  the  color  that  governs  here
remains, as Louboutin points out, the shade of red depicted
in  the  registration's  drawing.   As  Louboutin  concedes,
however,  because  of  varying  absorption  and  reflection
qualities of the material to which it is applied, a color
as it manifests on paper would appear quite different --
some lighter, some darker hues -- on other mediums such as
leather and cloth.   A competitor examining the Louboutin
registration  drawing  for  guidance  as  to  what  color  it
applies  to  may  therefore  remain  unable  to  determine
precisely which shade or shades it encompasses and which
others are available for it to safely use.

Moreover, YSL has represented to the Court that the
precise  color  of  the  styles  Louboutin  challenges  is  not
Chinese Red, and that YSL has never used Pantone No. 18-
1663 TP on its outsoles.   Undaunted, Louboutin insists that
YSL has nonetheless infringed the Red Sole Mark because its
challenged shoe models use a shade confusingly too close to
Chinese Red.   Yet Louboutin cannot provide a satisfactory
explanation  as  to  why  those  models  --  but  not  others
previously made by YSL that also bear a red outsole -- are
confusingly  similar  to  its  claimed  mark.   The  larger
question this conflict poses is how close to a protected

-24-

single color used in an item of fashion can the next competitor approach without encountering legal challenge from the first claimant of a shade as a trademark.

In response to this legal dilemma, Louboutin proposes that the Court simply draw a designated range both above and below the borderlines of Pantone No. 18-1663 TP, and declare all other stripes of red within that zone forbidden to competitors. Its suggested metric references Olay Co., Inc. v. Cococare Prods., Inc. See 218 U.S.P.Q. 1028, 1045 (S.D.N.Y. 1983) (issuing injunction requiring infringer to use "a discernibly different pink, at least 40% different in terms of [Pantone Matching System] tones" from that used by registrant). Louboutin's proposal would have the effect of appropriating more than a dozen shades of red -- and perhaps other colors as well[6] -- and goes far beyond the injunction upon which Louboutin relies. In Olay, the protectable interest was not "in the color pink alone," but

---

[6] Louboutin's suggestion that the Court require other designers to stay some percentage away from Chinese Red raises the question: some percentage of what? Chinese Red, like any color, is made up of a certain combination of other colors. Based on the Court's research, this combination can be expressed in various metrics, such as a combination of RGB (red, green, blue) or CMYK (cyan, magenta, yellow, black), or HSB (hue, saturation, brightness). See Mark Galer & Les Horvat, Digital Imaging: Essential Skills 3-5, 7 (3d ed. 2005). In Adobe Color Picker, see id. at 6, a variance of just 10 percent in any of these inputs, in either direction, yields more than a dozen shades visibly different from Chinese Red, in some cases so different as to appear to the casual observer pink on one side of Chinese Red or orange on the other.

rather in the color in combination with graphics and packaging. See id. Here, Louboutin's claimed mark is, in essence, the color red alone when used on the soles of "high fashion" footwear. (Mourot Decl. Ex. A (Docket No. 22-1).) Moreover, although Louboutin attempts in these proceedings to limit the scope of the mark to high-heeled footwear, no such limitation appears on the face of the registration. (See id.)

The other options Louboutin's claim would leave other competitors are no more practical or palatable. As YSL endeavored to do during a deposition of Christian Louboutin in connection with this action, other designers could seek advance clearance from Christian Louboutin himself, spreading the fan of shades before him to see at what tint his red light changes to amber.[7] Or they could go to court and ask for declaratory relief holding that a proposed red sole is not close enough to Chinese Red to infringe Louboutin's mark, thereby turning the judge into an arbiter of fashion design. Though Qualitex points out that in trademark disputes courts routinely are called upon to

---

[7] In response to YSL's inquiry as to whether a particular YSL shoe infringes the Red Sole Mark, Christian Louboutin responded at his deposition that he "will think about it." (Hamid Decl. Ex. A (Docket No. 32-1) at 60:11-14.) In response to YSL's inquiry as to whether Christian Louboutin would "object to any shade of red on a sole," counsel for Christian Louboutin instructed him not to answer. (Id. at 46:4-18 (emphasis added).)

decide difficult questions involving shades of differences in words or phrases or symbols, the commercial contexts in which the application of those judgments generally has arisen has not entailed use of a single color in the fashion industry, where distinctions in designs and ideas conveyed by single colors represent not just matters of degree but much finer qualitative and aesthetic calls.

Because Louboutin's registration specifies that it covers women's high fashion "designer footwear," the description is broad enough to encompass all styles of shoes, not just the high-heeled model illustrated in the PTO registration. Louboutin's argument that it would not pursue a claim of infringement based upon red outsoles on, for example, flat shoes, wedges or kitten heels, is cold comfort to competing designers. In fact, in one case in Paris, Louboutin sought to enforce its French trademark for a "shoe sole in the color red" against the company Zara France, S.A.R.I., which is not a high-end retailer. (See Hamid Decl. Ex. G (Docket No. 32-2).)

Another dimension of uncertainty the Red Sole Mark creates pertains to its coating. Louboutin's claim extends not just to the base of "the color red," but also to its gloss. In the registration, it is described more

specifically as "lacquered" red.   Thus, it is not clear,

for   example,   whether   the   protection   of   Louboutin's

trademark would apply to a "Chinese Red" outsole that was

not   shiny,   but   entirely   flat.    In   fact,   that   issue   has

surfaced in this case.   YSL asserts that the color tone of

some of the shoes Louboutin challenges is not lacquered at

all but a flat red.   By bringing this litigation, Louboutin

is  of  course  calling  upon  the  Court  to  pass  judgment  as

well on the degree of buffing that a competitor may give to

a  Chinese  Red  outsole  before  it  begins  to  infringe  on

Louboutin's rights.

Finally,   conferring   legal   recognition   on   Louboutin's

claim  raises  the  specter  of  fashion  wars.    If  Louboutin

owns  Chinese  Red  for  the  outsole  of  high  fashion  women's

shoes,  another  designer  can  just  as  well  stake  out  a  claim

for  exclusive  use  of  another  shade  of  red,  or  indeed  even

Louboutin's  color,  for  the  insole,  while  yet  another  could,

like  the  world  colonizers  of  eras  past  dividing  conquered

territories  and  markets,  plant  its  flag  on  the  entire  heel

for  its  Chinese  Red.    And  who  is  to  stop  YSL,  which

declares  it  pioneered  the  monochrome  shoe  design,  from

trumping  the  whole  footwear  design  industry  by  asserting

rights to the single color shoe concept in all shades?   And

these imperial color wars in women's high fashion footwear would represent only the opening forays. What about hostile color grabs in the markets for low-fashion shoes? Or for sports shoes? Or expanding beyond footwear, what about inner linings, collars, or buttons on coats, jackets, or dresses in both women's and men's apparel?

In sum, the Court cannot conceive that the Lanham Act could serve as the source of the broad spectrum of absurdities that would follow recognition of a trademark for the use of a single color for fashion items. Because the Court has serious doubts that Louboutin possesses a protectable mark, the Court finds that Louboutin cannot establish a likelihood that it will succeed on its claims for trademark infringement and unfair competition under the Lanham Act. Thus there is no warrant to grant injunctive relief on those claims.

B.   OTHER CLAIMS

Louboutin also seeks preliminary injunctive relief on its claims for (1) trademark infringement under state law; (2) trademark dilution under federal and state law; and (3) unfair competition under state law. None of these claims can succeed absent a protectable mark. See Pirone v. MacMillan, Inc., 894 F.3d 579, 581-82 (2d Cir. 1990)

-29-

(trademark infringement under state law); <u>Maharishi Hardy</u> <u>Blechman Ltd. v. Abercrombie & Fitch Co.</u>, 292 F. Supp. 2d 535, 552 (S.D.N.Y. 2003) (trademark dilution under federal and state law); <u>Alzheimer's Found. of Am., Inc. v.</u> <u>Alzheimer's Disease & Related Disorders Ass'n, Inc.</u>, --- F. Supp. 2d ---, Nos. 10 Civ. 3314, 10 Civ. 5013, 2011 WL 2078227, at *3 (S.D.N.Y. May 25, 2011) (unfair competition under state law).[8]  Because Louboutin cannot demonstrate a sufficient likelihood that its Red Sole Mark merits protection, the Court need not consider whether YSL's allegedly infringing shoes are likely to cause consumer confusion, nor whether Louboutin is likely to suffer irreparable harm absent an injunction.

C.   <u>COUNTERCLAIMS</u>

YSL has asserted counterclaims for cancellation of the Red Sole Mark and for damages.  If a motion for summary judgment were brought, the Court's conclusion that the Red Sole Mark is ornamental and functional in its fashion industry market would compel it to grant partial summary

---

[8] The Court notes that Louboutin's claim for unlawful deceptive acts and practices, although not a basis for its motion for a preliminary injunction, similarly would fail in this context.  <u>See</u> <u>R.D. Corp. v.</u> <u>Jewelex New York Ltd.</u>, --- F. Supp. 2d ---, No. 07 Civ. 13, 2011 WL 1742111, at *5 (S.D.N.Y. May 4, 2011) (dismissing claim for unlawful deceptive acts and practices under New York General Business Law § 349 because it arose out of a dispute between competitors involving trademark infringement).

judgment in favor of YSL on YSL's counterclaims seeking cancellation of Louboutin's mark.   However, no motion for summary judgment is before the Court, and discovery has not formally closed.   Consequently, Louboutin is entitled to certain "procedural safeguards" before the Court may sua sponte dispose of its claims.   See First Fin. Ins. Co. v. Allstate Interior Demolition Corp., 193 F.3d 109, 115 (2d Cir. 1999).   While, in the Court's view, the ample record developed in connection with the preliminary injunction briefing obviates the need for further discovery, the parties must be provided notice and a reasonable time to respond before the Court may consider whether judgment as a matter of law is warranted.   See Fed. R. Civ. P. 56(f).

Summary judgment as to YSL's counterclaims for cancellation of the mark would not dispose of the entire case, because YSL's counterclaims for tortious interference with business relations and unfair competition would remain.   Nevertheless, the Court recognizes that the validity of Louboutin's Red Sole Mark is the heart of this litigation, and following the final resolution of that issue in this forum would be the most appropriate time for Louboutin to take an appeal to the United States Court of Appeals for the Second Circuit.   See Fed. R. Civ. P. 54(b);

-31-

see, e.g., Mech. Plastics v. Titan Techs., Inc., 823 F. Supp. 1137, 1151 (S.D.N.Y. 1993).

### III. ORDER

For the reasons stated above, it is hereby

**ORDERED** that the motion (Docket No. 17) of plaintiffs Christian Louboutin S.A., Christian Louboutin, L.L.C. and Christian Louboutin individually (collectively, "Louboutin") for a preliminary injunction is DENIED; and it is further

**ORDERED** that counsel for all parties are directed to appear for a case management conference on August 17, 2011 at 2:00 p.m., at which Louboutin shall show cause why the record of this action as it now exists should not be converted into a motion for partial summary judgment cancelling Louboutin's trademark at issue here for the reasons stated in the Court's decision above.

**SO ORDERED.**

Dated:     New York, New York
           10 August 2011

VICTOR MARRERO
U.S.D.J.

-32-